QUINN EMANUEL URQUHART & SULLIVAN, LLP
Adam Wolfson (SBN 262125)
adamwolfson@quinnemanuel.com
Joseph Sarles (SBN 254750)
josephsarles@quinnemanuel.com
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone:  (213) 443-3000
Facsimile:  (213) 443-3100

Stephen A. Swedlow (*pro hac vice* forthcoming)
stephenswedlow@quinnemanuel.com
David A. Nelson (*pro hac vice* forthcoming)
davenelson@quinnemanuel.com
191 N. Wacker Dr., Suite 2700
Chicago, IL 60606
Telephone:  (312) 705-7400
Facsimile:  (312) 705-7401

*Attorneys for Plaintiff SaurikIT, LLC*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAURIKIT, LLC<br><br>                               Plaintiff,<br><br>          v.<br><br>APPLE INC.,<br><br>                               Defendant. | CASE NO. _____<br><br>**COMPLAINT**<br><br>JURY TRIAL DEMANDED |

## <u>TABLE OF CONTENTS</u>

<u>**Page**</u>

I.      INTRODUCTION ..................................................................................................1

II.     THE PARTIES .....................................................................................................3

III.    JURISDICTION AND VENUE ..........................................................................4

IV.     INTRADISTRICT ASSIGNMENT ...................................................................4

V.      RELEVANT FACTS ...........................................................................................5

        A.      CYDIA—THE INNOVATOR THAT LED APPLE TO CREATE THE
                APP STORE ............................................................................................5

        B.      APPLE MONOPOLIZES THE IOS APP DISTRIBUTION AND IOS APP
                PAYMENT PROCESSING MARKETS ................................................8

                1.      Apple Belatedly Launches Its Own App Store ...............................8

                2.      Apple Has Monopoly Power in the Relevant Markets for iOS App
                        Distribution and iOS App Payment Processing ...........................12

                3.      Apple's Anticompetitive Conduct and the Antitrust Injury ........21

INTERSTATE TRADE AND COMMERCE..................................................................30

PRAYER FOR RELIEF..................................................................................................37

DEMAND FOR JURY TRIAL .......................................................................................37

## I.   <u>INTRODUCTION</u>

1.     In today's world, if you ask an iPhone user what is the "App Store," they will tell you it is the store that Apple includes on all new iPhones and is the distribution channel through which users locate, download, and pay for applications ("apps") for their phone.  The App Store is a huge business that generates over $50 billion annually, of which Apple generally takes a 30% cut.  It is also a source of much controversy because, just as it does in nearly all aspects of its business, Apple has wielded the power the App Store gives it over iOS app distribution ruthlessly, and in a way that has not only drawn substantial outcry from the app developer community, but also deep scrutiny from governments and regulators worldwide.

2.     What most do not know, however, is that it did not have to be this way and, in fact, is not this way (and never was) on nearly every other electronic device platform.  Historically, distribution of apps for a specific operating system ("OS") occurred in a separate and robustly competitive market.  Apple, however, began coercing users to utilize no other iOS app distribution service but the App Store, coupling it closer and closer to the iPhone itself in order to crowd out all competition.  But Apple did not come up with this idea initially—it only saw the economic promise that iOS app distribution represented after others, like the Plaintiff here, demonstrated that value with their own iOS app distribution products/services.  Faced with this realization, Apple then decided to take that separate market (as well as the additional iOS app payment processing market described herein) for itself.

3.     Plaintiff SaurikIT, LLC ("SaurikIT" or "Cydia") was founded by Jay Freeman, a preeminent software engineer.  When Apple introduced the iPhone, it failed to address the distribution of iOS apps.  Mr. Freeman realized that Apple's users wanted and needed to expand the iPhone's stock capabilities, so he developed Cydia.  With an intuitive and attractive interface, Cydia was the first comprehensive solution to fill that need and was the App Store before the App Store even existed.

4.     Cydia became hugely popular by offering a marketplace to find and obtain third party iOS applications that greatly expanded the capabilities of the stock iPhone, including games, productivity applications, and audio/visual applications such as a video recorder (whereas the

original iPhone only allowed still camera photos).  Apple subsequently took many of these early third party applications' innovations, incorporating them into the iPhone directly or through apps.

5.       But far worse than simply copying others' innovations, Apple also recognized that it could reap enormous profits if it cornered this fledgling market for iOS app distribution, because that would give Apple complete power over iOS apps, regardless of the developer.   Apple therefore initiated a campaign to eliminate competition for iOS app distribution altogether.  That campaign has been successful and continues to this day.  Apple did (and continues to do) so by, *inter alia*, tying the App Store app to iPhone purchases by preinstalling it on all iOS devices and then requiring it as the default method to obtain iOS apps, regardless of user preference for other alternatives; technologically locking down the iPhone to prevent App Store competitors like Cydia from even operating on the device; and imposing contractual terms on users that coerce and prevent them from using App Store competitors.   Apple has also mandated that iOS app developers use it as their sole option for app payment processing (such as in-app purchases), thus preventing other competitors, such as Cydia, from offering the same service to those developers.

6.       Through these and other anticompetitive acts, Apple has wrongfully acquired and maintained monopoly power in the market (or aftermarket) for iOS app distribution, and in the market (or aftermarket) for iOS app payment processing.  Apple has frozen Cydia and all other competitors out of both markets, depriving them of the ability to compete with the App Store and to offer developers and consumers better prices, better service, and more choice.   This anticompetitive conduct has unsurprisingly generated massive profits and unprecedented market capitalization for Apple, as well as incredible market power.

7.       But Apple's anticompetitive conduct has not gone unnoticed.  Regulators around the globe are currently investigating its abuses of power over iOS app distribution, iOS app payment processing, and iOS apps themselves.  The United States government, for example, recently condemned Apple as a monopolist the likes of which "we last saw in the era of oil barons and railroad tycoons."  According to a recent U.S. House Judiciary Antitrust Subcommittee report, "Apple leverages its control of iOS and the App Store to create and enforce barriers to competition and discriminate against and exclude rivals while preferencing its own offerings."   European

regulators likewise have "opened formal antitrust investigations to assess whether Apple's rules for app developers on the distribution of apps via the App Store violate EU competition rules" and are concerned that "Apple obtained a 'gatekeeper' role when it comes to the distribution of apps and content to users of Apple's popular devices."  And that is just the beginning—Apple is under investigation for its anticompetitive conduct in at least seven jurisdictions around the globe for precisely the conduct Cydia challenges here.

8.      Were it not for Apple's anticompetitive acquisition and maintenance of an illegal monopoly over iOS app distribution, users today would actually be able to choose how and where to locate and obtain iOS apps, and developers would be able to use the iOS app distributor of their choice.  This would have, in turn, forced Apple to compete for such distribution, which basic economics dictates would have carried substantial benefits to consumers and developers alike.  But Apple chose a different path and instead illegally squashed all competition for the App Store, even despite efforts, like Cydia's, to continue to compete in that market up to this day.  Apple's actions have increased prices for developers and consumers, decreased market output in multiple respects, and generally suppressed innovation because Apple simply wanted more money for itself.  Such actions are antithetical to fair competition, violate the law, and require action to prevent further harm to the market and consumers.  This lawsuit seeks to open the markets for iOS app distribution and iOS app payment processing to those who wish to compete fairly with Apple, and to recover the enormous damages Apple caused.

## II.   THE PARTIES

9.      Plaintiff Cydia is a California company with its principal place of business in Isla Vista, California.  The Cydia application is an app marketplace that seeks to expand the capabilities of the iPhone for users, including by distributing innovative applications, games, and packages.  Cydia was developed in 2008 by a programmer named Jay Freeman.  At its inception in 2008, Cydia was the most successful iOS app distributor, predating the App Store.  Apple then escalated the anticompetitive conduct described herein, which forced its later-developed App Store into a dominant position and largely shut Cydia and other competitors out of the iOS app distribution market.  Yet, even under these anticompetitive circumstances, Cydia has consistently

1   been the second-most successful iOS app distribution channel, demonstrating both the demand for

2   Cydia specifically, and for non-Apple iOS app distribution services generally.

3       10.     Defendant Apple is a California corporation with its principal place of business in

4   Cupertino, California.   Apple is likely the largest public company in the world.   Apple sells

5   hardware, in the form of iPhones, iPads, Watches, and Mac computers, as well as a number of

6   related services.   Apple controls and administers iOS as well as the Apple App Store ("App

7   Store"), which includes setting policy for the App Store and contracting with app developers and

8   consumers.

9   **III.   JURISDICTION AND VENUE**

10      11.     This Court has subject matter jurisdiction over plaintiff's federal antitrust claims

11  under the Clayton Antitrust Act, 15 U.S.C. § 26, and 28 U.S.C. §§ 1331 and 1337.   The Court has

12  supplemental jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

13      12.     This Court has personal jurisdiction over Apple because Apple's headquarters are

14  located in Cupertino, California.   Apple has engaged in sufficient minimum contacts with the

15  United States and has purposefully availed itself of the benefits and protections of both United

16  States and California law such that the exercise of jurisdiction over Apple would comport with due

17  process.   Apple has also entered into agreements with developers and consumers that require

18  related disputes to be litigated in this District.

19      13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Apple

20  maintains its principal place of business in the State of California and in this District, and because

21  a substantial part of the events or omissions giving rise to plaintiff's claims occurred in this

22  District. In the alternative, personal jurisdiction and venue also may be deemed proper under

23  Section 12 of the Clayton Antitrust Act, 15 U.S.C. § 22, because Apple may be found in or

24  transacts business in this District.

25  **IV.   INTRADISTRICT ASSIGNMENT**

26      14.     Pursuant to Civil Local Rule 3-2(c), this antitrust case shall not be assigned to a

27  particular Division of this District, but shall be assigned on a District-wide basis.   Cydia notes that

28  related cases *Cameron v. Apple Inc*., 19-cv-03074-YGR, *Epic Games v. Apple Inc.*, 3:20-cv-

05640-YGR, and *In re Apple iPhone Antitrust Litig.*, 11-cv-06714-YGR are currently pending in the Oakland Division.

## V.   **RELEVANT FACTS**

15.     Apple has injured both Cydia and competition by way of its unlawful behavior in the U.S. market(s) for (1) iOS app distribution, and (2) iOS app payment processing services.  As the holder of an improperly-obtained monopoly in these market(s), Apple's behavior has resulted in exclusionary and anticompetitive policies and contractual arrangements, reduced output and reduced innovation, and supracompetitive prices for app developers and consumers.  It has also caused Cydia substantial damages, including up to the present, due to Apple's continued anticompetitive conduct, which occurs with every new sale of every new iPhone, and with every update to the iOS operating system on existing iPhones.

### A.     **CYDIA—AN IOS APP STORE BEFORE THE APP STORE**

16.     When the first iPhone launched, it was not a "smartphone" by today's definition.[1] Although it had cutting edge hardware, the first iPhone was extremely limited in its functionality. It came with only a handful of Apple apps, like a web browser and a basic email client.[2]  There were no third party software applications available, and Apple did not even have any mechanism to allow users to download or install additional applications or features on their devices.[3]

17.     Jay Freeman was one of the first iPhone adopters and immediately recognized its promise to allow users to do far more than Apple originally envisioned.  Mr. Freeman is a preeminent software engineer who studied computer science at the University of California, Santa Barbara and has worked in the field ever since.  Among other things, he researched static analysis of platforms such as Microsoft's .NET and Java, which later became the ubiquitous software

---

[1]   https://www.businessinsider.com/first-phone-anniversary-2016-12.

[2]   https://www.computerworld.com/article/2549128/update--jobs-touts-iphone---appletv-.html.

[3]   https://www.somagnews.com/9-features-of-the-first-iphone/.

language that is the foundation of the Android operating system.  This background uniquely prepared him for his pioneering development of Cydia.

18.  Under long-standing technology industry practice—even Apple's own practice on its Mac computers—after users purchase a computing device, they are free to install whatever applications they desire, regardless of developer or origin.  Markets (or aftermarkets) for applications written for a specific OS are well-recognized and exist for nearly every category of computing device sold today.  This is because applications written for one OS do not work on a different OS, so are not substitutes for one another, even if they perform equivalent tasks or have similar purposes.

19.  Since well before Apple introduced the iPhone, and up through today, the majority of software applications have been sold in a robust distribution market involving multiple different types of distribution channels, including traditional brick and mortar stores, online websites, and OEM-provided marketplaces.  Participants in these markets compete with each other for the sale of software applications.  Thus, as an historical example, consumers were able to purchase disks with Mac software from brick and mortar stores, or could purchase the right to download that same software on the internet from Apple and then download the program directly to their computer.  In those earlier days of the internet, Apple competed with other sellers to distribute software for its devices.

20.  When Apple first introduced the iPhone, it clearly intended to follow that same precedent, as it did not itself provide a mechanism for users to locate and obtain third party applications on their devices.  While the economic potential for providing such a marketplace is now obvious in retrospect, Mr. Freeman was among the first to recognize the opportunity and to meet the needs of the market.

21.  With Cydia, which Mr. Freeman developed and programmed by himself, users suddenly could use that app to locate, obtain, and eventually pay for *other* desirable applications for their iOS devices.  This innovation was revolutionary on the then-fledgling smartphone format

and, from the outset, demand for the service Cydia provided was massive.  One of the most popular early applications, for example, was Cycorder,[4] the first video recorder app for the iPhone, which was available well before Apple's own video recording app.[5]  Mr. Freeman built Cycorder from scratch along with many other applications, and other third party developers almost immediately began programming their own applications, games, and other features, and offering them for distribution or sale in the Cydia store.[6]  Cydia not only provided a repository to browse available applications, but it permitted users to add so-called "extensions" or "packages" that made their devices easier to use and more customizable.[7]  In the years since this additional innovation, Apple has incorporated such "extensions" into its definition of apps and makes many available on the App Store today.  For example, applications available via Cydia pioneered the "control center," predictive keyboards, rich text formatting for email, accessing the camera from the lock screen, and many more features that were later (sometimes years later) incorporated by Apple into iOS or Apple's own applications.[8]

22.    Cydia was a massive undertaking that became increasingly time-consuming and complex as its popularity soared in the months and early years after its introduction.  Mr. Freeman's work to build the initial marketplace was a huge task, particularly due to the almost total lack of programming interface support from Apple in those early days.  From scratch, Mr. Freeman built the software necessary for app delivery and an app purchase mechanism, and created curation frameworks and systems for app selection.  He also broke new ground with his payment processing mechanisms, integrating the then-largest payment processors in the world,

---

[4]    https://cydia.saurik.com/info/cycorder/.

[5]    https://www.macworld.com/article/1141031/iphone3gs.html; https://www.gsmarena.com/apple_iphone_3g-2424.php.

[6]    https://masonsblogonios.wordpress.com/2011/05/31/cydia-history/.

[7]    https://wccftech.com/top-cydia-tweaks-bbm-plus-nosafarihistory-and-more/.

[8]    https://ios.gadgethacks.com/how-to/60-ios-features-apple-stole-from-jailbreakers-0188093/.

such as PayPal and Amazon.[9]  Based on this work, Mr. Freeman built a reputation for incredibly reliable and fair service.

23.     Although exact estimates vary, Cydia reached roughly 10% of iPhone users at its peak, around 2009, and despite Apple's introduction of the App Store.[10]  This meant that tens of millions of users sought out Cydia's service—first, when it pioneered the concept of an app-based iOS app marketplace on iPhones and, later, as an alternative to the App Store after Apple copied Cydia's innovations and began imposing the App Store on iPhone users in the ways described below.[11]  Indeed, hundreds of thousands of users have continued to download Cydia in each of its iterations over the years, even as Apple has done more and more with each new generation of its iOS software and devices (including the latest version) to stamp out competition for iOS app distribution.[12]  iPhone users have always wanted choice in app distribution, and Cydia, as the original innovator in this space, has always been ready, willing, and able to provide that choice.

**B.     APPLE MONOPOLIZES THE IOS APP DISTRIBUTION AND IOS APP PAYMENT PROCESSING MARKETS**

**1.     Apple Belatedly Launches Its Own App Store**

24.     Although Cydia—and the many third party developers using Cydia—were far ahead of Apple early on, Apple opened its own competitive App Store in July 2008.[13]  As it has done countless times since with other types of apps, Apple lifted many of the popular aspects of the Cydia store and incorporated them into the App Store.  For example, many of the apps and

---

[9]  Cydia was one of the largest users of Amazon Flexible Payments.  Cydia also integrated Alipay services.

[10]  https://jalopnik.com/even-toyota-is-apples-bitch-5789431 (8-9%); http://isource.com/2009/05/27/what-percentage-of-iphones-are-jailbroken-less-than-10-percent/ (7%).

[11]  https://www.businessinsider.com/jailbreak-statistics-2013-3.

[12]  https://www.businessinsider.com/jailbreak-statistics-2013-3.

[13]  https://www.apple.com/newsroom/2018/07/app-store-turns-10/#:~:text=In%2010%20years%2C%20the%20App,travel%20and%20so%20much%20more.

packages distributed through Cydia were ultimately incorporated by Apple into iOS or its own apps.[14]

25.     But, even with Apple's introduction of the App Store, there were numerous reasons that app developers and consumers still preferred Cydia instead.  With a smaller market but a reasonably large customer base, each developer with their app on the Cydia store had a higher chance of being noticed and gaining popularity (and revenue).  Cydia also offered expedited app approval compared to Apple, the latter of which is famous for the time it takes to approve apps (often, months) and is notoriously opaque in its decision making process.[15]  In the years since its inception, many iOS app developers have faced substantial difficulty getting answers to simple questions from Apple about their apps, the app submission process, listings on the App Store, and other similar issues.[16]

26.     Ever since Apple first introduced the App Store, it has preinstalled the App Store app on iPhones and made it so that users can neither remove the app nor change their default preference to any other marketplace, such as Cydia**.**  Moreover, iPhone users that do not want to void their warranty can ***only*** download iOS apps through the App Store, which Apple exclusively controls, regardless of whether the given app was made by Apple or a third party developer. Apple states that it controls which apps are available for download on every one of its Apple iOS devices.[17]  As noted, third party developers create many of these apps, but users can also only pay for the apps through the App Store, and Apple takes a 30% commission on the vast majority of all app-related purchases, from download fees to in-app purchases.[18]  In contrast, Cydia has always

---

[14]   https://ios.gadgethacks.com/how-to/60-ios-features-apple-stole-from-jailbreakers-0188093/.

[15]   https://www.theverge.com/2020/6/17/21293813/apple-app-store-policies-hey-30-percent-developers-the-trial-by-franz-kafka.

[16]   https://appleinsider.com/articles/15/04/23/apple-under-fire-once-again-for-inconsistent-app-store-rule-enforcement.

[17]   https://developer.apple.com/app-store/review/guidelines/.

[18]   https://judiciary.house.gov/uploadedfiles/competition_in_digital_markets.pdf at 98. The only exception to this commission is a recently-announced change in Apple's policy, whereby app

(footnote continued)

offered to negotiate rates with its developers and has in fact done so to offer rates lower than 30% (or even the 15% commission Apple recently announced in response to regulatory scrutiny for sub-$1 million apps).

27.     Apple also uses price controls for all app-related purchases.[19]  For example, payments from app buyers go first to Apple.  Apple then distributes a portion of the proceeds to app developers.[20]  App developers are precluded from direct contact with their customers, reducing engagement, developers' ability to provide feedback to customer issues, and denying developers more information about their customers.  In contrast, Cydia does not limit customer interaction with developers in this way, nor does it require developers to use its payment processing services; rather, many have chosen to do so throughout the years because of Cydia's excellent service.

28.     For their products to be sold in the App Store, iOS application developers enter into the Apple Developer Agreement, the Apple Developer Program License Agreement, and Schedule 2 to the License Agreement, among possibly others.

29.     An iOS app developer then must receive Apple's approval for its apps and in-app products before Apple will distribute and sell the apps through the App Store.[21]

30.     Developers can monetize their apps in several ways: a "Free Model" that enables free apps, increasing likelihood of engagement; a "Freemium Model" that makes the app download free, but users are offered optional additional features in-app that require payments; a "Subscription Model" that enables ongoing monetization through renewable transactions; a "Paid

---

developers that make less than $1 million in revenue annually will only have to pay a 15% commission.  This category of developer, however, only accounts for 5% of Apple's App Store revenue. *See* https://www.nytimes.com/2020/11/18/technology/apple-app-store-fee.html. Furthermore, the 30% commission has been in place for well over a decade, and remains hanging over all app developers that grow and become more successful.

[19]   *Id.*

[20]   *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1519 (2019).

[21]   https://developer.apple.com/app-store/review/guidelines/.

Model" that makes the app itself a paid download and offers no additional features; and a "Paymium Model" that enables paid app downloads and paid in-app content.[22]

31.    As discussed in further detail below, the iOS operating system is unique and incompatible with other mobile operating systems.[23]  Similarly, apps written for iOS do not work on other operating systems (such as Android), and vice versa.  Once a consumer purchases an iPhone, their only choice of apps for that phone are apps written for iOS, and, due to Apple's conduct, the App Store is essentially the only way in which iOS apps and in-app items can be sold to iOS device owners.[24]  Apple insists that buyers of its devices purchase apps and in-app products only through the App Store, or else void their device's warranty.[25]  To reach Apple iOS device owners, then, developers have essentially no choice but to sell via the App Store.

32.    Because of this, the App Store has become a massive commercial success.  At its inception, the store included about 500 free and commercial native applications.[26]  It has since grown exponentially and, by the release of the iPhone 5 and introduction of the iPad mini in 2012, claimed more than 25 billion app downloads.[27]  By the end of 2014, over 1.4 million apps were available in the App Store in many categories.[28]  Today, more than two million apps are available in the App Store.[29]

33.    As Mr. Freeman foresaw when he first created Cydia, apps have become an incredibly important part of the smartphone experience and are now an everyday tool in the life of

---

[22]   https://developer.apple.com/app-store/business-models/.

[23]   https://judiciary.house.gov/uploadedfiles/competition_in_digital_markets.pdf at 334.

[24]   https://judiciary.house.gov/uploadedfiles/competition_in_digital_markets.pdf at 335.

[25]   *Id.*

[26]   https://www.apple.com/newsroom/2018/07/app-store-turns-10/#:~:text=In%2010%20years%2C%20the%20App,travel%20and%20so%20much%20more.

[27]   https://www.apple.com/newsroom/2012/03/05Apples-App-Store-Downloads-Top-25-Billion/.

[28]   https://www.apple.com/tn/newsroom/2015/01/08App-Store-Rings-in-2015-with-New-Records/.

[29]   https://www.digitaltrends.com/news/apple-app-store-turns-10/.

people throughout the world.  Indeed, apps, and their in-app product purchase options, are one of the largest growing markets in the electronic commerce industry, with astonishing worldwide growth from less than $10 billion annual revenue in 2011 to an expected $189 billion by the end of this year.

34.     Apple sits atop all of these sales on iOS devices because it has anticompetitively wrested control of what was historically an unconcentrated and competitive type of market (sales and distribution of software applications for a specific OS) and interposed itself as the near sole player in that market for iOS apps.  Annually, the App Store generates over $50 billion, of which Apple takes more than $15 billion.

### 2.     Apple Has Monopoly Power in the Relevant Markets for iOS App Distribution and iOS App Payment Processing

35.     Apple possesses monopoly power in the U.S. market (or aftermarket) for iOS app distribution (*i.e.*, distribution for apps written for iOS devices), and in the U.S. market (or aftermarket) for iOS app payment processing (*i.e.*, payment processing for apps written for iOS devices, as well as in-app purchases for such apps).  Customers for each include app developers and consumers using iOS devices, and they exist as aftermarkets to iOS devices.  Each is discussed in further detail below.

(i)     iOS app distribution

36.     In designing iOS and the iPhone, Apple was faced with a problem that previously plagued its desktop and laptop computers throughout the 1980s and 1990s.  In that era, Apple took an almost entirely proprietary approach to its hardware and software.  That approach, however, severely limited the scope of Apple's software offerings and put it at a decided competitive disadvantage against others, such as Microsoft and OEMs that used the Windows operating system, who took a much more open approach to software.  Apple thus carved out only a very small, niche market share during that era, and in fact almost went bankrupt as a result.  Indeed, it was not until Apple relented and stopped trying to prevent third party developers from operating in its software application markets that its fortunes turned around.

37.     Guided by this historical lesson and by Cydia and others' early success (and popularity), Apple realized soon after introducing the iPhone that it needed to offer at least the appearance of broad choice of software to use on its new smartphone.  This was particularly so because other companies—notably, Google, Microsoft, and Blackberry—were developing their own smartphones and had a much more open history regarding third parties' ability to create and sell applications for their respective platforms.  Apple therefore, as discussed above, introduced the App Store in July 2008 and thereafter actively tried to encourage the appearance of a robust market for iOS apps.  Touting the choice and breadth of apps the App Store presumably enabled, Apple has consistently used the availability of third party applications to fuel the demand for the iPhone and its iOS operating system.  Indeed, Apple promoted the iPhone by heavily advertising third party applications and stating, "there's an app for that."

38.     Apple's efforts have succeeded to drive demand for its iOS devices, including the iPhone, in competition with devices running other operating systems.   In the U.S. alone, consumers own nearly 200 million iPhones, and tens of millions of other iOS devices, including iPads.[30]  All of those devices run only iOS applications.

39.     High switching costs prevent users from switching from one operating system to another operating system after they initially purchase a mobile device.  These switching costs increase over time for a variety of reasons, including, among other things, the cost of the mobile device (typically hundreds, if not over a thousand, dollars); the user's familiarity with the operating system and unwillingness to learn a different operating system; the user's familiarity with apps on that operating system; the users' costs sunk into purchased applications that are not compatible with other operating systems, which is amplified by the restrictions on the App Store and the inability of App Store developers to communicate freely with their users; and the costs of hardware purchased to support the mobile devices utilizing that operating system (*e.g.*, power cords, wireless mouse/keyboards, wireless headphones, other device-specific peripherals), which

---

[30]  https://www.statista.com/statistics/242269/apple-iphone-in-the-usa-sales-since-2nd-quarter-2007/.

would have to be incurred anew if the user switched to a different type of device.  Moreover, switching costs for mobile devices—particularly for iOS devices, due to Apple's typically extreme practices—have increased dramatically in recent years with the advent of cloud computing, which, *inter alia*, allows users to store their files on the "cloud" (*i.e.*, not directly on their device).  As specifically relevant to Apple, iOS users' photos, videos, music files, and other personal files are often stored on iCloud and only accessible on other Apple devices.  Although users may obtain copies of those files, Apple has made doing neither easy nor intuitive, and thus made it very difficult for users to effectuate this kind of transition.  This means that iOS users become more and more locked into iOS devices, because they wish to have continued access to their personal files— and this is a switching cost they have little ability to understand or appreciate before purchasing an iOS device.

40.     These high switching costs, which were (and are) not readily apparent to the vast majority of iPhone users before they purchase their devices, were nevertheless apparent to Apple early on.  This led it to realize that it could make enormous additional profits if it exerted complete control over the various aftermarkets into which iPhone users were locked once they purchased their device.  As noted above, one of these markets was for iOS app distribution, which, based on historical practice (as well as Apple's ex-iOS practice) was a market characterized by third parties competing with Apple for the distribution and sale of apps for iOS devices.  Once it realized (based on Cydia and others' example) that iOS app distribution was a significant opportunity and that smartphones made electronic app distribution uniquely attractive and profitable, Apple took drastic steps to, *inter alia*, ensure that it controlled every aspect of iOS app distribution, preinstalling the App Store app as the sole marketplace and distributor for iOS apps instead of more traditional channels, such as developers' websites, general websites, competing electronic marketplaces, and even brick and mortar stores.  Apple exerted this control because, once it forced its way into that gatekeeper role, Apple was able to completely control the aftermarket for iOS apps (via its power over iOS app developers who wanted to sell to iOS device users) and accordingly increase its profits at an exponential rate.

41.     As noted above, today, users who want apps on their iOS devices *must* download those applications from Apple's iOS App Store app.   By technological design and contractual restraint, Apple does not allow other third party services to distribute iOS apps.   Furthermore, Apple has designed iOS in such a way that no iOS app distributor is available or largely even useable on iOS devices.   In this way, Apple is significantly different than other companies.   For example, in the Android operating system, Android users can download Android applications from multiple application marketplaces—including Google's Play Store, Amazon's Appstore, and Samsung's Galaxy Store.   Apple takes multiple, active steps to prevent anything similar for iOS devices, including both technologically *and* contractually preventing users and application developers from circumventing that prohibition.

42.     All of this is highly problematic because, as also noted above, apps must be designed to run on a specific operating system.   A device running iOS can only run apps designed for iOS.   Thus, once a user selects iOS as their operating system by purchasing an Apple device, that user can only run applications designed for iOS on their device.   This means that, for iOS users, apps written for other operating systems are not interchangeable at all with iOS apps, because they cannot be used on an iOS device.   Put differently, iOS apps exist in an aftermarket, much the same as Windows apps exist in their own aftermarket and Android apps exist in their own aftermarket.   The operating system on a user's device, once they purchase that device, defines and limits the universe of apps from which they can choose any alternatives (let alone reasonable alternatives).

43.     App developers, who are also customers in the iOS app distribution market— because the app distributor(s) offer a service and product that facilitates locating, selling, and installing the developer's app—face a similar reality.   The existence of other mobile device operating systems is meaningless to developers who program apps and in-app products for use on iOS devices, because it does not change the markets into which those apps are sold and developers cannot take a one-size-fits-all approach to app development.   Developers may learn to code in the Swift or Objective-C programming languages—*i.e.*, the two main programming languages for iOS apps—and they and their employees, if any, may not know how to code in a different

programming language applicable to devices running on a different operating system. Regardless of what programming languages they know, however, developers cannot simply run a program to convert iOS applications to the code used for a different operating system environment in the way that one might convert a Word document to a PDF; instead, the apps must be written anew in the code for that device or system.

44.    Based on these differences, a move away from the iOS system would mean that a developer could no longer offer its iOS apps or in-app products to tens of millions of consumers (who would have no other way to buy these products for their devices), and the developer would have no substitute available, because it could not sell its iOS app(s) into a different market for mobile apps, such as for the Android or Windows operating systems.  And, even if one engaged in the time and expense to reprogram an iOS app for Android, Windows, etc., distributing it through an app distribution service geared toward apps written for that other operating system would have (and has) no effect on Apple's pricing for iOS app distribution services.[31]

45.    Thus, other app distribution services for other operating systems offer no competitive downward pressure on iOS app distribution pricing. Google's distribution services, which are tied to offerings in its Google Play store, do not cover iOS products—only Android OS products distributed via Google Play. The same is true of Amazon.com's distribution services, which are tied to its app distribution service—these, too, are solely for Android OS products, and never for iOS items.

46.    In  previously-filed  legal  actions  regarding  Apple's  App  Store-related anticompetitive conduct, Apple has argued that consumers sometimes have multiple devices running different operating systems, and that this somehow means there is not a market (or aftermarket) for iOS app distribution.  Such an argument, however, is factually incorrect.  As an initial matter, different types of computing devices are not reasonable substitutes for one another,

---

[31]  Moreover, even app developers that offer cross-platform apps (*e.g.*, Minecraft, Epic) can exert no pricing pressure on Apple for iOS app distribution by using marketplaces for other OS's

(footnote continued)

due to both switching costs and imperfect information.  (A user will not buy a laptop, for example, just because they want to avoid restrictions on a phone or tablet.  They purchase the laptop because of its unique form factor and the computing purposes to which the user wants to put the device.)  But, even if this were not the case, consumers typically purchase and use just one smartphone mobile device at a time.  The same goes for other types of computing devices, such as tablet computers or laptops.  The apps available to a consumer are therefore typically confined to the operating system on each device; it is not as if the typical user has one smartphone for email, one smartphone for playing games, and one smartphone for watching videos.  But, even if that were the case, on each device a user owns and uses, they can only run apps written for that device's operating system.  Thus, if a consumer has an iPhone and a Windows laptop, they will need apps written for iOS and Windows, respectively, even if those apps perform the same essential functions (*e.g.*, web browsing, email, etc.).

47.     Notably, Apple admits that it shuts out all competition from app distribution to iOS device consumers, ostensibly to protect its device customers from bad apps and malware. But this is overblown pretense.[32]  There is no reason to believe that Cydia or other reputable vendors could not host an app store and provide a trustworthy app distribution system if Apple were to cease excluding and undermining competitors; indeed, Apple's smartphone competitors (*e.g.*, Google) explicitly permit competing app distribution services, which shows that Apple's actions and justifications to the contrary are pretense.  Apple also permits third party app distribution to its macOS-compatible devices.

(ii)     <u>iOS app payment processing</u>

48.     Since they first began offering iOS apps, many third party developers have not only sold those apps for a fee up front, but also built purchase options into their apps, such as upgraded

---

apps.  This is because, for cross-platform apps, different operating systems are *complements*, not substitutes.

versions of the app, special game options (*e.g.*, tokens, special outfits, extra characters, etc.), subscriptions to an app-based service, or other features not offered as part of the initial app download.   In order to effectuate such purchases, the app developer must use a payment processing service.   That service takes the user's payment information and runs it through the appropriate credit, debit, or other payment network to complete the sale.

49.     In order to maximize the user experience, app developers prefer that any payments occur in-app.   This is because directing a user out of the app to complete a purchase reduces engagement with the app and increases the chance that the user will not complete the purchase transaction, due to the higher "friction" of the experience.   Accordingly, as a practical matter, developers must include payment options directly in their apps, else they risk losing consumer engagement.

50.     Just as distribution for software for a specific OS has historically been a robust and separate market from the devices running that OS, so, too, has payment processing for apps written on different OSes.   Application developers on Windows machines, for example, had multiple different options to process payments made through their software, including proprietary systems or third party options.   That practice continues to this day outside of the iOS ecosystem, including in Apple's macOS ecosystem.

51.     Nevertheless, similar to iOS apps themselves, a payment processing service for iOS apps must be written specifically for iOS.   More specifically, in order to work, the payment processing service must be able to integrate into and/or interact with not only the app itself, but also certain portions of the broader operating system.   The only available alternatives for iOS app developers are thus payment processing services written for iOS.

52.     Similar to iOS app distribution, Apple realized early on that controlling iOS app payment processing by excluding competitors would generate massive profits for itself.   Apple

---

[32]  For example, Apple allows developers that pay it extra for "enterprise" accounts to avoid many of the so-called security restrictions of the App Store.  *See*

(footnote continued)

therefore began to impose contractual terms that iOS developers agree to exclusively use Apple for app payment processing, else face exclusion from the App Store.  Apple was able to impose these terms and coerce app developers into agreeing to them because of its monopoly power over iOS app distribution.  The net result was to make Apple the sole option for iOS app payment processing, even when app developers wanted other options due to the high commission (30%) that Apple charged for such processing.  Apple recently announced that it plans to lower its 30% commission for businesses reporting "proceeds" of less than $1 million per year.[33]  This policy change demonstrates that Apple was always able to compete on price and that any justifications it provides for the 30% commission are pretextual in nature and not procompetitive. The truth is that, based on its substantial monopoly power, Apple chose to charge excessive royalties to developers that would have been particularly inclined to seek out competitive services such as Cydia.

53.     One particularly notable example of Apple's dominance of this market is Spotify. In an attempt to get around Apple's burdensome commission for its app payment processing service, Spotify began directing iOS app users to its website when they wanted to purchase a subscription to its music streaming service.  In exchange for the inconvenience of leaving the app to make a purchase (which greatly detracted from the user experience), Spotify offered a lower subscription fee.  If users nevertheless purchased a subscription through the iOS app instead, Spotify charged a higher fee because of Apple's 30% tax.  In response, Apple threatened to kick Spotify off the App Store if it did not use Apple's iOS payment processing service and did not charge a uniform (higher) fee across all types of devices.  Spotify was forced to comply, although it complained to regulators, because it had no other option for iOS app payment processing.[34]

---

https://developer.apple.com/programs/enterprise/.

[33]   https://developer.apple.com/news/?id=i7jzeefs.

[34]   Faced with such public scrutiny, Apple agreed that Spotify user subscriptions would only be subject to the 30% commission for the first year, and then drop to 15% every year after.  But

(footnote continued)

54.     Most other iOS app developers do not even have the option to fight back in the way Spotify did.   Instead, they must simply toe the line and obey Apple's command, despite the widely-held desire to avoid Apple's commission for app-related payments in whatever ways possible.   But, because they cannot do so without risking complete exclusion from the App Store, they must comply and, for any app-related payment, use Apple's iOS app payment processing service and none other, despite that alternatives exist and are available.

(iii)     <u>Monopoly power</u>

55.     As the above facts indicate, Apple clearly has monopoly power in both relevant markets (or aftermarkets).   Apple has complete control over prices in both markets and is able to raise them at will.   For example, in both markets, Apple can (and does) charge whatever it wants for its commission.   This has led to Apple charging a much higher commission, and in far more instances, than would have otherwise occurred in a market in which Apple had competitors who could have, *inter alia*, charged lower commissions, offered better benefits in exchange for their commissions, reduced the number of instances in which they charged commissions, or other competitive acts constraining Apple's pricing behavior.   Next, as discussed above, Apple has the absolute power to exclude competitors from each market.   Next, due to its anticompetitive conduct, Apple has obtained and maintained nearly 100% market share in each relevant market. Finally, Apple's monopoly power in each market is protected by high barriers to entry, including (a) the required investment to build and maintain an app store and/or a payment processing service for iOS devices, (b) requisite software and algorithms for an app store and/or a payment processing service, (c) intellectual property licensing requirements, (d) the scale necessary to achieve cost efficiencies, and (e) Apple's exclusionary and anticompetitive conduct.

56.     App developers cannot constrain Apple's anticompetitive conduct in the iOS app distribution or iOS app payment processing markets by declining to develop apps for iOS. If a developer does not develop apps for iOS, the developer must forgo *all* of the one billion plus iOS

---

the 30% tax on the first year is itself the damaging tax, and Apple forces this on Spotify in order to
    (footnote continued)

users. No developer has sufficiently important or attractive apps to overcome the network effects and switching costs associated with iOS to entice enough iOS users to leave iOS, such that developing apps solely for other platforms would be profitable.  Thus, developers need to be on iOS.

57.    Similarly, competition in the sale of mobile devices does not constrain Apple's power in the iOS app distribution or iOS app payment processing markets (or aftermarkets) because, as discussed above, iOS device users face substantial switching costs and lock-in to the iOS ecosystem. Further, regardless of competition in the sale of mobile devices, competition at the smartphone level would not constrain Apple's power in the iOS app distribution market because consumers cannot adequately account for and therefore constrain Apple's anticompetitive conduct through their purchasing behavior. The same is true of competition at the tablet level.

58.    The relevant geographic market for each market is the U.S.  There are no material geographic barriers to competition for iOS app distribution or iOS app payment processing.

59.    Apple is also an attempted monopolist in the U.S. markets (or aftermarkets) for iOS app distribution and iOS app payment processing.  Given that the facts alleged amply support a finding that Apple has always maintained monopoly power in these markets, they no doubt support a finding that Apple is attempting to monopolize both by improper, intentional means.

### 3.    Apple's Anticompetitive Conduct and the Antitrust Injury

60.    Apple has harmed competition by excluding competitors for iOS app distribution and iOS app payment processing through a variety of unreasonable, exclusionary, and predatory means.  Historically, Apple did not exclude such competition, as there were, for example, robust markets for distributing Mac apps (*e.g.*, brick and mortar stores, websites, multiple different online marketplaces) and for payment processing on Apple devices (*e.g.*, app developers' proprietary payment processing services, PayPal, etc.).  Given the profits Apple realized it could reap,

---

make its own Apple Music service appear more attractive, price-wise.

1   however, by entering those markets itself and controlling them through iOS, it changed course and

2   now unreasonably excludes nearly all competition.

3                    (i)      Anticompetitive conduct in iOS app distribution

4          61.    Apple's practices in the iOS app distribution market are particularly insidious with

5   respect to Cydia and other alternative app stores because those competitors not only act as an

6   alternative to the App Store in general, but—particularly for Cydia—also provide a distribution

7   channel for apps that Apple rejected from the App Store due to Apple's extensive business

8   conflicts and predatory/exclusionary practices.   For example, Apple banned apps from its App

9   Store that supported Google Voice because, on information and belief, Apple sought to advantage

10  its own services over Google's.[35]   Apple has also at times imposed restrictions on applications that

11  can utilize cellular service, including an app called Slingplayer, and others.   Apple has banned

12  apps that have been used by peaceful protesters,[36] and has also worked with hackers that leveraged

13  iOS apps to suppress migrant and minority groups.[37]   Apple routinely punishes app developers that

14  speak out against its policies, including Epic (the maker of Fortnite that is currently embroiled in a

15  lawsuit against Apple), or those that work to support fair competition in the app distribution

16  market, like Toyota.[38]

17         62.    Apple has consistently tried to snuff out alternative app stores (of which Cydia is

18  and has always been the largest) and has effectively limited them to just a tiny swath of iPhone

19  owners.   To this end, Apple first attempted to argue it was illegal for iPhone owners to fully

20  control their own devices, as they do on Apple's Mac devices, and use distribution channels like

21  Cydia.   Apple filed a 27-page argument with the U.S. Copyright Office stating that obtaining the

22  sort of access necessary to implement Cydia would or should be illegal.   However, Apple lost that

23

24         [35]   *See* https://daringfireball.net/2009/08/apples_fcc_response.

25         [36]   https://www.vox.com/recode/2019/10/23/20927577/apple-hong-kong-protest-app-

26  democracy; https://www.nytimes.com/2019/10/09/technology/apple-hong-kong-app.html.

27         [37]   https://www.reuters.com/article/us-apple-cyber/apple-says-uighurs-targeted-in-iphone-

    attack-but-disputes-google-findings-idUSKCN1VR29K.

28

1   battle decisively; the Copyright Office found that such activities were not illegal, and in fact are

2   supported by the copyright laws.

3       63.     Given this loss, Apple turned to contractual and technological restraints to exclude

4   Cydia and other iOS app distributors.  Over the years, Apple has continuously modified its App

5   Store policies to preclude iOS app developers from attempting to distribute their apps through any

6   channel except the App Store, and it has selectively and arbitrarily enforced those policies to make

7   it more difficult for Cydia and all other iOS app distributors to compete.  Apple has taken similar

8   steps with respect to iOS payment processing services.  For example, Apple specifically revised its

9   developer program license agreement to prohibit developers from facilitating distribution of apps

10  from any source other than the App Store, and it has on multiple occasions paused or delayed app

11  approval if app developers do not add more revenue-generating features for Apple, such as in-app

12  purchases.   iOS app developers have no choice but to abide by these obligations if they wish to

13  sell their apps in the iOS app market, and they agree when they become iOS developers to adhere

14  to every new iteration of the App Store policies.  Apple thus coerces them into only using the App

15  Store (else face effective exclusion from iOS users) and into only using Apple's iOS payment

16  processing services.

17      64.     Apple has also continuously implemented ever more restrictive measures to prevent

18  users from gaining access to their devices and installing Cydia as a competitive app store.  Its first

19  efforts in this regard—which it has included on each new iPhone sold for nearly a decade, and in

20  updates to iOS throughout that time—Apple created technical restrictions it built into iOS that

21  largely prevent users from downloading and installing competing app stores or apps that are made

22  available directly on websites.  Apple placed technical restrictions on app installation through

23  entitlements and code signing to prohibit competition in this way.  Consequently, developers of

24  subscription-based mobile gaming services were (and are) required to distribute apps through the

25

26  _____

27  [38] https://jalopnik.com/even-toyota-is-apples-bitch-5789431.

28

App Store and consumers must use the App Store to download these apps to their iOS devices; there is no alternative.

65.     More recently, Apple made these technical restrictions even more pervasive by introducing runtime code modification prevention, pointer authentication, physical map codesigning, memory tagging extensions, and other control mechanisms that specifically target and prevent Cydia from competing with Apple because they effectively prevent users from using Cydia or any other alternative app store on iOS at all—even if they wish to modify their phone through lawful means.  These restrictions threaten to completely wipe out Cydia's ability to serve its users, and are the primary impetus for the timing and urgency of Cydia's Complaint.

66.     Apple also pre-installs the App Store app on the home screen of every iOS device it sells and disables users' ability to uninstall the App Store app or to make any other app marketplace or iOS app distribution channel their default.  Apple does not permit any other app stores on iOS devices, both through the technical restrictions described above and through its contractual policies, such as the Apple Developer Agreement, Section 3.2.2.  It also prevents users from downloading apps through websites, and punishes app developers that attempt to utilize such means.

(ii)     iOS app payment processing

67.     With respect to iOS app payment processing, Apple wields its power over iOS app distribution to force iOS app developers to agree to use Apple's iOS app payment processing services to the exclusion of all others, including both the app developers' own processing services and third party services.  iOS app payment processing service providers, such as Cydia, therefore have no ability to provide such services to iOS app developers.

68.     More specifically, Apple imposes unreasonable restraints and unlawfully maintains its monopoly in the iOS app payment processing market through several anticompetitive acts, including contractual and policy restrictions on app developers.  There is no procompetitive justification for these anticompetitive acts.

69.     Developers seeking to distribute their apps on the App Store are required to follow Apple's App Store Review Guidelines or risk Apple rejecting or removing their app from the App

Store. (Developer Agreement § 6.3, Ex. A.)  Section 3.1.1 of these guidelines provides that "if you [the developer] want to unlock features or functionality within your app, (by way of example: subscriptions, in-game currencies, game levels, access to premium content, or unlocking a full version), you must use in-app purchase. Apps may not use their own mechanisms to unlock content or functionality . . . Apps and their metadata may not include buttons, external links, or other calls to action that direct customers to purchasing mechanisms other than in-app purchase . . . .""

70.    Additionally, Section 3.1.3 of the guidelines provides that developers may not "directly or indirectly target iOS users to use a purchasing method other than [Apple's] in-app purchase, and general communications [to users] about other purchasing methods [must not be] designed to discourage use of [Apple's] in-app purchase . . . ."

71.    These guidelines describe Apple's anticompetitive tying policy: an app developer's access to the App Store—the only means to reach Apple's substantial iOS user base—is conditioned on the developer's use of Apple's payment processing services to process payments for apps and in-app content. But Apple's policies take it yet another step further, gagging developers from even informing users of other payment options outside the app or from discouraging its users from using Apple's payment system.  These policies serve to cement Apple's monopoly position in the iOS payment processing market (or aftermarket).

(iii)   <u>The harm to competition from these anticompetitive acts,</u>

<u>and Cydia's antitrust injury</u>

72.    In each of the above scenarios, iOS users are unable to constrain Apple's anticompetitive activities in either of the relevant markets (or aftermarkets) because (a) much of Apple's behavior is behind the scenes and invisible to them; (b) they have little ability to learn about Apple's behavior before they make an iPhone or other iOS device purchase; (c) they become locked into their smartphone or other mobile device purchase at the time of purchase, due to the cost, investment, and longevity of the purchase and associated service contract; and (d) they even become more locked into iOS over time, for the reasons previously discussed.  Similarly, iOS app developers are unable to constrain Apple's anticompetitive activities because, if they do

not accede to its demands, they are unable to sell into the iOS app market at all.  Accordingly, Apple's power has only grown over each of the markets over time, and both iOS users and developers are less and less able to act as a brake on Apple's power and anticompetitive activities.

73.     Unfortunately, iOS users' and developers' inability to discipline Apple's misbehavior means that it is able to harm them and competitors in myriad, all-too-inevitable ways. As noted above, Apple excludes competitors in iOS app distribution and iOS app payment processing, which has the effect, first and foremost, of removing constraints on its pricing behavior.  This has led to higher prices for both iOS app distribution and iOS app payment processing, including the 30% commission Apple historically charged for all iOS app-related revenues the App Store generates, and which it continues to charge for any successful app developer today.[39]  Apple's conduct has also reduced market output, reduced market innovation, and plainly reduced both developer and iOS user choice, despite obvious demand for competition to both the App Store and Apple's iOS app payment processing services.  These negative competitive effects impact developers and end users directly, because Apple is able to offer lower-quality products at supracompetitive prices with impunity, because it has no fear that doing so will cause it to lose market share or power.  These anticompetitive effects are discussed in further details below.

74.     As a result of its anticompetitive conduct, Apple is also able to pile on additional unnecessary fees, because iOS app developers cannot fight back.  One example is a $99 annual fee Apple collects from all developers who wish to sell their products through the App Store.  In June 2017, Apple introduced Rule 4.2.6 into the App Store guidelines which gave it the right to ban any

---

[39]  Apple's November 18, 2020 reduction to the commission for developers that generate less than $1 million in proceeds annually does not undercut this fact.  Such developers represent only 5% of the App Store's annual revenues, and they become subject to the higher 30% commission if they are lucky enough to grow. They cannot escape either commission, and cannot use competition to push back against the prices Apple charges. Put in its simplest terms, the recent commission reduction was a PR move, made in response to ever-increasing regulatory scrutiny and a growing recognition that Apple has acted anticompetitively for years. But it still does not change the fundamental problems presented by Apple's continuing and historic illegal, monopolistic conduct.

apps that share a code base or template with another app.  The rule was subsequently revised in December 2017 so that template apps could be submitted to the App Store again.  In this context, Apple made an important change: to successfully submit apps, developers must create a new developer account for each client app—meaning each account required the developer to pay a separate $99 annual fee for each business.  Had Apple not illegally monopolized the market for iOS app distribution, developers either would not have had to pay such an annual fee, or Apple would have had to compete on price for the fee with other competitors, such as Cydia.

75.     Apple also dictates minimum and greater price points, which prevent developers from offering paid products at less than $.99 or at price points ending in anything other than $.99. This pricing mandate inhibits sales and output in app and in-app transactions. There is no lawful justification for this transaction-inhibiting restraint, and, again, faced with competition from alternative distribution channels such as Cydia, Apple would have had to compete to allow more flexibility in pricing for iOS apps.

76.     The facts and circumstances of app and in-app product distribution do not give rise to any procompetitive justification for Apple's contractual pricing mandates, and Cydia's pricing shows that an app store need not price in the overly burdensome and rigid way Apple does. Cydia, for example, often negotiated over distribution fees with individual developers, negotiated over app featuring and advertising, and generally provided a flexible approach.

77.     Further underscoring that Apple's pricing for the App Store and its iOS app payment processing services have no legitimate procompetitive justifications, other mobile device ecosystem providers that also provide a marketplace for apps for their mobile OS act in far less restrictive, yet equally effective ways to attract developers to the mobile platform.  For example, Microsoft recently announced at its Build 2018 conference a new revenue sharing model for app sales in the Microsoft Store where up to 95% of the revenue from consumer applications, including both individual applications and in-app purchases, will go to the developer.   The Microsoft rates contrast with Apple's supra-competitive 30% rate for the vast majority of app and in-app products.

78.     Apple's monopolistic practices in the U.S. markets (or aftermarkets) for iOS app distribution and iOS app payment processing eliminate competition and stifle innovation and choice. Further, Apple harms consumers, developers, and competition by depressing output. Evidence shows that consumers of app store products are price sensitive.  Apple's overly expensive costs, fees, and pricing inhibit sales of products sold via the App Store.  Developers and would-be developers, who can only earn 70% on the dollar on each paid app or product, in addition to paying $99 annually (or more for multiple apps) to gain entry to the App Store, undoubtedly think very hard about whether to spend the effort, time, and energy that is required to design and program an app or related product, bring it to market in the single store available, and hope to recoup costs and make a reasonable profit.  For many, the calculus makes no economic sense.  This process leads to less output in sales and distribution transactions for developers, and thus less output in both the iOS app distribution and iOS app payment processing markets overall.

79.     Apple's anticompetitive behavior also stifles innovation in the U.S. market for iOS app and in-app-product distribution services. For example, Amazon.com devised an alternative way of distributing Android OS apps, Amazon Underground, where Amazon pays developers according to how much time consumers spend interacting with the apps.  Yet, Apple's contracts and practices would not allow to utilize such a model.

80.     Apple's abusive tactics also stifle innovation in apps—another way it hurts competition (and users and developers) generally.  When Cydia first started distributing apps, it also distributed "extensions" and "packages," which modified the user's iPhone experience. Apple initially prohibited such packages on its App Store, but later changed its mind once it saw user demand for such applications.  Since then, Apple has added "extensions" and "packages" into its definition of "apps," but it slowed down the adoption of such innovations due to an overly narrow view of what it viewed as "appropriate" for the App Store.  Cydia, meanwhile, innovated and allowed such creative applications in its marketplace from its earliest days, which clearly responded to consumer demand for a customized iPhone experience.  By largely excluding Cydia and other app store competitors, and by taking an iron hand approach to what it views as "permissible" for the iPhone, Apple reduces the number of locations app developers can feature

their apps, and prevents them from innovating in any ways that Apple does not prefer. Consumers, as well as developers and competition generally, benefit from other venues, like Cydia, that host iOS apps and, like Cydia has always done, encourage the development of more and better types of apps—including categories that break the mold in term of what "apps" can do.  All of these results would engender far more innovation and consumer choice, but are stifled by Apple's dominance over iOS app distribution.

81.     Apple also harms app developers by denying them the opportunity to choose other means to be compensated for their work. Apple's aggressive, anticompetitive behavior diminishes the choice offered by other marketplaces or distribution channels.  Finally, Apple depresses output by being the sole avenue for the distribution of iOS apps and in-app products.  This leads to fewer sales, which in turn leads to fewer distribution transactions and fees.

82.     But for Apple's restrictions, would-be competing app distributors, such as Cydia, could provide consumers and developers choice beyond Apple's own App Store and inject healthy competition into the market. These stores could compete on the basis of (among other things) price, service, and innovation. Competitors could innovate by (among other things) curating the apps available on a competing app store (such as offering selections of apps in particular categories of consumer interest, like gaming, travel, or health), providing more reliable reviews and other information about the apps, showing or advertising apps in different ways, or offering different pricing schemes. For example, in the personal computer space (including Macs), software can be purchased through many different sellers, including online stores provided by an application developer.

83.     Apple's conduct also increases consumers' costs. Apple's market power permits it to impose a supracompetitive tax on the price of apps purchased through the App Store and payments made through iOS apps—a rate that is far higher than what could be sustained under competitive conditions. Consumers bear some or all of that tax in the form of higher prices or reduced quantity or quality of apps.

**INTERSTATE TRADE AND COMMERCE**

84.     Apple's conduct has taken place in and affected the continuous flow of interstate trade and commerce of the United States, in that, *inter alia*:

(a)     Apple has provided iOS app distribution and iOS app payment processing services throughout the United States;

(b)     Apple has used instrumentalities of interstate commerce to provide iOS app distribution and iOS app payment processing services throughout the United States;

(c)     In furtherance of the anticompetitive scheme alleged herein, Apple employees have traveled between states and have exchanged communications through interstate wire communications and via U.S. mail; and

(d)     The anticompetitive scheme alleged herein has affected billions of dollars of commerce.  Apple has inflicted antitrust injury by artificially excluding Cydia and other competitors, raising prices paid by developers and consumers, and causing the other antitrust injuries described herein.

**COUNT I**

**Sherman Act Section 2 – Monopolization (15 U.S.C. § 2)**

85.     The foregoing paragraphs are incorporated by reference as though fully set forth herein.

86.     Apple has willfully acquired and maintained monopoly power in the relevant markets for iOS app distribution and iOS app payment processing.

87.     Apple possesses monopoly power in the relevant market for iOS app distribution and iOS app payment processing.  Apple has the power to control prices or exclude competition in the relevant markets.

88.     Apple has nearly 100% market share in each of the relevant markets, and there are substantial barriers to new entry in each relevant market.

89.     Apple has willfully acquired and maintained monopoly power in the relevant markets, by means of predatory, exclusionary, and anticompetitive conduct, including but not

limited to lock-in, tying arrangements, coercion of disloyal developers, vertically-arranged boycotts, and leveraging, as alleged herein.

Aftermarket monopolization

90.     Due to the information and switching costs described above, iOS device purchasers become locked in to their purchase after making their initial purchase, and then become more locked into the iOS ecosystem over time.

91.     Once users were locked into iOS devices and the iOS ecosystem, Apple utilized the power that lock-in conferred in order to exclude competition in the iOS app distribution and iOS app payment processing markets (or aftermarkets), as described herein.

92.     Apple's actions, based on the lock-in it obtained has impeded its competitors' ability to compete in both the iOS app distribution and iOS app payment processing markets (or aftermarkets).

Tying arrangements – iOS devices and iOS app distribution

93.     iOS devices are sold in the U.S. smartphone market, but, as described above, Apple obtains lock-in monopoly power over iOS device users once they select an iOS device for purchase.

94.     iOS devices and iOS app distribution are two separate services or products.

95.     Apple has conditioned the operation of an iOS device, as well as the warranty on such a device, on the use of its iOS app distribution service (the App Store).

96.     Apple has sufficient economic power over locked-in iOS device users to enable it to restrain trade in the relevant market for iOS app distribution.

97.     Apple's conduct has affected a not insubstantial amount of interstate commerce in iOS app distribution.

98.     Apple's conduct has had an anticompetitive effect in the relevant market for iOS app distribution.

Tying arrangements – iOS app distribution and iOS app payment processing

99.     iOS app distribution and iOS app payment processing services are two separate services or products.

31

100.    As described herein, Apple has conditioned the provision of iOS app distribution on the use of its iOS app payment processing service.

101.    Apple has sufficient economic power in the relevant market for iOS app distribution to enable it to restrain trade in the relevant market for iOS app payment processing services.

102.    Apple's conduct has affected a not insubstantial amount of interstate commerce in the provision of iOS app distribution and iOS app payment processing.

103.    Apple's conduct has had an anticompetitive effect in the relevant markets for iOS app distribution and iOS app payment processing services.

### Coercion of and threats against disloyal developers

104.    Apple has coerced developers not to work with other iOS app distribution or iOS app payment processing services providers, such as Cydia.

105.    Apple's threats and coercion have impeded competitors' ability to secure contracts for iOS app distribution and iOS app payment processing services in the United States.

106.    As described herein, Apple has agreed with and/or coerced iOS app developers not to work with other iOS app distribution and iOS app payment processing service providers.

107.    Apple's threats and coercion have impeded competitors' ability to attract iOS app developer to use their iOS app distribution and/or iOS app payment processing services.

### Vertically-arranged boycotts

108.    Apple has induced and coerced developers to boycott Apple's competitors for iOS app distribution and iOS app payment processing services.

109.    As described herein, Apple has agreed with, induced, and/or coerced developers to boycott Apple's competitors for iOS app distribution and/or iOS app payment processing services.

110.    Apple's conduct has foreclosed access to the relevant markets for iOS app distribution and iOS app payment processing, which is necessary to enable Apple's competitors in each market to compete.

Exclusive Dealing

111.   Apple has entered into long-term exclusive dealing arrangements with iOS application developers with respect to the exclusive use of the App Store and Apple's payment processing.

112.   Apple has similarly entered into long-term exclusive dealing arrangements with iOS device purchasers with respect to the exclusive use of the App Store and Apple's payment processing.

113.   Apple's arrangements have had the effect of foreclosing competition in a substantial share of the line of commerce affected and each of the relevant markets for iOS app distribution and payment processing.

114.   Apple's arrangements cannot be circumvented.

115.   Apple's arrangements with developers and users are of long duration and not easily terminable as a matter of practical economics.

116.   Apple has coerced developers and users to enter into these arrangements.

117.   Apple's arrangements are not the product of competition.

118.   Apple's arrangements have had the effect of substantially lessening competition and tending to create a monopoly in the relevant markets (or aftermarkets) for iOS app distribution and payment processing.

Leveraging

119.   Apple has monopoly power over locked-in iOS device users, as well as monopoly power in the relevant market for iOS app distribution services.

120.   Apple has used its lock-in monopoly power over iOS device users in a predatory, exclusionary, and anticompetitive manner to monopolize the relevant market for iOS app distribution, and its monopoly power in iOS app distribution in a predatory, exclusionary, and anticompetitive manner to monopolize the relevant market for iOS app payment processing services.

121.   Apple possesses a dominant position in the relevant markets for iOS app distribution and iOS app payment processing.

122.   Apple's conduct is not justified, because its conduct is not intended to enhance overall efficiency and to make the relevant markets more efficient.

123.   Apple's conduct has had a substantial effect on interstate commerce.

124.   Cydia has been or will be injured in their property as a result of Apple's conduct.

125.   Cydia has suffered and will suffer injury of the type that the antitrust laws were intended to prevent.  Cydia has been and will be injured by the harm to competition as a result of Apple's conduct.

## COUNT II

### Sherman Act Section 2 – Attempted Monopolization

126.   The foregoing paragraphs are incorporated by reference as though fully set forth herein.

127.   In the relevant markets for iOS app distribution and iOS app payment processing services, Apple has engaged in predatory, exclusionary, and anticompetitive conduct, including but not limited to lock-in, tying arrangements, coercion of disloyal developers, vertically-arranged boycotts, and leveraging, as alleged herein.

128.   Apple's conduct has had an anticompetitive effect in the relevant markets for iOS app distribution and iOS app payment processing services.

129.   Apple's conduct has no legitimate business purpose or procompetitive effect.

130.   Apple has engaged in that conduct with the specific intent of monopolizing the relevant markets for iOS app distribution and iOS app payment processing services.

131.   Apple has engaged in that conduct with a dangerous probability of monopolizing each of the relevant markets.

132.   Apple's conduct has had a substantial effect on interstate commerce.

133.   Cydia has been or will be injured in their property as a result of Defendants' conduct.

134.   Cydia has suffered and will suffer injury of the type that the antitrust laws were intended to prevent.  Cydia has been and will be injured by the harm to competition as a result of Defendants' conduct.

## COUNT III

### Sherman Act Section 1 – Unreasonable Restraint of Trade

135.    Cydia restates and incorporates the foregoing paragraphs as though fully set forth herein.

136.    As alleged above, Apple has induced or coerced various developers and consumers have entered into one or more contracts, combinations, or conspiracies to unreasonably restrain trade, to control prices or exclude competition, and to willfully acquire and maintain monopoly power in the relevant markets for iOS app distribution and iOS app payment processing services.

137.    As alleged above, Apple has conditioned the operation of iOS devices for consumers over which they hold lock-in market power on the use of Apple's iOS app distribution service.  Also as alleged above, Apple has conditioned iOS app distribution (over which it has market power) on the use of Apple's iOS app payment processing service.

138.    These contracts, combinations, or conspiracies include but are not limited to tying arrangements and vertically-arranged boycotts.

139.    Apple's conduct has had an anticompetitive effect in the relevant markets for iOS app distribution and iOS app payment processing services.

140.    Apple's conduct has no legitimate business purpose or procompetitive effect.

141.    There are less restrictive alternatives to the restraints Apple imposed on the relevant markets for iOS app distribution and iOS app payment processing services.

142.    Apple's conduct has had a substantial effect on interstate commerce.

143.    Cydia has been or will be injured in their property as a result of Defendants' conduct.

144.    Cydia has suffered and will suffer injury of the type that the antitrust laws were intended to prevent.  Cydia has been and will be injured by the harm to competition as a result of Defendants' conduct.

## COUNT IV

### Unfair Competition – California Business & Professions Code § 17200 *et seq.*

145.    Cydia restates and incorporates the foregoing paragraphs as though fully set forth herein.

146.    Absent injunctive relief, Cydia will suffer loss of money or property and an economic injury in fact, specifically being forced to terminate contracts with its customers and likely close its business and lay off its employees, and thus has standing to seek relief under section 17200.

147.    Apple's actions establish a claim of unlawful competition on multiple grounds. Apple's anticompetitive and tortious conduct gives rise to a claim under the "unlawful" business practices prong of the UCL.

148.    Similarly, Apple's anticompetitive conduct gives rise to a claim under the "unfair" business practices prong of the UCL.

149.    As a direct and proximate result of Apple's conduct, Cydia has suffered and will continue to suffer damages including but not limited to lost business and potential bankruptcy.

150.    Cydia has no adequate remedy at law because monetary damages will not afford adequate relief for the loss of Cydia's business relationships, client goodwill, and ability to continue operating.

**PRAYER FOR RELIEF**

Wherefore, Cydia requests the following relief:

      (a)     Damages in an amount to be determined;

      (b)     Treble damages;

      (c)     Attorneys' fees;

      (d)     Costs;

      (e)     Pre-judgment and post-judgment interest at the maximum rate permitted under the law;

      (f)     Punitive damages;

      (g)     Injunctive relief, including but not limited to an injunction barring Apple's conduct alleged in the Complaint;

      (h)     Declaratory relief, including but not limited to a declaration and judgment that Apple's conduct alleged in the Complaint violates the laws alleged in the Complaint; and

      (i)     Such other and further relief as the Court deems proper and just.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Cydia demands a jury trial as to all issues triable by a jury.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DATED:  December 10, 2020

QUINN EMANUEL URQUHART &
SULLIVAN, LLP


By  */s/ Adam B. Wolfson*

Stephen A. Swedlow (*pro hac vice* forthcoming)
stephenswedlow@quinnemanuel.com
David A. Nelson (*pro hac vice* forthcoming)
davenelson@quinnemanuel.com
Marc L. Kaplan (*pro hac vice* forthcoming)
marckaplan@quinnemanuel.com
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606-1881
(312) 705-7400

Adam B. Wolfson (SBN 262125)
adamwolfson@quinnemanuel.com
Joseph Sarles (SBN 254750)
josephsarles@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017-2543
(213) 443-3000

*Attorneys for Plaintiff SaurikIT, LLC*

38