QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Adam B. Wolfson (SBN 262125)
adamwolfson@quinnemanuel.com
Joseph Sarles (SBN 254750)
josephsarles@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017-2543
Telephone:  (213) 443-3000
Facsimile:  (213) 443-3100

Stephen A. Swedlow (*pro hac vice*)
stephenswedlow@quinnemanuel.com
David A. Nelson (*pro hac vice*)
davenelson@quinnemanuel.com
Marc L. Kaplan (*pro hac vice*)
marckaplan@quinnemanuel.com
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606-1881
Telephone:  (312) 705-7400
Facsimile:  (312) 705-7401

*Attorneys for Plaintiff SaurikIT, LLC*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| SAURIKIT, LLC,<br><br>              Plaintiff,<br><br>       v.<br><br>APPLE INC.,<br><br>              Defendant. | No. 20-cv-08733-YGR<br>Related Case<br><br>**PLAINTIFF SAURIKIT, LLC'S OPPOSITION TO APPLE INC.'S MOTION TO DISMISS**<br><br>Date: May 4, 2021<br>Time: 2:00 pm<br>Courtroom: 1, 4th Floor (via Zoom)<br>Judge: Hon. Yvonne Gonzalez Rogers |

# <u>TABLE OF CONTENTS</u>

**Page**

STATEMENT OF ISSUES TO BE DECIDED ......................................................................1

PRELIMINARY STATEMENT ...........................................................................................1

FACTUAL BACKGROUND .................................................................................................3

      A.    Cydia Offers iOS App Distribution And iOS App Payment Processing
             Services .....................................................................................................................3

      B.    Apple Eliminates Competition In The Markets For iOS App Distribution
             And Payment Processing Services ...........................................................................3

      C.    Apple's Anticompetitive Actions Harm Cydia And Destroy Competition................5

LEGAL STANDARD ............................................................................................................6

ARGUMENT .........................................................................................................................7

I.      CYDIA'S SHERMAN ACT DAMAGES CLAIMS ARE TIMELY ..............................7

      A.    Cydia Alleges That Apple Committed Millions Of Anticompetitive Acts In
             The Last Four Years .................................................................................................7

             1.    Each of Apple's anticompetitive agreements / coerced arrangements
                    constituted a new basis for Cydia's antitrust claims ......................................8

             2.    Apple's recent revisions to the App Store Guidelines and device and
                    iOS changes are additional exclusionary acts giving rise to a claim ...........10

             3.    Apple's argument that Cydia's antitrust claims accrued when Apple
                    "decided" to act anticompetitively has no basis in the law .........................11

      B.    Even If Apple's 2008 And 2009 Decisions Are Relevant For Limitations
             Purposes, Cydia Alleges Apple Restarted The Statute of Limitations
             Repeatedly In The Last Four Years .........................................................................13

             1.    Apple has entered into new anticompetitive agreements ..............................14

              2.    Apple has modified its anticompetitive policies and imposed new
                      technical restrictions to exclude competitors ...............................................16

             3.    Apple has enforced its anticompetitive agreements and policies
                      within the limitations period ........................................................................20

II.     CYDIA'S CLAIMS FOR INJUNCTIVE RELIEF ARE TIMELY .....................................21

III.    CYDIA'S STATE LAW CLAIMS ARE TIMELY ............................................................23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
    836 F.3d 1171 (9th Cir. 2016) .................................................................................. 8, 11

*Alarm Detection Sys., Inc. v. Orlando Fire Prot. Dist.*,
    326 F. Supp. 3d 602 (N.D. Ill. 2018) ............................................................................ 15

*AMF, Inc. v. Gen. Motors Corp. (In re Multidistrict Vehicle Air Pollution)*,
    591 F.2d 68 (9th Cir. 1979) ........................................................................... 11, 18, 20

*In re Animation Workers Antitrust Litig.*,
    87 F. Supp. 3d 1195, 1211 (N.D. Cal. 2015) ....................................................... 12, 13, 23

*Aurora Enters., Inc. v. Nat'l Broad. Co.*,
    688 F.2d 689 (9th Cir. 1982) ................................................................................. 11, 15

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
    2014 WL 1091589 (N.D. Cal. Mar. 13, 2014) .................................................................. 22

*Cha v. Kaiser Permanente*,
    2015 WL 434983 (N.D. Cal. Feb. 2, 2015) ..................................................................... 12

*Chi. Bldg. Design, P.C. v. Mongolian House, Inc.*,
    770 F.3d 610 (7th Cir. 2014) ........................................................................................ 7

*Columbia Steel Casting Co. v. Portland Gen. Elec. Co.*,
    111 F.3d 1427 (9th Cir. 1996) ................................................................................. 17, 18

*EEOC v. LogistiCare Sols. LLC*,
    2020 WL 6781270 (D. Ariz. Nov. 18, 2020) ................................................................ 21, 22

*In re Facebook, Inc., Consumer Privacy User Profile Litig.*,
    402 F. Supp. 3d 767 (N.D. Cal. 2019) ............................................................................. 7

*Garnica v. HomeTeam Pest Defense, Inc.*,
    2015 WL 3766514 (N.D. Cal. June 16, 2015) ................................................................ 7, 17

*Garrison v. Oracle Corp.*,
    159 F. Supp. 3d 1044 (N.D. Cal. 2016) ...................................................................... 12, 13

*Harris v. Cty. of Orange*,
    682 F.3d 1126 (9th Cir. 2012) ....................................................................................... 9

*Hennegan v. Pacifico Creative Serv., Inc.*,
    787 F.2d 1299 (9th Cir. 1986) ........................................................................... 18, 19, 20

*Manzarek v. St. Paul Fire & Marine Ins. Co.*,
    519 F.3d 1025 (9th Cir. 2008) ................................................................................... 6, 17

*McCarthy v. Johannesson*,
    2012 WL 12887540 (C.D. Cal. Dec. 11, 2012) .................................................................. 22

*MedioStream, Inc. v. Microsoft Corp.*,
    869 F. Supp. 2d 1095 (N.D. Cal. 2012) ...................................................................... 12, 18

*Midwestern Mach. Co. v. Nw. Airlines, Inc.*,
    392 F.3d 265 (8th Cir. 2004) ........................................................................................ 11

*Munoz v. Wells Fargo Bank, N.A.*,
  2015 WL 12748816 (C.D. Cal. Jan. 9, 2015) .................................................... 7, 12

*Oliver v. SD-3C LLC*,
  751 F.3d 1081 (9th Cir. 2014) ........................................................................ *passim*

*Pace Indus., Inc. v. Three Phoenix Co.*,
  813 F.2d 234 (9th Cir. 1987) ................................................................................ 8, 11

*PBTM LLC v. Football Nw., LLC*,
  2021 WL 37648 (W.D. Wash. Jan. 5, 2021) ....................................................... 8, 20

*Philpot v. Kos Media LLC*,
  2018 WL 10399910 (N.D. Cal. Dec. 6, 2018) ..................................................... 7, 12

*Red Lion Med. Safety, Inc. v. Ohmeda, Inc.*,
  63 F. Supp. 2d 1218 (E.D. Cal. 1999) ............................................... 8, 10, 18, 20

*Reyes-Aguilar v. Bank of Am., N.A.*,
  2014 WL 2917049 (N.D. Cal. June 24, 2014) ......................................................... 21

*Samsung Electronics Co. v. Panasonic Corp.*,
  747 F.3d 1199 (9th Cir. 2014) ......................................................................... *passim*

*Smith v. eBay Corp.*,
  2012 WL 27718 (N.D. Cal. Jan. 5, 2012) ........................................... 16, 17, 18, 20

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.*,
  2010 WL 3521979 (E.D. Cal. Sept. 3, 2010) ................................... 12, 15, 16, 18, 20

*Supermail Cargo, Inc. v. United States*,
  68 F.3d 1204 (9th Cir. 1995) ..................................................................................... 7

*TCL Commc'ns Tech. Holdings, Ltd. v. Telefonaktiebolaget LM Ericsson*,
  2016 WL 7049263 (C.D. Cal. Aug. 9, 2016) ........................................................... 23

*U.S. ex rel. Air Control Techs., Inc. v. Pre Con Indus., Inc.*,
  720 F.3d 1174 (9th Cir. 2013) ................................................................................. 12

*In re Wholesale Grocery Prods. Antitrust Litig.*,
  752 F.3d 728 (8th Cir. 2014) .................................................................................. 12

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
  401 U.S. 321 (1971) ..................................................................................... 11, 14

**Statutory Authorities**

15 U.S.C. § 15b .............................................................................................................. 14

**Additional Authorities**

Areeda & Hovenkamp, *Antitrust Law* ¶ 320a (4th ed. 2013) ....................................... 7, 8

Dylan Love, *The Latest Jailbreak Statistics Are Jaw-Dropping*, Business Insider,
  https://www.businessinsider.com/jailbreak-statistics-2013-3 (Mar. 2, 2013) .............. 19

*United States from 2014 to 2018*, Statista,
  https://www.statista.com/statistics/242269/apple-iphone-in-the-usa-sales-since-2nd-
  quarter-2007/ (May 2018) .................................................................................. 6, 8, 9

### STATEMENT OF ISSUES TO BE DECIDED

Whether Apple has met its burden to prove that the Complaint establishes beyond doubt that Cydia's claims are barred by the applicable statute of limitations or laches.

### PRELIMINARY STATEMENT

If one were to credit the core argument underlying Apple's motion to dismiss, it would completely rewrite the law on the statute of limitations for antitrust claims. Apple argues that if a monopolist *decides* to act anticompetitively, a Court must look to the date of that decision for limitations purposes rather than at the dates of the overt acts in support of that decision.

But that is not the law. The Ninth Circuit is crystal clear that antitrust claims based on exclusionary conduct accrue with every overt act in support of an anticompetitive scheme. The limitations period thus restarts with every such act. Under this law, a monopolist like Apple can *decide* years (or even decades) earlier that they wish to act anticompetitively, but they subject themselves to antitrust liability with every subsequent act they take that harms competition.

Applying this law to the Complaint's overlapping liability theories (none of which Apple contends are implausible), Apple's motion plainly fails. For example, SaurikIT, LLC ("Cydia") alleges that Apple ties iOS app distribution and iOS app payment processing to new iPhone purchases, such that Apple enters into millions of tying agreements every single year. (*See* Compl. ¶¶ 5, 15, 31, 38 n.30, 66.) These agreements also constitute exclusive deals. (*Id.* ¶ 112.) On the developer side, Cydia alleges that Apple ties iOS app distribution to iOS app payment processing, and that such agreements similarly constitute exclusive deals (among other types of anticompetitive conduct). (*Id.* ¶¶ 5, 63, 69-71, 104-10.) These agreements obviously apply to every new developer that distributes their iOS app, but also to every existing iOS developer that either renews their agreement to Apple's App Store Guidelines or releases a new app pursuant to those Guidelines. (*Id.* ¶¶ 28-29, 69-71.) Given that both tying and exclusive dealing claims accrue at the time of the agreement itself, Cydia more than plausibly alleges millions of anticompetitive agreements within the limitations period. This alone disposes of Apple's motion.

Even if did not, the Ninth Circuit's opinion in *Samsung Electronics Co. v. Panasonic Corp.*, 747 F.3d 1199 (9th Cir. 2014), squarely forecloses Apple's arguments that Cydia has not adequately

pled a timely claim under the antitrust laws. In *Samsung*, the Ninth Circuit held that applying a preexisting anticompetitive policy or agreement to a new party or product constitutes a new overt act, and thus restarts the limitations period. *Id.* at 1203-04. As noted above, Cydia alleges that Apple applies the various parts of its anticompetitive scheme to both new and existing consumers *and* developers on a consistent basis, all of which constitute new overt acts within the past four years.[1]

Samsung next teaches that expanding a previous anticompetitive policy in new ways also constitutes a new overt act. *Id.* Cydia alleges that Apple has taken numerous new steps within the past four years to shore up perceived holes in its exclusionary practices with respect to iOS app distribution and payment processing, including a technical update to iOS *in the few months before Cydia filed the Complaint* that now makes it effectively impossible for third parties like Cydia to offer iOS app distribution. (Compl. ¶¶ 63-65.) This act, along with the other exclusionary acts Cydia alleges Apple took during the limitations period, are yet more examples of overt acts restarting the statute.

Finally, with respect to injunctive relief and Cydia's UCL claim, the Ninth Circuit's opinion in *Oliver v. SD-3C LLC*, 751 F.3d 1081 (9th Cir. 2014), holds that any overt anticompetitive acts within the past four years render laches inapplicable to a plaintiff's injunctive relief request (even for activity older than four years). And, because the same accrual rules apply to UCL claims, Cydia's UCL claims are timely for the same reasons as its federal claims.

In the end, it appears that Apple's motion is a placeholder to keep this case temporarily in stasis while others proceed.[2] Contrary to Apple's implications, however, Cydia is not just some follow-on plaintiff hoping to capitalize on the work of others. Cydia is the first—and, to its understanding, only—App Store and app payment processing competitor to have ever filed suit, and

---

[1] A particularly notable example is the upcoming trial between Epic and Apple, which involves in no small part allegations that Apple kicked Epic off the App Store for having the audacity to challenge Apple's anticompetitive practices and for trying to distribute and/or engage alternative iOS app payment processing options besides Apple itself.

[2] This Court previously warned Apple against statute of limitations arguments. (*See* Ex. 1, *In re Apple iPhone Litig.*, Oct. 7, 2019 Hr'g. Tr. at 13:1-4 (Apple's counsel: "Well, first of all, we think that the Complaint is not timely, that it is barred by -- in whole or in part by the statute of limitations." The Court: "That's going to be denied.").)

it did so when Apple broke the proverbial camel's back by changing iOS to finally extinguish all competition. Cydia's claims are importantly different than the other claims currently before this Court, and Apple is tellingly unable to argue they are implausible. For these reasons, Cydia is ready to proceed, and it is doing so on timely claims.

## FACTUAL BACKGROUND

### A.     Cydia Offers iOS App Distribution And iOS App Payment Processing Services

When the first iPhone launched, there were no third party software applications available, and Apple had no mechanism to allow users to download or install additional applications or features. (Compl. ¶ 16.) Jay Freeman, Cydia's founder, "was among the first to recognize the opportunity and to meet the needs of the market" for third-party app distribution by developing and programming Cydia. (*Id.* ¶¶ 20-21.)

Cydia is an app marketplace, first deployed in 2008, that enables users "to locate, obtain, and . . . pay for *other* desirable application for their iOS devices," *i.e.*, devices that run on the iOS operating system. (*Id.* ¶¶ 9, 21.) "Cydia was the first comprehensive solution" to iOS app distribution, providing iOS app developers a channel to distribute their apps to iOS users and for iOS users to download them. (*Id.* ¶ 3.) Cydia also includes payment processing mechanisms enabling iOS developers to charge consumers for app downloads and in-app purchases. (*Id.* ¶¶ 21, 48, 76.) Cydia provides such payment processing services for developers at negotiated rates. (*Id.* ¶¶ 26, 76.)

### B.     Apple Eliminates Competition In The Markets For iOS App Distribution And Payment Processing Services

After seeing the success of iOS app distributors like Cydia, Apple realized that it could make significant profits through iOS app distribution and payment processing and therefore released its competitor to Cydia, the App Store, in 2008. (Compl. ¶¶ 5, 24.) Despite the fact that "Apple lifted many of the popular aspects of the Cydia store and incorporated them into the App Store," app developers and consumers still often preferred Cydia. (*Id.* ¶¶ 24, 25.)

Dissatisfied that Cydia and other iOS app distribution and payment processing providers remained active and successful competitors, Apple chose to "illegally squash[] all competition for the App Store . . . . because Apple simply wanted more money for itself." (*Id.* ¶ 8.) Apple was able

to do so based on its monopoly power in the relevant markets for iOS app distribution and payment processing. (*Id.* ¶¶ 35-59.)[3]

With respect to iOS users, Apple has tied the App Store to iOS devices by, for example, "preinstall[ing] the App Store app on iPhones and ma[king] it so that users can neither remove the app nor change their default preference to any other marketplace, such as Cydia." (*Id.* ¶¶ 26, 66.) Further, Apple's warranty agreement prohibits users from downloading apps through any platform other than the App Store, otherwise the warranty is voided. (*Id.* ¶¶ 26, 31.) Apple thus "controls which apps are available for download on every one of its Apple iOS devices." (*Id.* ¶ 26 (footnote omitted).) Apple has also "created technical restrictions it built into iOS that largely prevent users from downloading and installing competing app stores," and, "[m]ore recently," has made "these technical restrictions even more pervasive by," for example, "introducing runtime code modification prevention." (*Id.* ¶¶ 64-65.)

Apple also imposes anticompetitive restrictions and agreements on iOS app developers to prevent them from distributing their apps on any platform but the App Store. To have their products sold in the App Store, Apple requires iOS application developers to enter into multiple agreements that prohibit them from using other app distribution platforms like Cydia. (*Id.* ¶ 28.) Apple also requires that app developers receive Apple's approval for each of its apps before Apple will distribute and sell the apps through the App Store. (*Id.* ¶ 29.) "Over the years, Apple has continuously modified its App Store policies to preclude iOS app developers from attempting to distribute their apps through any channel except the App Store," including, for example, by "revis[ing] its developer program license agreement to prohibit developers from facilitating distribution of apps from any source other than the App Store . . ." (*Id.* ¶ 63; *see also id.* ¶ 66.) Developers are bound to follow these modifications, as "they agree when they become iOS developers to adhere to every new iteration of the App Store policies." (*Id.* ¶ 63.) Apple also "routinely punishes app developers that speak out against its policies" or "work to support fair competition in the app distribution market." (*Id.* ¶ 61; *see also id.* ¶¶ 63, 66.)

---

[3] On this motion, Apple challenges neither the definitions of these markets nor allegations of its monopoly power in both.

In addition, Apple has put in place restrictions that prevent iOS app developers from using any payment processing mechanisms outside of the App Store. Apple "impose[s] contractual terms that iOS developers agree to exclusively use Apple for app payment processing, else face exclusion from the App Store." (*Id.* ¶ 52; *see also id.* ¶¶ 67-68.) These contractual terms include the Developer Agreement and App Store Review Guidelines that require developers to "use [Apple's] in-app purchase" and prohibits developers from telling "iOS users to use a [different] purchasing method . . ." (*Id.* ¶¶ 69-70.) Apple has also threatened to remove apps from the App Store that do not use Apple's payment processing services. (*Id.* ¶ 53.) As a result, "an app developer's access to the App Store . . . is conditioned on the developer's use of Apple's payment processing services to process payments for apps and in-app content." (*Id.* ¶ 71.)

Apple has thus engaged in a lengthy list of unlawful practices, including tying arrangements, exclusive dealing, aftermarket monopolization, vertically-arranged boycotts, and leveraging. (*Id.* ¶ 5; *see also id.* ¶¶ 90-120, 127, 136-38.) Apple does not argue that any aspect of these claims is implausible as alleged.

Apple's campaign against competition has been wildly successful. "By technological design and contractual restraint, Apple does not allow other third party services to distribute iOS apps." (*Id.* ¶ 41.) And, through contractual agreements and enforcement, Apple is "the sole option for iOS payment processing . . ." (*Id.* ¶ 52.) Apple "has anticompetitively wrested control" of both markets from Cydia and others and, as a result, earns more than $15 billion annually from the App Store, largely through the imposition of price controls and supra-competitive fees and commissions. (*Id.* ¶¶ 26, 34, 52, 55, 74-75, 83.)

### C. Apple's Anticompetitive Actions Harm Cydia And Destroy Competition

Although Cydia "was the most successful iOS app distributor" when it was first launched, Apple's anticompetitive conduct has "largely shut Cydia and other competitors out of the iOS app distribution market." (Compl. ¶ 9.) Because Apple ties the operation of iOS devices with use of the App Store through both contracts with iOS device purchasers and technical restrictions, Apple has "caused Cydia substantial damages, including up to the present, . . . which occurs with every new sale of every new iPhone, and with every update to the iOS operating system on existing iPhones."

1   (*Id.* ¶ 15.) Thus, every iOS device sale comes with new agreements between Apple and a consumer

2   that the consumer will not (and cannot due to technical restrictions) use Cydia. So too for app

3   developers:  every new developer who signs Apple's agreements and every new app uploaded to

4   the App Store is yet another developer and app that cannot use Cydia's app distribution or payment

5   processing services. Each of these transactions harms Cydia by causing it to lose business and

6   excluding Cydia from the markets. (*Id.* ¶¶ 84(d), 92, 107, 110, 118, 134, 149.) These impacts are

7   significant, as just within the past few years Apple has sold tens of millions of iOS devices and

8   hundreds of thousands of new apps were uploaded to the App Store. (*Id.* ¶ 32 (600,000 new apps

9   uploaded to the App Store between 2014 and when the Complaint was filed); *Apple iPhone sales in*

10  *the United States from 2014 to 2018*, Statista (May 2018),

11  https://www.statista.com/statistics/242269/apple-iphone-in-the-usa-sales-since-2nd-quarter-2007/

12  (16 million iPhones sold in the first quarter of 2018 alone) (cited at Compl. ¶ 38 n.30).)

13      The culmination of Apple's death-by-a-thousand-cuts strategy is that, in the present, Cydia

14  has been effectively prevented from competing with the App Store. For example, in 2009, "Cydia

15  reached roughly 10% of iPhone users," meaning "tens of millions of users sought out Cydia's

16  service . . ." (*Id.* ¶ 23.) After Apple began its crusade to stifle competition, that number fell even

17  though "hundreds of thousands of users have continued to download Cydia . . ." (*Id.*) Apple's most

18  recent technical restrictions are the most pernicious, as "they effectively prevent users from using

19  Cydia" and "threaten to completely wipe out Cydia's ability to serve its users, and are the primary

20  impetus for the timing and urgency of Cydia's Complaint." (*Id.* ¶ 65; *see also id.* ¶¶ 6, 15.)

21  Nevertheless, Apple's campaign to eliminate Cydia and all competition in the markets for iOS app

22  distribution and iOS payment processing continues to this day. (*Id.* ¶ 5.)

23                          **LEGAL STANDARD**

24      When deciding a Rule 12(b)(6) motion to dismiss, courts must "accept factual allegations in

25  the complaint as true and construe the pleadings in the light most favorable to the non-moving

26  party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). Because

27  Apple does not challenge the plausibility of Cydia's allegations, "the best way to analyze the [statute

28  of] limitation[s] issue is to assume that the antitrust laws have been violated and then consider when

the antitrust cause of action has accrued . . ." Areeda & Hovenkamp, *Antitrust Law* ¶ 320a (4th ed. 2013) ("Areeda & Hovenkamp").

On a motion to dismiss arguing that the claims are untimely, the movant bears an additional burden. "[S]tatutes of limitations provide an affirmative defense, which normally must be raised at summary judgment rather than on a motion to dismiss." *In re Facebook, Inc., Consumer Privacy User Profile Litig.*, 402 F. Supp. 3d 767, 790 n.10 (N.D. Cal. 2019). "[A] plaintiff is not obligated to plead the absence of affirmative defenses." *Philpot v. Kos Media LLC*, 2018 WL 10399910, at *3 (N.D. Cal. Dec. 6, 2018). Because Apple bears the burden of proving its affirmative defenses and timeliness is not an element of Cydia's claims, Cydia is "not required affirmatively to plead facts demonstrating that a claim is timely." *Munoz v. Wells Fargo Bank, N.A.*, 2015 WL 12748816, at *8 (C.D. Cal. Jan. 9, 2015). Accordingly, "at the motion to dismiss stage 'a complaint cannot be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts that would establish the timeliness of the claim.'" *Garnica v. HomeTeam Pest Defense, Inc.*, 2015 WL 3766514, at *2 (N.D. Cal. June 16, 2015) (quoting *Supermail Cargo, Inc. v. United States,* 68 F.3d 1204, 1207 (9th Cir. 1995)); *see also Chi. Bldg. Design, P.C. v. Mongolian House, Inc.*, 770 F.3d 610, 614 (7th Cir. 2014) ("In other words, the plaintiff must affirmatively plead himself out of court; the complaint must plainly reveal [ ] that [the] action is untimely under the governing statute of limitations." (internal quotation marks omitted) (alterations in original)).

## ARGUMENT

## I.   CYDIA'S SHERMAN ACT DAMAGES CLAIMS ARE TIMELY

### A.   Cydia Alleges That Apple Committed Millions Of Anticompetitive Acts In The Last Four Years

Properly construed, Counts I, II, and III allege *millions* of anticompetitive acts (if not more) occurring within the past four years. The Complaint alleges that Apple imposes unlawful tying, exclusive dealing, and vertically-arranged boycott agreements on iOS device users and iOS developers with each sale of an iOS device and each  approval of an iOS app or app update submitted to the App Store. Cydia also alleges that Apple engaged in other types of exclusionary practice (including aftermarket monopolization and leveraging) through similar and additional acts. As

alleged (and unchallenged on this motion), Cydia alleges that each new exclusionary act inflicts new injury to Cydia. Apple does not argue that such claims are implausible, so the Court's analysis is limited to when the acts giving rise to Cydia's claims allegedly occurred, not whether Cydia adequately states a claim. *See* Areeda & Hovenkamp ¶ 320a.

Here, Apple cannot seriously refute that Cydia alleges millions of anticompetitive acts within the past four years. Accordingly, Cydia has clearly stated timely claims.

### 1. Each of Apple's anticompetitive agreements / coerced arrangements constituted a new basis for Cydia's antitrust claims

"[A] cause of action in antitrust accrues each time a plaintiff is injured by an act of the defendant and the statute of limitations runs from the commission of the act." *Oliver*, 751 F.3d at 1086 (quoting *Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 237 (9th Cir. 1987)). At the very earliest, exclusive dealing and tying claims accrue "when the arrangement was executed or became effective." *PBTM LLC v. Football Nw., LLC*, 2021 WL 37648, at *15 (W.D. Wash. Jan. 5, 2021) (regarding tying); *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1181 (9th Cir. 2016) ("[A] prerequisite to any exclusive dealing claim is an agreement to deal exclusively."); *see also Red Lion Med. Safety, Inc. v. Ohmeda, Inc.*, 63 F. Supp. 2d 1218, 1224 (E.D. Cal. 1999) (the effects of exclusionary practices "are felt not all at once . . . but each time a [competitor] is unable to sign a . . . customer").

Here, Cydia alleges that Apple imposes tying, exclusive dealing, and vertically-arranged boycott agreements on consumers with every iOS device sale, because as part of the sale Apple pre-installs the App Store app (Compl. ¶¶ 5, 26, 66) and then forces consumers via the iOS device warranty (*id.* ¶¶ 26, 31, 95) and technical restrictions (*id.* ¶¶ 5, 64-66) to only use the App Store for iOS app distribution and only Apple for iOS payment processing. Each iOS device activation thus constitutes a new anticompetitive act, (*id.* ¶¶ 95, 112, 137), and the Complaint alleges that Apple sells *millions* of iOS devices every year. (Compl. ¶ 38 n.30 (citing *Apple iPhone sales in the United States from 2014 to 2018*, Statista (May 2018), https://www.statista.com/statistics/242269/apple-

iphone-in-the-usa-sales-since-2nd-quarter-2007/.)[4] Because each iOS device sale is accompanied by a newly-coerced anticompetitive agreement, each iOS device activation harms Cydia and acts as the basis for a new antitrust claim. (Compl. ¶ 15 (explaining how "Apple's continued anticompetitive conduct, which occurs with every new sale of every new iPhone" has "caused Cydia substantial damages"); *id.* ¶¶ 64-65 (Apple's most recent technical "restrictions threaten to completely wipe out Cydia's ability to serve its users" and "prevent Cydia from competing with Apple"). Thus, Cydia has alleged millions of anticompetitive acts within the past four years giving rise to unchallenged, plausible claims. This alone ends the inquiry on Apple's motion.

But Cydia's antitrust claims do not just stem from Apple's exclusionary conduct with respect to iOS device purchasers. The Complaint also alleges that Apple has coerced hundreds of thousands of anticompetitive agreements onto iOS app developers regarding iOS app distribution. Apple requires that iOS developers enter into agreements with Apple and abide by Apple's policies in order to sell apps through the App Store. (*Id.* ¶¶ 28-29, 63.) Those agreements and policies "preclude iOS app developers from attempting to distribute their apps through any channel except the App Store," else face exclusion from iOS users. (*Id.* ¶ 63.) Apple also requires that every app uploaded to the App Store receive Apple's approval and comply with Apple's policies. (*Id.* ¶¶ 29, 63.) "Apple thus coerces [developers] into only using the App Store" for distribution. (*Id.* ¶ 63; *see also id.* ¶¶ 104-06, 111, 137.) Roughly 600,000 new apps were added to the App Store between 2014 and 2020. (*Id.* ¶ 32 ("over 1.4 million apps were available" in the App Store in 2014 and, as of December 10, 2020, there were "more than two million apps").) Every new developer and every new app uploaded to the App Store is predicated on a new tying, exclusive dealing, and/or vertically-arranged boycott agreement that harms Cydia by precluding the developer from distributing its apps through Cydia. Thus, Cydia has alleged hundreds of thousands of claims within the statute of limitations regarding Apple's anticompetitive behavior related to iOS app developers and iOS app distribution.

---

[4] The Court may consider the documents cited in the Complaint, as Apple does not question their authenticity and "the [C]omplaint relies on those documents." *Harris v. Cty. of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012).

So, too, with iOS app payment processing services. "Developers seeking to distribute their apps on the App Store are required to follow Apple's App Store Review Guidelines" and the Guidelines expressly prohibit developers from using anything but Apple's in-app payment mechanisms. (Compl. ¶ 69; *id.* ¶¶ 28-29; *see also id.* ¶ 70 ("developers may not directly or indirectly target iOS users to use a purchasing method other than Apple's in-app purchase" (brackets and internal quotation marks omitted)). Thus, "an app developer's access to the App Store . . . is conditioned on the developer's use of Apple's payment processing services to process payments for apps and in-app content" and Apple's agreements even go so far as to "gag[] developers from even informing users of other payment options" and "discouraging its users from using Apple's payment system." (*Id.* ¶ 71; *see also id.* ¶¶ 63, 100, 104-06, 111, 137.) And, again, Apple enforces these policies by requiring that each new app be approved by Apple before it is distributed through the App Store. (*Id.* ¶ 29.) Cydia is harmed every time Apple coerces an iOS app developer into agreeing to exclusively use Apple's payment processing services, as such anticompetitive agreements and practices preclude the developer from using Cydia's services. (*Id.* ¶ 67 ("Cydia[] therefore ha[s] no ability to provide [payment processing] services to iOS app developers"); *id.* ¶ 6.) And, because hundreds of thousands of apps have been added over the past few years (*id.* ¶ 32), Apple has entered into hundreds of thousands of new anticompetitive agreements regarding its payment processing services, which started the four-year statute of limitations anew every time (and rendering Cydia's claims timely). *Oliver*, 751 F.3d at 1086; *Red Lion Med. Safety*, 63 F. Supp. 2d at 1224.

### 2. Apple's recent revisions to the App Store Guidelines and device and iOS changes are additional exclusionary acts giving rise to a claim

In addition to the millions of anticompetitive arrangements discussed above, Cydia also alleges that (a) Apple has continuously updated—*i.e.*, multiple times in the past four years—its App Store Guidelines to cut out what it apparently perceived as loopholes regarding competition in the iOS app distribution and payment processing markets, and (b) with its most recent phone hardware and the most recent update to iOS, made it so competing iOS app distribution providers can no longer operate on iOS devices. (Compl. ¶¶ 15, 63-65.) These alleged anticompetitive acts all occurred in the limitations period.

3. **Apple's argument that Cydia's antitrust claims accrued when Apple "decided" to act anticompetitively has no basis in the law**

Apple does not dispute that Cydia plausibly alleges Apple imposed millions of anticompetitive arrangements on iOS device purchasers and iOS app developers in the past four years regarding the exclusive use of the App Store and Apple's in-app payment processing services. Nevertheless, Apple argues (Mot. at 7) that Cydia's claims are based exclusively on " (1) Apple's [2008] decision requiring that apps be distributed to iOS users through the App Store, and (2) Apple's [2009] decision requiring that IAP be used for paid apps and in-app purchases of digital content."

Setting aside that this is a facially incorrect characterization of the Complaint, Apple's alleged 2008 and 2009 decisions are, for purposes of the statute of limitations, irrelevant. As noted above, each tying and exclusive dealing agreement Apple imposed in the past four years is an independent unlawful act inflicting new injury and starting the four-year limitations period anew.

But, even if this were not the case, Apple's "decision date" argument finds no basis in the law (and, indeed, Apple cites none). (*See id.* at 7-8.) To the contrary, binding case law is clear that an antitrust claim accrues when a defendant *acts* on their anticompetitive decision in a way that causes (or is dangerously likely to  cause) competition and the plaintiff harm. *See Aerotec Int'l*, 836 F.3d at 1181 ("[A] prerequisite to any exclusive dealing claim is an agreement to deal exclusively."); *Samsung*, 747 F.3d at 1202 ("[E]ach time a plaintiff is injured by an *act* of the defendants a cause of action accrues to him to recover the damages caused by that act . . ." (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971)) (emphasis added)). Apple's own case citations make this point; they all involve instances where, unlike here, the alleged anticompetitive *acts* (not a mere decision) occurred outside the statute of limitations period.[5] Moreover, Apple's

---

[5] *Midwestern Mach. Co. v. Nw. Airlines, Inc.*, 392 F.3d 265, 269 (8th Cir. 2004) (merger occurred in 1986 and plaintiff filed complaint regarding that merger eleven years later); *Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 236 (9th Cir. 1987) (plaintiff sued in 1983 challenging alleged anticompetitive contract from 1973); *Aurora Enters., Inc. v. Nat'l Broad. Co.*, 688 F.2d 689, 693-94 (9th Cir. 1982) (plaintiff did not sue over 1966 tying agreement until 1981); *AMF, Inc. v. Gen. Motors Corp. (In re Multidistrict Vehicle Air Pollution)*, 591 F.2d 68, 69-70 (9th Cir. 1979) (defendants' "formed a conspiracy" and refused to deal with plaintiff in 1964 but plaintiff did not

11
SAURIKIT, LLC'S OPPOSITION TO MOTION TO DISMISS
Case No. 20-cv-08733-YGR

1   articulation of the law would have absurd consequences, as it would allow a monopolist to *decide*

2   to act anticompetitively, wait four years, and then be forever immunized from antitrust lawsuits.

3   Courts clearly reject such a strained application of the statute of limitations. *See In re Wholesale*

4   *Grocery Prods. Antitrust Litig.*, 752 F.3d 728, 736 (8th Cir. 2014) ("If the wholesalers' logic were

5   accepted, two parties could agree to divide markets for the purpose of raising prices, wait four years

6   to raise prices, then reap the profits of their illegal agreement with impunity because any antitrust

7   claims would be time barred. That is not the law.").

8          Apple contends that allegations that do not contain "specific dates" for each particular

9   anticompetitive act are insufficient and conclusory. (Mot. at 10.) Cydia has, however, alleged that

10  Apple regularly committed new anticompetitive acts since December 10, 2016. (*Supra* at 8-10.)

11  And, regardless, Cydia is "not required affirmatively to plead facts demonstrating that a claim is

12  timely." *Munoz*, 2015 WL 12748816, at *8. The burden is on Apple to prove the claims are *un*timely.

13  *U.S. ex rel. Air Control Techs., Inc. v. Pre Con Indus., Inc.*, 720 F.3d 1174, 1178 (9th Cir. 2013)

14  (vacating district court's dismissal of complaint because "nothing on the face of ACT's complaint

15  indicates" that conduct underlying complaint "*did not . . .* [occur] within" the statute of limitations

16  (emphasis added)); *Philpot*, 2018 WL 10399910, at *3-4 (denying motion to dismiss even though

17  plaintiff's only allegation regarding timeliness was "conclusory" because "there is no pleading

18  requirement that a plaintiff must make non-conclusory allegations negating the existence of an

19  affirmative defense"); *Cha v. Kaiser Permanente*, 2015 WL 434983, at *4 (N.D. Cal. Feb. 2, 2015)

20  (holding that "dismissal on statute of limitations grounds [was] inappropriate" even though it was

21  "not apparent from the face of Ms. Cha's complaint when (if ever) she received appropriate notice"

22  for her claim to accrue).

23  ───────────────

24  sue until 1970 and did not articulate overt acts in furtherance of the alleged conspiracy within
    limitations period); *Garrison v. Oracle Corp.*, 159 F. Supp. 3d 1044, 1066 (N.D. Cal. 2016)

25  (plaintiff sued in 2014 over anticompetitive agreement from 2009 and earlier); *In re Animation
    Workers Antitrust Litig.*, 87 F. Supp. 3d 1195, 1206, 1211 (N.D. Cal. 2015) (plaintiffs were injured

26  by anticompetitive agreements in 2004, 2005, and 2007 but did not sue until 2014); *MedioStream,*

27  *Inc. v. Microsoft Corp.*, 869 F. Supp. 2d 1095, 1106 (N.D. Cal. 2012) (plaintiff did not "allege that
    [defendant] executed an unlawful agreement within the limitations period"); *Stanislaus Food Prods.*

28  *Co. v. USS-POSCO Indus.*, 2010 WL 3521979, at *16 (E.D. Cal. Sept. 3, 2010) (plaintiff sued in
    2009 over 1986 agreement).

The two cases Apple cites for this argument completely undercut the broader "anticompetitive decision date" framework it advocates. In *Garrison v. Oracle Corp.*, 159 F. Supp. 3d 1044 (N.D. Cal. 2016), and *In re Animation Workers Antitrust Litigation*, 87 F. Supp. 3d 1195 (N.D. Cal. 2015), the plaintiffs affirmatively alleged that the defendant(s) entered the anticompetitive agreements at issue more than four years before the plaintiffs filed their respective lawsuits. In each case, the court found that the original agreements were an overt *act* allegedly causing anticompetitive harm, and thus that (contrary to Apple's "decision date" argument) the limitations period began running then. The problem for the plaintiffs in both *Garrison* and *Animation Workers* is they did not allege any subsequent overt acts occurring in the limitations period and thus clearly established through the own allegations that their claims were untimely. *Garrison*, 159 F. Supp. 3d at 1066 (plaintiffs alleged that most recent anticompetitive agreement was entered into in 2009, meaning "[t]he statute of limitations expired . . . a year before the complaint was filed" in 2014); *Animation Workers*, 87 F. Supp. 3d at 1211 (plaintiffs were injured by agreements not to compete in 2004, 2005, and 2007 so the "statute of limitations ran . . . as early as 2008, and at best in 2011" but plaintiffs did not file suit until 2014). Such cases are inapposite here, where Cydia specifically alleges millions of harmful anticompetitive agreements and other acts within the statute of limitations.[6]

### B. Even If Apple's 2008 And 2009 Decisions Are Relevant For Limitations Purposes, Cydia Alleges Apple Restarted The Statute of Limitations Repeatedly In The Last Four Years

Cydia's claims are still timely even under Apple's mischaracterization that they stem from Apple's decisions made in 2008 and 2009, as Apple is engaged in continuing antitrust violations demonstrated by numerous overt acts that have occurred since December 10, 2016, including by entering into new unlawful agreements, modifying its anticompetitive policies and technical restrictions, and enforcing its agreements and policies on a regular basis since 2016.

---

[6] To the extent these decisions could be interpreted to hold that a plaintiff must plead specific dates showing that its claims are timely, they are unfortunately incorrect. Neither address the Ninth Circuit's precedent prohibiting dismissal of a complaint unless it affirmatively pleads that all of the relevant conduct occurred outside the statute of limitations.

"The governing statute, 15 U.S.C. § 15b, sets a four year statute of limitations on private antitrust actions. But an exception to this time limit exists for continuing violations." *Samsung*, 747 F.3d at 1202 (citing *Zenith Radio*, 401 U.S. at 338). "To state a continuing violation of the antitrust laws in the Ninth Circuit, a plaintiff must allege that a defendant completed an overt act during the limitations period that meets two criteria: 1) It must be a new and independent act that is not merely a reaffirmation of a previous act; and 2) it must inflict new and accumulating injury on the plaintiff." *Id.* (internal quotation marks and citation omitted). "This standard is meant to differentiate those cases where a continuing violation is ongoing—and an antitrust suit can therefore be maintained— from those where all of the harm occurred at the time of the initial violation." *Id.*

As relevant here, the Ninth Circuit held in *Samsung* and *Oliver* that imposing new agreements in support of the same scheme, expanding old agreements in new ways, and enforcing previous anticompetitive acts or agreements all constitute "overt acts" restarting the limitations period on a continuing violation. Cydia alleges Apple committed each of these acts repeatedly within the last four years.

### 1.    Apple has entered into new anticompetitive agreements

As discussed extensively above (at 8-10), Apple has (among other anticompetitive acts) entered into new tying, exclusive dealing, and vertically-arranged boycott agreements with iOS device purchasers and app developers since 2016 as part of every iOS device sale, every new app developer sign up for the App Store, and every new app uploaded to the App Store. The Ninth Circuit has squarely held both that "adoption of" a new anticompetitive agreement is "a 'new and independent act' that cause[s] 'new and accumulating injury'" and that application of an agreement to a new party or product is "also an overt act that restart[s] the limitations period." *Samsung*, 747 F.3d at 1203-04.[7]

---

[7]    In *Samsung*, the defendants created a license agreement in 2003 for SD cards that imposed a six percent royalty on all SD cards not manufactured by one defendant and "its allies." 747 F.3d at 1201. Later, the defendants developed new SD cards and, in 2006, adopted a new license agreement that applied to the second-generation SD cards and imposed the same six percent royalty on certain manufacturers. *Id.* at 1201-02. The plaintiff, Samsung, had signed the 2003 license and refused to sign the 2006 license but, at the defendants' insistence, nevertheless made the royalty payments. *Id.*

Because Apple's pre-December 2016 contracts necessarily do not cover new devices, new developers, or new apps (otherwise Apple would not need to enter into new agreements), each subsequent agreement—the millions upon millions of them—constitutes "a 'new and independent act' that cause[s] 'new and accumulating injury'" by preventing more and more users and developers from using Cydia's services with respect to more and more devices and apps. *Id.*; *see also Alarm Detection Sys., Inc. v. Orlando Fire Prot. Dist.*, 326 F. Supp. 3d 602, 612 (N.D. Ill. 2018) ("renewal of the [exclusive dealing] contract" and passage of new ordinances restricting plaintiffs' access to the market "are more than mere inertial consequences of prior agreements and ordinances" as "they are evidence of a conscious effort to continue" the defendants' exclusionary practices).

Apple does not challenge that the anticompetitive *agreements* it imposed on each iOS app developer and iOS device user within the past four years constitute millions of separate overt acts. Instead, Apple contends that new iOS device *sales* alone do not constitute an overt act. (Mot. at 9 (citing *Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, 2010 WL 3529179, at *16 (E.D. Cal. Sept. 3, 2010).) Such an argument completely ignores Cydia's claims concerning Apple's exclusionary practices with respect to *app developers*, but also mischaracterizes the nature of Cydia's claims with respect to iOS device users. Cydia does not allege that the mere sale of an iOS device (*e.g.*, a customer paying Apple money in return for an iPhone) is anticompetitive; it is the anticompetitive arrangements and other exclusions Apple imposes with each new device, each new app, and each new app update that forms the basis for Cydia's claims. Apple's millions of annual acts are thus the equivalent of the updated license agreement in *Samsung* that expanded what types of products the license covered (*see supra* at 14 n.7), showing that Cydia's claims are clearly timely.

Apple's cited authorities are thus inapposite, as they hold only that paying money pursuant to old agreements does not count as a new overt act by the defendant. *Aurora Enters., Inc. v. Nat'l Broad. Co.*, 688 F.2d 689, 694 (9th Cir. 1982) (plaintiffs' claims based on syndication profits

_____

at 1202. Samsung sued in 2010 alleging that both licenses were unlawful under sections 1 and 2 of the Sherman Act. *Id.* The district court dismissed the suit as time-barred, but the Ninth Circuit reversed. The Court held that "[t]he adoption of the 2006 license was a 'new and independent act' that caused 'new and accumulating injury'" because it did not cover the "second-generation SD cards." *Id.* at 1203-04.

15

1  received "as a result of a contracted executed in 1966"); *Stanislaus Food Prods.*, 2010 WL 3521979,

2  at *16 (plaintiff challenged competitors' 1986 agreement to stop competing and form joint venture

3  that raised prices). Because Cydia's claims are based on Apple's execution of *new* agreements and

4  imposition of *new* restrictions as part of each iOS device sale and with each new app or app update,

5  the Court can safely ignore Apple's hyperbolic argument that denying its motion "would 'destroy'

6  the statute of limitations 'since parties may continue indefinitely to receive some benefit as a result

7  of an illegal act performed in the distant past.'" (Mot. at 9 (internal quotation marks omitted).)

### 2.  Apple has modified its anticompetitive policies and imposed new technical restrictions to exclude competitors

When a defendant imposes additional technical restrictions or fine-tuned its anticompetitive

policies, those are new overt acts restarting the statute of limitations. For example, in *Smith v. eBay

Corp.*, the plaintiffs alleged that eBay had unlawfully tied eBay's services to use of PayPal's

payment processing services (also owned by eBay) and implemented policies prohibiting sellers

from using alternative payment methods. 2012 WL 27718, at *1-2 (N.D. Cal. Jan. 5, 2012). The

court denied the defendants' motion to dismiss based on the statute of limitations because the

plaintiffs "premise[d] their tying claims on eBay's continued modification of the Accepted Payment

Policy" to further "restrict acceptable forms of payment." *Id.* at *4-5; *see also id.* at *5 (holding the

same for monopolization and attempted monopolization claims).

Cydia alleges that Apple engaged in functionally identical modifications of its policies and

technology here. (Compl. ¶ 63.) "For example, Apple specifically revised its developer program

license agreement to prohibit developers from facilitating distribution of apps from any source other

than the App Store, and it has on multiple occasions paused or delayed app approval if app

developers do not add more revenue-generating features for Apple, such as in-app purchases." (*Id.*)

And, with respect to technical measures to prevent competition, "Apple has also continuously

implemented ever more restrictive measures to prevent users from gaining access to their devices

and installing Cydia as a competitive app store." (*Id.* ¶ 64.) "More recently, Apple made these

technical restrictions even more pervasive by," for example, "introducing runtime code modification

prevention . . . and other control mechanisms that specifically target and prevent Cydia from

competing with Apple because they effectively prevent users from using Cydia or any other alternative app store on iOS at all." (*Id.* ¶ 65.) Accordingly, by alleging that Apple is continuously modifying its policies and technical restraints to prevent iOS device users and iOS app developers from using Cydia, Cydia's claims are timely. *Garnica*, 2015 WL 3766514, at *2 (denying motion to dismiss where the defendant "may well have altered the terms of its agreement with Garnica within the statute of limitations period"); *Smith*, 2012 WL 27718, at *4-6.

Apple's arguments that these allegations do not plausibly establish overt acts within the limitations period have no merit. Apple claims that Cydia's allegations are insufficient because they "are undated" (Mot. at 10, 13), but the Complaint plainly alleges that Apple's misconduct is "continu[ing]" and occurred "recently" (Compl. ¶¶ 63-65). Any and all reasonable inferences must be applied in Cydia's favor, and the clear—explicit—inference of such language is that it happened within the past four years. *See Manzarek*, 519 F.3d at 1031. And, regardless, the Complaint cannot be dismissed due to an alleged lack of specific dates. (*Supra* at 7, 12-13.)

Next, Apple asserts that modifying its policies and technology "necessarily flow from Apple's decisions made in 2008 and 2009 that the App Store be the sole app store for app distribution on iOS devices and that iOS app developers use Apple's IAP for in-app purchases . . ." (Mot. at 11; *id.* at 9 ("Apple's updates . . . are technical reaffirmations of its" earlier decisions); *id.* at 13-14 ("Apple has implemented those technical modifications to ensure that iOS users comply with the very policies Apple established in 2008 and 2009 . . .").) Apple's argument boils down to the proposition that once a party decides to violate the antitrust laws, *all* subsequent overt acts taken in service of that goal are immune from liability if they occur more than four years after the initial decision. Such an argument plainly violates binding law and, indeed, the Ninth Circuit has rejected this type of argument. *Samsung*, 747 F.3d at 1203 ("an action . . . [is] sufficient to restart the statute of limitations so long as the defendant had the ability not to take the challenged action"). Because Apple clearly "had the ability not to" modify its policies and technology to exclude competition, Apple's argument fails. *Id.*; *Oliver*, 751 F.3d at 1087 n.5 (conduct was not merely a reaffirmation of earlier action because "Defendants could have ceased charging the price-fixed price at any time"); *see also Columbia Steel Casting Co. v. Portland Gen. Elec. Co.*, 111 F.3d 1427, 1444 (9th Cir.

1996) (defendant's refusal to deal was an overt act that restarted the statute of limitations, even though decision was required under earlier contract, because the contract "was not a permanent and final decision that controlled the later act" as the defendant could have breached).

Apple's cited authorities are, again, inapposite. The Ninth Circuit has made clear that *AMF, Inc. v. General Motors Corp. (In re Multidistrict Vehicle Air Pollution)*, 591 F.2d 68 (9th Cir. 1979), which held that a plaintiff's unsuccessful attempts to get market acceptance for a product rejected outside the limitations period were not new acts causing timely injury, "is the exception, not the rule." *Samsung*, 747 F.3d at 1203. The Ninth Circuit has repeatedly distinguished *AMF* from instances, like here, where the defendant had the ability to refrain from engaging in the later anticompetitive acts. *Id.*; *Oliver*, 751 F.3d at 1087 n.5; *Columbia Steel Casting*, 111 F.3d at 1444; *Hennegan v. Pacifico Creative Serv., Inc.*, 787 F.2d 1299, 1300-01 (9th Cir. 1986); *see also Red Lion Med. Safety*, 63 F. Supp. 2d at 1224 (refusing to apply *AMF* because "[a]lthough Ohmeda's parts policy has been in place for at least 15 years . . . . Ohmeda could always change its policy"). *Stanislaus Food Products Co. v. USS-POSCO Industries* is even further afield, as there the court held only that the plaintiff could not challenge a joint venture formed outside the statute of limitations. The Court *also* observed that the plaintiff could "challenge subsequent acts by [the defendant] which violate antitrust laws" and *denied* the motion to dismiss with respect to "additional wrongful conduct" that occurred later.[8] 2010 WL 3521979, at *15 n.8, *17 (E.D. Cal. Sept. 3, 2010); *see also Smith*, 2012 WL 27718, at *5 (distinguishing *Stanislaus* based on defendant's modification of its policies).

---

[8]  *MedioStream, Inc. v. Microsoft Corp.*, 869 F. Supp. 2d 1095 (N.D. Cal. 2012), cited by Apple only with respect to Cydia's allegations that Apple has imposed anticompetitive restrictions on consumers through "updates" to iOS devices (Mot. at 9), also does not change the conclusion. There, the plaintiff did not even argue that the defendant was engaged in a continuing violation. Plaintiff MedioStream, Inc.'s Opp. to Microsoft's Mot. to Dismiss at 8-11, *MedioStream, Inc. v. Microsoft Corp.*, ECF No. 82, No. 5:11-cv-03095-RMW (N.D. Cal. Nov. 14, 2011). Regardless, the court in *MedioStream* acknowledged that the plaintiff's claims would have been timely if there was "an agreement executed within the limitations period" or "active enforcement of mutable policies first put in place outside the limitations period" as Cydia alleges here (*supra* at 8-10; *infra* at 20-21). 869 F. Supp. at 1105 (internal quotation marks and emphasis omitted).

1    Finally, Apple claims that the Complaint does not allege "how th[e] modified policies

2    inflicted *new* injuries on [Cydia] separate and apart from the permanent injury Plaintiff allegedly

3    suffered as a result of Apple's initial decisions in 2008" and 2009. (Mot. at 11.) This argument rests

4    on Apple's assertion that Cydia's only injury occurred in 2008 when Cydia "was excluded" from

5    distributing iOS apps, and in 2009 "when Apple . . . required that all iOS developers use" Apple's

6    payment processing services. (*Id.* at 12.) Notably, Apple does not dispute that the Complaint

7    adequately alleges that Apple's recent modification of its technical restrictions has inflicted new

8    injuries (*see id.* at 9, 13-14); nor could Apple, as the Complaint alleges that, unlike earlier

9    restrictions, the most recent technical modifications "threaten to completely wipe out Cydia's ability

10   to serve its users . . ." (Compl. ¶ 65). Moreover, Apple does not dispute (because it cannot)

11   undisputed law that tying and exclusive dealing claims, like those Cydia alleges, accrue with *every*

12   *single agreement*. (*See supra* at 8-10.)

13   Regarding Apple's modification of its policies, Apple ignores that such modifications inflict

14   incremental harm on Cydia by making it more and more difficult for Cydia to compete, thereby

15   preventing more and more iOS users and app developers from using Cydia. Although Apple

16   introduced the App Store and its app payment services in 2008 and 2009, Cydia continued to

17   compete and serve iOS device users and app developers. (Compl. ¶¶ 23, 25 (explaining how iOS

18   device users and app developers continued to use Cydia's services "even with Apple's introduction

19   of the App Store"); Dylan Love, *The Latest Jailbreak Statistics Are Jaw-Dropping*, Business Insider

20   (Mar. 2, 2013), https://www.businessinsider.com/jailbreak-statistics-2013-3 (as of 2013, Cydia had

21   "roughly 23 million monthly unique users") (cited at Compl. ¶ 23 n.11).) Because Apple initially

22   failed to completely exclude Cydia, "Apple turned to contractual . . . restraints to exclude Cydia"

23   and has thus "continuously modified its App Store policies . . . to make it more difficult for Cydia

24   . . . to compete." (Compl. ¶ 63.) Each new modification Apple made to its policies therefore inflicted

25   new and incremental harm on Cydia by preventing millions of additional iOS device users and app

26   developers from using Cydia's services.

27   Cydia's harm is similar to the incremental harm recognized in *Hennegan v. Pacifico Creative*

28   *Service, Inc.*, 787 F.2d 1299 (9th Cir. 1986). In *Hennegan*, the plaintiffs operated a souvenir shop

and sued competing souvenir shops and tour operators who had allegedly entered into a conspiracy whereby the defendant shops paid the tour operators to steer tourists away from the plaintiffs' stores and towards the defendants' stores—attempting to exclude the plaintiffs from the souvenir gift shop market. *Id.* at 1300. The Ninth Circuit held that the "tour operators' shepherding of tourists away from the [plaintiffs'] shop and to the shops of the souvenir vendors" constituted "overt acts" and were not barred by the statute of limitations. *Id.* at 1300-01. Apple's conduct here is functionally identical, as Apple's policy modifications are designed to (and do) "shepherd[]" iOS device users and iOS app developers away from Cydia's services to the App Store.

"In contrast to . . . *Hennegan*, the Ninth Circuit has found no continuing violation only in situations in which the act outside the limitations period 'completely and permanently excluded [the plaintiff] from the market.'" *Red Lion Med. Safety*, 63 F. Supp. 2d at 1224 (quoting *Hennegan*, 787 F.2d at 1301) (alteration in original). Thus, because Apple's early actions in 2008 and 2009 did not "completely and permanently exclude[]" Cydia from the markets for iOS app distribution and payment processing, Apple's continuous policy modifications are overt acts that restart the statute of limitations as they inflict new incremental harm on Cydia by increasing Cydia's exclusion from the markets and preventing it from serving new customers. *PBTM*, 2021 WL 37648, at *11 (denying motion because "the [challenged] contract incrementally limited PBTM's ability to market the V12 products, it did not permanently exclude PBTM or destroy its business"); *Smith*, 2012 WL 27718, at *5 (policy changes "inflicted new and accumulating harm"); *Red Lion Med. Safety*, 63 F. Supp. 2d at 1224 (denying motion because the effects of tying policies "are felt not all at once . . . but each time [a competitor] is unable to sign a . . . customer because" of such policies).

Apple's cited authority (*Stanislaus* and *AMF*) is again inapposite, for the reasons discussed above.

### 3. Apple has enforced its anticompetitive agreements and policies within the limitations period

The Ninth Circuit has "repeatedly held that acts taken to enforce a contract were overt acts that restarted the statute of limitations." *Samsung*, 747 F.3d at 1204 (collecting cases). For example, a defendant's mere request that another party comply with an anticompetitive contract is sufficient

to establish a qualifying overt act. *Id.* at 1204 ("When the SD Defendants approached Samsung and required it to make license payments . . . those acts caused independent harm and accumulating injury.").

Here, the Complaint alleges that Apple has "selectively and arbitrarily enforced [its anticompetitive] policies to make it more difficult for Cydia . . . to compete" with the App Store and Apple's payment processing services. (Compl. ¶ 63.) Further, "Apple routinely punishes app developers that speak out against its policies, including Epic [Games] . . . or those that work to support fair competition in the app distribution market, like Toyota." (*Id.* ¶ 61 (footnote omitted); *see also id.* ¶ 66 (describing how Apple "punishes app developers that attempt to utilize" app distribution platforms other than the App Store). Indeed, in litigation currently pending before this Court, Epic Games sued Apple in 2020 for removing its Fortnite app from the App Store after Epic attempted to use a payment processing service outside of the App Store. Complaint, *Epic Games, Inc. v. Apple Inc.*, ECF No. 1, No. 4:20-cv-05640-YGR (N.D. Cal. Aug. 13, 2020). And Apple filed counterclaims to enforce its contracts with Epic, claiming that that Epic breached the contracts by trying to use a payment mechanism other than Apple's. Answer & Counterclaim, *Epic Games, Inc. v. Apple Inc.*, ECF No. 66, No. 4:20-cv-05640-YGR (N.D. Cal. Sept. 8, 2020).[9] It is exactly those contracts that Cydia alleges are anticompetitive in nature (and the Epic dispute is emblematic of Apple's widespread practices). These are overt acts sufficient to satisfy the statute of limitations, and Apple does not dispute this in its Motion. *Samsung*, 747 F.3d at 1204.

## II.    CYDIA'S CLAIMS FOR INJUNCTIVE RELIEF ARE TIMELY

Laches does not bar Cydia's claims for injunctive relief. "A claim is barred by laches where (1) the plaintiff unreasonably delays in bringing suit and (2) the defendant is prejudiced by the delay." *EEOC v. LogistiCare Sols. LLC*, 2020 WL 6781270, at *1 (D. Ariz. Nov. 18, 2020). Because laches is a fact-based affirmative defense, "claims are not easily disposed of at the motion to dismiss

---

[9] The Court may take judicial notice of this related case. *Reyes-Aguilar v. Bank of Am., N.A.*, 2014 WL 2917049, at *4 (N.D. Cal. June 24, 2014) ("Courts may take notice of proceedings in other courts if those proceedings have a direct relation to matters at issue." (internal quotation marks omitted)).

1    stage based on a defense of laches." *Id.* "A laches defense raised at the motion to dismiss posture

2    requires exclusive reliance on the factual allegations in the complaint. . . . [T]his postural

3    requirement poses a nearly insurmountable obstacle to a favorable resolution of a defendant's fact-

4    dependent laches claim." *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2014 WL 1091589, at *13

5    (N.D. Cal. Mar. 13, 2014). Here, Apple's laches defense fails for three independent reasons.

6         *First*, because, as explained above, Cydia has alleged that it was injured within the four-year

7    antitrust statute of limitations, laches does not apply. *Oliver*, 751 F.3d at 1087 ("Because Plaintiffs

8    allege that they were injured within the four-year limitations period, Plaintiffs have alleged

9    sufficient facts to show that laches does not bar their federal antitrust claim." (footnote omitted)).

10        *Second*, Apple cannot show an unreasonable delay. "[A] lengthy span of time, alone, is not

11   enough to prove unreasonable delay." *LogistiCare Sols.*, 2020 WL 6781270, at *1. Here, Apple

12   asserts that Cydia's alleged delay was unreasonable solely because Cydia was allegedly aware that

13   Apple began its anticompetitive conduct in 2008 and 2009. (Mot. at 14-15.) Because Apple fails to

14   point to any allegation showing "why the [alleged] delay occurred" and the Complaint contains no

15   such allegations, Apple cannot prove that laches bars Cydia's claims. *LogistiCare Sols.*, 2020 WL

16   6781270, at *1.

17        *Third*, Apple cannot show prejudice. Apple claims that if Cydia "had filed suit sooner, Apple

18   could have invested its resources in shaping an alternative identity . . . in the minds of the public.

19   (Mot. at 15 (internal quotation marks omitted) (ellipsis in original).) Yet Apple does not, and cannot,

20   cite any allegations that establish Apple would have acted differently if Cydia had sued earlier.

21   Apple points to allegations that the App Store has been successful (*id.*), but none address whether

22   Apple would have done anything differently if Cydia had filed suit sooner, let alone establish that

23   Apple has actually been harmed in any way. Indeed, Apple has fought attempts (such as Epic's) to

24   change its App Store and in-app payment processing practices tooth and nail—it is going to trial on

25   the issue before this Court in May. Apple therefore cannot demonstrate prejudice. *See McCarthy v.*

26   *Johannesson*, 2012 WL 12887540, at *4 (C.D. Cal. Dec. 11, 2012) (denying motion to dismiss

27   where complaint's allegations did not "provide sufficient information to conclude that defendants

28   have been prejudiced by plaintiffs' delay").

1    **III.    CYDIA'S STATE LAW CLAIMS ARE TIMELY**

2    Finally, Cydia's unfair competition law ("UCL") claims in Count IV are timely for the same

3    reasons as Cydia's federal claims. UCL claims based on anticompetitive conduct are subject to the

4    same accrual rules as the underlying antitrust claims, so the statute of limitation runs in parallel

5    fashion. *Animation Workers*, 87 F. Supp. 3d at 1211 ("Plaintiffs' UCL claim based on Defendants'

6    alleged anticompetitive conduct also began to accrue at the time Plaintiffs suffered their injury").

7    Further, the continuing violation doctrine (or "continuing accrual" theory) also applies to UCL

8    claims. *TCL Commc'ns Tech. Holdings, Ltd. v. Telefonaktienbolaget LM Ericsson*, 2016 WL

9    7049263, at *6 (C.D. Cal. Aug. 9, 2016) ("Under that theory, separate, recurring invasions of the

10   same right triggers each violation's own statute of limitations."); *In re Animation Workers Antitrust*

11   *Litig.*, 87 F. Supp. 3d at 1211 (observing that UCL claims are not time barred if there are "allegations

12   that Defendants engaged in 'continuing violations'"). Because Cydia's UCL claims are based on the

13   same conduct as Cydia's federal claims and the same accrual rules apply, Cydia's UCL claims are

14   timely for the reasons explained above. (*Supra* at 8-21.)

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SAURIKIT, LLC'S OPPOSITION TO MOTION TO DISMISS
Case No. 20-cv-08733-YGR

1   Dated: March 22, 2021

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

QUINN, EMANUEL, URQUHART &
SULLIVAN, LLP

Respectfully submitted,

/s/    Adam B. Wolfson
Stephen A. Swedlow (*pro hac vice*)
David A. Nelson (*pro hac vice*)
Marc L. Kaplan (*pro hac vice*)
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606-1881
(312) 705-7400

Adam B. Wolfson (SBN 262125)
Joseph Sarles (SBN 254750)
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017-2543
(213) 443-3000

*Attorneys for Plaintiff SaurikIT, LLC*