*ORIGINAL*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable YVONNE GONZALEZ ROGERS, Judge

| | | |
|---|---|---|
| SAURIKIT, LLC, | ) | **Motion to Dismiss** |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | NO. C 20-08733 YGR |
| | ) | |
| APPLE INC., | ) | Pages 1 - 35 |
| | ) | |
| Defendant. | ) | Oakland, California |
| _____ | ) | Wednesday, January 5, 2022 |

### REPORTER'S TRANSCRIPT OF ZOOM WEBINAR PROCEEDINGS

### APPEARANCES VIA ZOOM WEBINAR:

```
For Plaintiff:          Quinn, Emanuel, Urquhart & Sullivan
                        191 N. Wacker Drive, Suite 2700
                        Chicago, Illinois 60661-1881
                   BY:  STEPHEN A. SWEDLOW, ATTORNEY AT LAW

                        Quinn, Emanuel, Urquhart & Sullivan
                        865 S. Figueroa Street, 10th Floor
                        Los Angeles, California  90017-2543
                   BY:  ADAM B. WOLFSON, ATTORNEY AT LAW


For Defendant:          Gibson, Dunn & Crutcher LLP
                        333 South Grand Avenue
                        Los Angeles, California  90071
                   BY:  JAGANNATHAN P. SRINIVASAN,
                          ATTORNEY AT LAW


Reported By:       Raynee H. Mercado, CSR No. 8258
```

Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

```
 1    Tuesday, January 5, 2022                          2:27 p.m.

 2                      P R O C E E D I N G S

 3                         (Zoom Webinar)

 4         THE CLERK:  Calling civil case 20-8733-YGR, SaurikIT,

 5    LLC versus Apple, Inc.

 6      Counsel, starting with the plaintiff, please state your

 7    appearance for the record.

 8         MR. SWEDLOW:  Good afternoon, Your Honor.  Stephen

 9    Swedlow and Adam Wolfson of Quinn Emanuel for plaintiff.

10         THE COURT:  Okay.  Good afternoon.

11         MR. SRINIVASAN:  Good afternoon, Your Honor.  Jay

12    Srinivasan of Gibson Dunn for Apple.

13         THE COURT:  Okay.  Good afternoon.

14      And on the plaintiff's side, who's going to be doing the

15    argument?

16         MR. SWEDLOW:  Adam Wolfson.  Sorry.  Go ahead.

17         THE COURT:  Okay.  Mr. Wolfson.

18      All right.  Well, Mr. Srinivasan, why don't we go ahead

19    and you can start.  I'm sure that I will quickly interrupt.  I

20    have views, but I'll let you get started.

21         MR. SRINIVASAN:  Sure.  Thank you, Your Honor.

22      We -- we think this is a fairly straightforward

23    application of the statute of limitations here.  There seems

24    to be very little dispute that the claims accrued in 2008.

25    The allegations are clear that the plaintiff Saurik or
```

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1  SaurikIT was operating in 2008.  And that Apple is alleged to
2  have institute [sic] a policy in July of 2008 that prevented
3  all other app stores from operating on their iOS and on their
4  devices.
5     That was a -- not a decision made by Apple.  It was a -- a
6  definitive act that was conclusive, substantial and
7  comprehensive.
8     They made no bones -- and this is alleged -- about acting
9  in a way that other app stores like plaintiffs could not
10 operate at all on a -- on iOS.  And that's, you know, in many
11 paragraphs in the complaint.  I think that that's fairly well
12 established.
13    There is also allegations that payment processing began
14 with Apple in about 2009 and that Apple immediately made the
15 decision and acted and implemented a decision to hard-wire
16 into its products and its operating system a -- a -- you know,
17 a procedure where only Apple's payment processing was allowed.
18    I do -- I do want to pause a little bit because I think
19 the case is really a refusal to deal case, and the payment
20 processing piece is a little bit of a red herring because
21 there was no payment processing for plaintiff to ever even
22 deal with.
23    The act -- the definitive, conclusive act was Apple saying
24 you cannot operate your app store on iOS and all of the harm
25 flows from that.  There was no tie because it wasn't as if

1    they ever operated the app store.

2        In any event, the -- and paragraph 41 I think particularly

3    captures plaintiff's allegations in -- in showing that what

4    Apple did was conclusively cut them off.  In fact, the quote

5    from that paragraph, among many, is that "by technological

6    design and contractual restraint, Apple does not allow

7    third-party services to distribute on iOS," period, full stop.

8    That is the allegation.

9        So I think the only issue in this case is that, you know,

10   when -- when -- whether the continuing violation doctrine

11   applies or not.

12       I would also add that, by the way, the plaintiff -- the

13   complaint makes very clear that plaintiffs were well aware of

14   their claim in 2008.  They were operating.  They were

15   prevented from operating.  There's no suggestion that they

16   didn't know this happened to them.

17       So as alleged, this definitive and comprehensive harm

18   occurred to them in 2008.  And thereafter, the allegations

19   in -- you know, indicate that Apple simply reiterated that

20   initial act over and over and over again.  And it's not just

21   2008 but in the subsequent eight years.

22       They filed their complaint December of 2020.  If you go

23   back four years from there, that's December of 2016.  Now,

24   some of these allegations are undated, but there are

25   allegations that Apple gilded the lily, as it were, in various

1    ways on enforcing and essentially implementing its initial

2    decision.  It reiterated it over and over and over.  It

3    reaffirmed.

4        So with that backdrop, the question is, does the

5    continuing violation doctrine apply here.  And the parties

6    agree on the standard.  The standard is, is there a new and

7    independent act that's different than a reaffirmation and also

8    is there a distinct and new harm to Apple [sic] as a result of

9    those new acts.  And we would submit that this is not a close

10   call.

11       There is obviously some line-drawing in every one of these

12   cases as to what constitutes the continuing violation and what

13   does not.  There has to be some line because if there is not a

14   line, then there is no statute of limitations for a Sherman

15   Act so we have to conclude that there must be some cases, some

16   allegations, where the continuing violation doctrine does not

17   apply to excuse stale claims.

18       And the -- the Ninth Circuit case law actually provides

19   plenty of guidance on this the issue.  We would start, of

20   course, with the *Vehicle Air Pollution* case back in 1979.

21   Now, that case has language that talks about why a

22   comprehensive decision to not to do business -- that's a

23   refusal to deal case like we have here with a particular third

24   party who wanted to supply some kind of device -- a -- a

25   cleaning device to -- to certain car manufacturers.

1       And ultimately, the Ninth Circuit found that that refusal

2    occurred outside the limitations period and that that refusal

3    was -- I think in their words, they say, was irrevocable,

4    immutable, permanent and final.  And a large part of that

5    conclusion was because of their finding that, quote, the

6    original equipment supply market to automobile manufacturers

7    differs substantially from other supplier relationships.  Any

8    part must be integrated into the full car design.  Planning is

9    essential.  And planning requires lead time.

10       I quote that language, Your Honor, because that language

11    has been quoted repeatedly in the -- by the Ninth Circuit

12    since, including from cases that plaintiffs rely on.

13       Plaintiffs rely on the *Hennegan* case out of Guam and the

14    *Red Lion* safety case, which is an Eastern District of

15    California case.  Both of those cases did find continuing

16    violations, but they both went out of their way to say that

17    were the allegations similar to the air pollution case, we

18    would not find a continuing violation.  And both cite the

19    language of, quote, there is no technological impediment or

20    necessary lead time associated with changing the conduct in

21    those two cases.

22       I would also add, Your Honor, that ultimately, the Ninth

23    Circuit seems to tell us -- and they've said it expressly --

24    that in a refusal to-to-deal-type case where somebody says

25    "no," you don't get to restart the statute of limitations by

1    coming back and asking again and again and again.  And that --

2    or -- or essentially the initial refusal stands.

3        The *Aurora Enterprises vs. NBC* case says that there is no

4    continuing violation in air pollution, which is the case that

5    we just talked about, because, quote, it involves an

6    allegation of a refusal to deal, was not -- was per- -- not an

7    allegation of an enforcement of an illegal contract.

8        That case also says that active enforcement of an illegal

9    contract may under certain circumstances cause a renewal and

10   trigger the continuing violation doctrine but not a

11   refusal-to-deal case.

12       Yet another case that plaintiffs cite is the Northwest --

13          **THE COURT:**  So I'm going to interrupt you at this

14   point.

15          **MR. SRINIVASAN:**  Sure.

16          **THE COURT:**  Mr. Wolfson, I -- tend to agree that

17   there needs to be some overt act relative to your client, and

18   there doesn't seem to be.

19       I -- this theory that every time they operate on a daily

20   basis, that restarts the statutes of limitations, which seems

21   to be your argument, I'm not persuaded given the case law and

22   given that all of the acts that you've alleged in your

23   complaint don't specifically have anything to do with your

24   client, who was obviously aware of this back in 2008, 2009 and

25   did nothing until everything exploded against Apple and -- and

```
 1    it looks very much like some kind of -- I wouldn't say copy
 2    cat because it's not entirely a copy cat.  But, you know,
 3    there's a lot of activity and all of a sudden out of the blue
 4    your client comes in over a decade later and says, no, wait a
 5    minute.  This affects us.  We knew about this in 2008, 2009,
 6    and we been operating, but we'd like to sue Apple now.
 7         So -- and I would note with respect to -- I understand the
 8    law.  You can argue it.  I understand that the Multi-district
 9    Vehicle Air Pollution case, you know, there are cases that say
10    it's the exception not the rule in terms of -- of how we deal
11    with these antitrust cases.  But the -- the suggestion that
12    you're making in here really does, I think, defeat any statute
13    of limitations argument because you effectively have kind of
14    created this theory that says, even though -- the way that
15    they operate relative to everybody else vitiates the statute
16    of limitations.
17         And -- and I'd like you to also let me know whether you
18    think you can amend in any way.  It's not -- it's not clear to
19    me.  I -- as I read your complaint, think it is paragraph 65
20    where perhaps there's something that happened, but you use the
21    word "more recently," and I don't know what that means, and I
22    certainly don't know whether it's within four years, so I
23    would need know when "more recently" is.
24         MR. WOLFSON:  Okay.  Your Honor, I'd like to address
25    those in kind.
```

1          First of all, the length of time that Your Honor noted,

2     what I'd note is that that is not the question.  The question

3     is whether Apple has committed an overt act within the past

4     four years that gave rise to our claims.  And the *Columbia*

5     *Steel* case that we've cited in our opposition, for example,

6     Ninth Circuit case -- the cite is 111 F3d --

7          **THE COURT:**  Well, what is the specific overt act

8     relative to your client, not to a consumer, not to a

9     developer, but to your client?

10          **MR. WOLFSON:**  So the overt acts, Your Honor, include

11    tying agreements against both consumers and developers.

12          **THE COURT:**  So that doesn't relate to your client.

13          **MR. WOLFSON:**  It does, Your Honor, because the nature

14    of a tying agreement is that you are taking away customers --

15          **THE COURT:**  How do I know anything about why any

16    customer would want to use your client in any event?

17                    (Simultaneous colloquy.)

18          **THE COURT:**  When you're not -- you -- There -- you

19    haven't -- your client has been sitting on the sidelines since

20    2008.

21          **MR. WOLFSON:**  It has not, Your Honor.

22      As we've alleged in the complaint, Cydia continued to

23    operate through 2020 and continued to offer its alternative

24    app store.

25      What happened is that in 2020, as we allege in the

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1   complaint, Apple make a technological change to iOS --

2          **THE COURT:**  Where and what paragraph are you talking

3   about?

4          **MR. WOLFSON:**  I will pull that up in a moment, Your

5   Honor.

6       The -- let's see.  The technological change -- the 2021 --

7   paragraphs 64 through 65, I believe, Your Honor, is one where

8   we talked about that.

9       I'm trying to pull up the complaint as we speak.

10         **THE COURT:**  So 64 doesn't say anything about 2020,

11   nor does 65.

12         **MR. WOLFSON:**  I apologize, Your Honor.  I'm trying to

13   get these in front of me.  I thought I had a copy in my hand.

14      20 -- Your Honor, I apologize.  I'm trying -- I'm going to

15   try and get this as quickly as I can for you.

16      But, first, real quick, Your Honor, one thing I would like

17   to note is that the tying and exclusive dealing claims that we

18   have brought, by their very nature, are agreements that Apple

19   enters into with third parties that harm competition.

20      The nature of an exclusive deal, which we allege with

21   respect to the developer side and the -- and the consumer side

22   of these app stores, is that you have a potential customer of

23   your competitors agree not to use them.

24                  (Simultaneous colloquy.)

25         **THE COURT:**  -- happen in 2008?

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

```
 1           How did -- how did it change?  How was there any change

 2     limitations period -- because you are arguing, aren't you,

 3     that they could, in fact -- even though they knew about this

 4     the 2008 and 2009, they can sit on their hands and not do

 5     anything.

 6               MR. WOLFSON:  The --

 7               THE COURT:  That is effective what you're arguing,

 8     right?

 9               MR. WOLFSON:  Your Honor, the answer is yes.  And

10     that if they keep committing overt acts like these exclusive

11     deals, these tying agreements, they keep on doing it, the law

12     is that it -- it doesn't matter whether you know, it's whether

13     you have new and accumulating injury.

14                         (Simultaneous colloquy.)

15               THE COURT:  But it can't be a reaffirmation of a

16     prior act.  Do you agree with that?

17               MR. WOLFSON:  It cannot just be a reaffirmation of

18     a --

19               THE COURT:  So how is it different?

20               MR. WOLFSON:  Because, Your Honor --

21               THE COURT:  That's what I'm struggling with because

22     all of what you have in your complaint seems a reaffirmation

23     of everything that had been done, so what -- where can you

24     point me to something that's new?

25               MR. WOLFSON:  Your Honor, I'd point you actually to
```

1    the *Hennegan* case to give an example.

2            **THE COURT:**  No.  In your complaint.

3            **MR. WOLFSON:**  Well, in our complaint, Your Honor, the

4    tying -- each tying agreement -- each time Apple enters a

5    new --

6            **THE COURT:**  Mr. Wolfson --

7            **MR. WOLFSON:**  Yes.

8            **THE COURT:**  -- how is it different --

9                    (Simultaneous colloquy.)

10           **THE COURT:**  -- than it is --

11   So I'm trying to understand how this isn't just a

12   reaffirmation.  How is it different than what was happening in

13   2008 and 2009?  Because I thought you just agreed that it does

14   in fact -- it can't be a reaffirmation.

15           **MR. WOLFSON:**  Your Honor, the reaffirmation law is

16   one where the action in and of itself was done -- was

17   performed before -- earlier than four years before the

18   complaint.  And then all of the harm that occurred from it --

19   harm to competition occurred at that time.

20       If you then -- for example, you enter into an

21   anti-competitive contract and then enforce that contract

22   within the limitation period, even though it's just in line

23   with the same policy, in line with the same contract that you

24   entered before the limitations period, it actually acts as a

25   new overt act.

```
 1        If you take --
 2            THE COURT:  What case do you have -- what case do you
 3   have for that perspective?
 4            MR. WOLFSON:  On the policy -- let's see.  That would
 5   be the --
 6            THE COURT:  On making this distinction that the
 7   re- -- that a reaffirmation, even though it's the exact same
 8   issue, the exact same policy, that -- I mean -- let me ask you
 9   this:  How do you define "reaffirmation"?  Define it for me.
10            MR. WOLFSON:  A reaffirmation, to use
11   Mr. Srinivasan's example, is if -- if a case was refusal to
12   deal case -- this is not.  Apple has not --
13            THE COURT:  Well, you have a -- refusal to deal
14   allegations in here, I thought.
15            MR. WOLFSON:  We do not.  This is --
16            THE COURT:  Okay.
17            MR. WOLFSON:  Apple has been not challenged the
18   plausibility of our tying, exclusive dealing, vertically
19   arranged boycott --
20            THE COURT:  Well, exclusive dealing you have
21   paragraphs 111 through 118.
22            MR. WOLFSON:  Yes.  And we allege also that the
23   developer agreements constitute exclusive deals because Apple
24   forces developers to agree that they will not use any other
25   develop -- any other app store.
```

 1     So each time you enter into an exclusive deal, that --

 2     that point, that agreement, is what gives rise to an exclusive

 3     dealing claim.

 4         The Ninth Circuit's *Aerotec* case is crystal clear on this.

 5     You cannot have an exclusive dealing agreement until you have

 6     an exclusive deal.  And each time Apple is entering into these

 7     developer agreements, which, by the way, it's Apple's period

 8     burden on this motion to say that they are -- that there's no

 9     set of facts based on the complaint's allegations that could

10     lead to a timely claim.

11         And we have alleged that every time a developer enters

12     this agreement, every time they have to reaffirm their

13     commitment to this agreement, every time Apple enforces this

14     agreement, that they are new -- new overt acts.

15         And to be clear, Your Honor, Apple does not have a single

16     case anywhere in any of its briefs that says that when you

17     enter a new tying agreement that that's not a new overt act.

18     They do not have --

19         **THE COURT:**  Mr. Srinivasan, do you have a case in

20     that regard?

21         **MR. SRINIVASAN:**  Well, Your Honor, we -- we don't

22     have a case in that regard.  But what we do have is many cases

23     that are cited by both parties that talk -- we can call this

24     a -- a refusal to deal case or a tying agreement case.

25     Mr. Wolfson says we didn't challenge the implausibility of any

1  of these things that -- you know, we just elected not to.  We

2  focused on the argument we had.  We don't --

3         **THE COURT:**  Mr. Srinivasan, can you turn up your

4  sound, please?

5         **MR. SRINIVASAN:**  Sure.  Is that better, Your Honor?

6         **THE COURT:**  That is better.  Thank you.

7         **MR. SRINIVASAN:**  Sorry about that.

8      To answer your question, Your Honor, the -- the Ninth

9  Circuit cases talk about refusal to deal cases like this.

10  This case is exactly like the *David Orgell* case where a

11  retailer said, I want to sell your product.  The manufacturer,

12  in that case, Wedgewood Crystal said, no.  We do not want to

13  do business with you.  You cannot work on our platform.

14      We've talked about -- and that case specifically, Your

15  Honor, found that that was an act that was reaffirmed over

16  time the defendant kept saying "no," kept implementing

17  policies to prevent them.

18      By the way, Wedgewood continued to sell its crystals to

19  other retailers.  There were plenty of sales.  There were

20  plenty of agreements.  Those don't get transformed into --

21  into something new that's different conduct against different

22  entities.  The conduct against the plaintiff was the same, a

23  refusal to deal.

24      The Northwest football case, Your Honor, that again --

25  cited by Saurik -- by plaintiff -- this is 511 F.Supp 3d 1158.

1    I think this is in the Western District of Washington.  They

2    say the line of cases relied upon by defendants follow a

3    similar facts as AMF where defendant's subsequent refusals to

4    trade were really -- were merely reaffirmations of the

5    original decision not to deal.

6        There is a contrast -- the cases, as I mentioned

7    earlier -- I think the *Aurora Enterprises* case say where you

8    get into an illegal agreement with somebody else and you keep

9    enforcing that agreement -- or in *Hennegan* where you have to

10   continue to exclude some third party, that's a different

11   situation.  You could find a continuing violation.

12       And even the *Samsung* case that they rely on says, quote,

13   as our sister circuits have said, the typical antitrust

14   continuing violation occurs when conspirators continue to meet

15   to fine-tune their cartels.

16       Those are the type of cases where a continuing violation

17   has been found because at any given point, they can stop.

18   They can not reaffirm.  They could decide to deal with

19   somebody.

20       Where it has never been found is where a manufacturer or

21   party like Apple makes a decision, implements that decision

22   through its technology, like the vehicle case, and -- and

23   these -- all these cases repeatedly say, when you have said

24   "no" and then you implement in your technology, in your

25   design, which is what we are alleged to have done, that merely

1    reaffirming that conduct through other means is not -- does

2    not open up the statute of limitations.

3        I would say one other thing, Your Honor, if I may, which

4    is Mr. -- Mr. Wolfson talks about, you know, these new

5    agreements, these new -- new agreements with consumers or with

6    developers.  And you asked him the question, what changed

7    about that?  What changed, not just from 2008 but all the way

8    up to 2016 where --

9            **THE COURT:**  So he couldn't find it.

10       Mr. Wolfson, have you been able to find the reference in

11   your complaint?

12           **MR. WOLFSON:**  Yes.  It is in paragraph 65, Your

13   Honor.

14           **THE COURT:**  So paragraph 65 doesn't reference 2020.

15           **MR. WOLFSON:**  No, it does not.  But it's not --

16           **THE COURT:**  So you can amend it to be 2020?

17           **MR. WOLFSON:**  We can -- Your Honor, we can point to

18   documents from Apple's production from 2019 that specifically

19   reference Cydia and technological changes they took

20   specifically to exclude Cydia at that time.

21       But the point -- Your Honor, this is something that

22   Mr. Srinivasan is glossing over.  The *Aurora* case that he has

23   a cited a few times, for example, from 1982 --

24           **THE COURT:**  Well, tell me more.  Before you -- before

25   you switch topics --

 1          **MR. WOLFSON:**  Yes.

 2          **THE COURT:**  -- tell me more about what it is you can

 3     allege in 2019 that was this change because it's not anywhere

 4     in your complaint that I understand or at least that's

 5     apparent.

 6          **MR. WOLFSON:**  So, Your Honor, things that we can cite

 7     at -- that have occurred within the past four years based on

 8     the discovery we have seen.  Actions specifically taken to try

 9     to make it so that it was more difficult for Cydia -- Cydia

10     specifically to operate.

11          For example, something where -- they are talking about an

12     iOS update that, quote, broke Cydia Impactor.  Where they

13     said, it feels too good to destroy someone's spirit.  We did

14     something else today that will kill him again with a little

15     smiley emoticon.  That, we can specifically talk about with

16     respect to Cydia.

17          We can talk about actions taken in 2018 where Apple

18     blocked Amazon Free Time because it was concerned that people

19     would become more familiar with Amazon's platform and be more

20     willing to use that as an app store.

21          We can talk about Apple in 2019 blocking a store called

22     AltStore because if it became available, that would have

23     allowed users to download apps without jail-breaking their

24     phones.

25          **MR. SRINIVASAN:**  Your Honor --

1        **MR. WOLFSON:**  We can talk about --

2        **MR. SRINIVASAN:**  Excuse me.  I'm butting in only

3   because I want to make sure Mr. Wolfson isn't reading from

4   documents that are subject to a protective order, and it -- I

5   would just ask him to refrain --

6        **MR. WOLFSON:**  Sure.

7        **MR. SRINIVASAN:**  -- if that's, in fact, what's

8   happening.

9        **MR. WOLFSON:**  And I'll try to be a little bit more

10  generic, Your Honor.

11     We can talk about documents from 2020 where Apple is

12  trying to cut out clouding systems.  We can talk about apps --

13  we can talk about their selective enforcement of the

14  guidelines and the App Store policies from 2020 where they

15  made exceptions because they wanted to have the ability to

16  have Chinese app users to have a bit more -- more penetration

17  in Asia, so where they are selectively applying these

18  guidelines.

19     And what we allege in the complaint is that Apple has

20  continuously updated and changed its guidelines, changed its

21  contracts, changed its technology to plug up perceived holes

22  in competition, and it has continued to do that up through

23  present.

24     Now, all of this, we absolutely can amend, but the problem

25  for Apple in this motion is that they have to show that when

 1    we see [sic] "more recently," when we're talking about, that

 2    that could never possibly --

 3         **THE COURT:**  The problem is, Mr. Wolfson, is that when

 4    I read the complaint, not being an advocate for your client or

 5    for Apple, this complaint reads to me like, as I said, not

 6    quite a copy cat, but all of this happened in 2008, and then

 7    all of a sudden, I issue a preliminary injunction in 2020 and

 8    I got a brand-new complaint with a new client who's been

 9    sitting on their hands.

10         That's what it looks like to me.  And I couldn't -- and it

11    seemed to me when I read your complaint like you hedged on any

12    of the timing issues which would allow you to come within the

13    statute of limitations.  And that gives me pause.

14         So if you can -- if you can make some of this more

15    explicit, in terms of showing acts that are more recent, then

16    I agree with you, you know, that -- then Apple's going to have

17    a more difficult time.  But that's not how the complaint reads

18    to me.

19         **MR. WOLFSON:**  Okay.  Your -- understood, Your Honor.

20         Just also on the legal side of things, I'd just like to

21    make a few points about the case, the binding case law from

22    the Ninth Circuit.

23         The *Aurora* case that Mr. Srinivasan has -- has talked

24    about a few times is actually very important case for this

25    discussion.  It's cited in the *PBTM vs. Football Northwest*

1    case that we cite and that, again, he mentioned, the Western

2    District of Washington case from 2021.  And in the -- the

3    Washington case, the court there noted that a tying claim

4    accrues at the time a tying agreement is made.

5        And for that proposition and further in discussion, it

6    cites *Aurora*.  *Aurora* talks about how a tying agreement that

7    is old, say -- in that case, I believe it was from 1966.  The

8    Ninth Circuit says the statute of limitations on a tying

9    agreement can restart when a party enforces that tying

10   agreement.  So the point being that you had it start at the

11   time of the tying agreement, but it restarts later.

12           **THE COURT:**  Let me -- let me ask you this,

13   Mr. Wolfson:  When you filed this complaint, I'd not issued my

14   opinion --

15           **MR. WOLFSON:**  Um-hmm.

16           **THE COURT:**  -- in the *Epic Games* case where I found

17   that you couldn't have a tying arrangement the way you've

18   alleged it.

19       Do you plan on amending that claim, or is that something

20   that you're going to put in there; we're going to have summary

21   judgment; I'm going to say the same thing I said before; and

22   then you can preserve that for the Ninth Circuit?

23           **MR. WOLFSON:**  I think we actually anticipated certain

24   aspects of Your Honor's order in that our tying claim we

25   alleged that the fore market is U.S. smartphones, just like

1    Your Honor found would have been the more rational or

2    reasonable presentation in the *Epic* case.  We do not allege

3    that the fore market is iOS but, rather, smartphones.

4        So it -- we actually -- we think that your opinion is

5    consistent with the way that we conceive of this case and have

6    alleged the case in terms of tying claim.

7        And another distinction is that *Epic* never brought an

8    exclusive dealing claim, and we do have an exclusive dealing

9    theory here that we think is importantly different because,

10   although, respectfully, we have different views on market

11   definition than Your Honor put in the *Epic* decision, even with

12   the -- you know, even with the definition that Your Honor

13   applied, that would actually have potentially led to liability

14   under an exclusive dealing theory.

15       So we think we have important differences with *Epic* that

16   would not just lead to a straight summary judgment decision.

17           **THE COURT:**  Okay.  I appreciate that clarification.

18   Thank you.

19           **MR. WOLFSON:**  Thank you, Your Honor.

20       Might I add just a bit more on the -- on what I believe is

21   the -- the law for this purposes of this discussion, Your

22   Honor?

23           **THE COURT:**  In terms of *Aurora*?  Sure.

24           **MR. WOLFSON:**  Well, it -- a couple things.  The

25   *Hennegan* case from the Ninth Circuit found that overt acts

 1     occur each time -- in that case, it was conspiracy to steer

 2     customers away from the plaintiff's business, so the mechanism

 3     there was that the defendants and their agents would steer

 4     customers away.

 5          Here, the mechanism of anti-competitive harm that we

 6     are -- have alleged is Apple preventing customers from using

 7     alternative app stores like Cydia through the mechanisms of

 8     tying agreements, exclusive dealing arrangements, things like

 9     that.

10          So the *Hennegan* -- the theory of *Hennegan* and the

11     mechanism is important.  And also, Your Honor, I do want to

12     point out that it's not like there's just been one iPhone

13     since 2008 and 2009.  It's not like there's just one version

14     of iOS since 2008 and 2009, or even the IAP, the in-app

15     purchasing API.  Those have evolved over the years.  We have

16     Apple releasing iPhones and updates through iOS every single

17     year including through the last --

18          **THE COURT:**  I don't disagree with that, but what you

19     don't allege in your complaint is how that's a new act

20     relevant to your client.

21          So, yeah, that happens.  You know, I'm not -- I'm not an

22     engineer.  I know that I can now do something new when I get

23     my update, but that doesn't necessarily mean that it's a new

24     independent act.  And that's what's not clear about -- in your

25     complaint.

1        MR. WOLFSON:  Well, but this is where the -- this is

2    where I think it's important for us to talk about the -- the

3    case law on this.  Like, the *Columbia Steel* case talked about

4    a policy, just like Apple is saying here, that they had a

5    policy that had been in place for years.  But in *Columbia*

6    *Steel*, that policy had been in place for 18 years.  And when

7    they enforced that policy through new acts, even though it had

8    been harming the plaintiff before that, what mattered was that

9    the new acts caused new and accumulating industry -- injury.

10       And here what Apple had the choice to do was to change its

11   policy.  And Samsung -- the *Samsung* case from Ninth Circuit

12   says, if you have the ability not to take the challenged

13   action even if you're doing the same thing in policy or in

14   spirit, each time you take an act that you could have not and

15   it adds a new and accumulating injury to the plaintiff --

16       THE COURT:  Mr. Wolfson, so in *Columbia Steel*, that

17   was a refusal to deal case.

18       MR. WOLFSON:  Yes.

19       THE COURT:  You don't have a refusal to deal.  And,

20   in fact, it -- I mean, as I understand your complaint, there

21   is no relationship between the parties.  Right?  There's no

22   relationship between your client and Apple.  Unlike Epic and

23   the developers case and the consumers case, everybody has a

24   relationship with Apple.  But your client doesn't.  And you

25   don't allege a refusal to deal.

1          **MR. WOLFSON:**  We do not.  And, Your Honor, we do

2     not -- and Apple has not challenged the plausibility of our

3     theories of liability.

4          But the -- the key in *Epic*, in *Cameron*, in *Pepper*, all of

5     those, is that the agreements that Apple forces on consumers

6     and developers prevent competition on the app store.  And by

7     preventing Cydia, preventing other app stores from operating,

8     Apple is harming competition.

9          And in their reply, footnote 9, they actually say, *Cameron*

10    was timely because Apple forced these agreements on the

11    consumers.  But the reason that potentially harms consumers

12    under the antitrust laws is 'cause it prevented them using

13    something like Cydia, so --

14                    (Simultaneous colloquy.)

15          **THE COURT:**  So tell me what -- what -- am I right

16    that the way I read your complaint, there is no relationship?

17          **MR. WOLFSON:**  Well, the -- the relationship is that

18    Cydia is the competitor to the Apple App Store, and that it

19    has continued to be an operating competitor since it first

20    came about.

21          Now, it has lost market share.  It has lost opportunities

22    and continues to lose opportunities because of what Apple does

23    on both sides of the platform with consumers, iPhone users,

24    and developers.  But the relationship is one of competition.

25          And, frankly, Your Honor, Cydia's complaint is the only

```
 1    one that we are aware of where a competitor -- a competing app
 2    store provider has brought suit.  But the nature of all four
 3    related cases is that had there be competition for app stores,
 4    for payment processing, that there would be better -- that
 5    consumers and developers would be better off, so --
 6              THE COURT:  So why not bring a refusal to deal?
 7              MR. WOLFSON:  Well, Your Honor --
 8              THE COURT:  I mean, isn't -- again, I'm trying to
 9    understand the big picture here.
10              MR. WOLFSON:  Well, Your Honor, we think that when we
11    conceive of this case, that the mechanism here is not a
12    refusal to deal case.
13         Our view is that this is Apple imposing anti-competitive
14    agreements and abusing its position over locked-in consumers
15    to monopolize these markets, so it's not so much a refusal to
16    deal in our view as it is a tying case, as it is an exclusive
17    dealing case, as it is a --
18              THE COURT:  But what does it want to do?  Doesn't it
19    want to be on Apple's platform?  And if it wants to be on
20    Apple's platform -- I mean, how else can it operate if not on
21    Apple's platform?
22              MR. WOLFSON:  Well, I mean, it -- just getting into
23    more of the -- the substance of the case, Your Honor, there
24    could be a number of less restrictive ways for Apple to, you
25    know, accomplish its goals with respect to whatever it's going
```

1   to say justifies these -- these behaviors.

2       But consumers being able, if they wanted to, to able to

3   download and -- and install Cydia, as they've had to, through

4   means that are not the app store, being free to do that and

5   not have Apple punish developers that want to use Cydia, not

6   have Apple force consumers who have a brand-new phone to lose

7   their warranty if they use Cydia.

8       You know, not imposing these restraints.  Not imposing

9   these inabilities to use Cydia.  That absolutely is part of

10  this.  And, of course, you know, the -- this is a damages case

11  as well.  So Cydia will be seeking that later on.

12      But in terms of now, the case itself is about Apple

13  preventing Cydia's customers from choosing Cydia and thereby

14  harming competition and harming both sides.

15          **THE COURT:**  And why did it wait so long?

16          **MR. WOLFSON:**  Well, there was the straw that broke

17  the camel's back in 2020, Your Honor.

18      There was a final moment where Apple went too far.  Cydia

19  kept trying, kept trying.  But -- and, you know, as we've

20  seen -- without giving away, you know, internal conversations,

21  at least, Your Honor, what we've seen is a further recognition

22  publicly that Apple has been acting in a not particularly fair

23  way here.

24      And in 2020, as we noted in our complaint, there was sort

25  of the -- that moment that made it all but impossible for

 1   Cydia to operate.  And that is a point where we would agree

 2   that, you know, you have a near final death knell for a

 3   company's ability to compete.

 4       All before that, Cydia continued to compete and continued

 5   to try to compete, but Apple just eventually went too far.

 6       **THE COURT:**  Okay.  Well, I need to see that.  I

 7   promise you I won't -- I had a few other things on my plate in

 8   terms of getting to this case and -- so apologies for not

 9   getting to it sooner.

10       But what I'd like you to do, then, is to amend the

11   complaint to add those allegations so I do understand kind of

12   what the more recent context is so that I do have an

13   understanding of what these additional overt acts are.

14       And, you know, it if -- if it's there, then -- makes the

15   decision a lot easier.  Right now, I don't -- I don't see it

16   in the complaint.

17       So I'm going to grant the motion with leave to amend.

18   Apple cannot bring -- if you choose to bring another motion to

19   dismiss, you cannot bring any other grounds upon which you

20   could have brought on the first, so no second bite at the

21   Apple, so to speak -- no pun intended.  But it's the beginning

22   of year, right, so I had a few free jokes before everybody

23   rolls their eyes.

24       How much time you need, Mr. Wolfson?

25       **MR. WOLFSON:**  Can I -- well, I think we could

1    probably do that within two weeks, Your Honor?

2           THE COURT:  Okay.  Two weeks.  That's the 19th.

3       How much time to respond, Mr. Srinivasan?

4           MR. SRINIVASAN:  Um --

5           THE COURT:  Two weeks?

6           MR. SRINIVASAN:  Sure.  We could do it, Your Honor.

7       If I could just address your final comment, I do want

8    to --

9           THE COURT:  February 2nd, a response.

10          MR. SRINIVASAN:  I'm sorry.

11          THE COURT:  Go ahead.

12          MR. SRINIVASAN:  I'm sorry, Your Honor.  Thank you.

13      On -- on the idea of not attacking their theories or bring

14   other arguments.  We certainly don't intend to do that.  But

15   we do believe this is a refusal to deal case.  And we think

16   they pled this in this fairly circuitous manner to avoid the

17   fact that a refusal to deal case is time barred.

18      These are the type of cases that are time barred.  And so

19   to the extent that we need to sort of unpack that a little

20   bit, I assume that Your Honor would be okay with us --

21          THE COURT:  You brought your motion on the basis of

22   the statute of limitations.  You can bring that motion.

23      What you can't do is bring some other motion -- I know

24   we've got lawyers that have switched.  You do not get a redo

25   at -- at a motion to dismiss.  That's my point.

1     **MR. SRINIVASAN:** We understand. Thank you.

2  I just -- it will be in the context of the statute of

3 limitations argument, but --

4     **MR. WOLFSON:** Your Honor --

5     **MR. SRINIVASAN:** -- may have to get into their

6 theories as a result --

7     **THE COURT:** And -- and I don't know -- you know, the

8 plaintiff is the -- is the master of their complaint. They

9 don't have to bring a claim that you want them bring or that

10 you think they should bring, so I'm not exactly sure where

11 you're going to go with that, but that's -- that's not your

12 call.

13     **MR. SRINIVASAN:** I understand, Your Honor.

14  But -- but I suppose this just -- it -- we've gotten into

15 this debate already in this motion in the sense of if they are

16 trying borrow claims from other people and call them tying

17 claims or exclusive dealing claims when it's truly -- with

18 respect to their client, it's a refusal to deal claim, I think

19 that -- that's the context in which we would do it, but I

20 understand Your Honor --

21     **THE COURT:** But how do you -- how do you raise that

22 on a 12(b)(6) motion? That's not really in front of me on a

23 12(b)(6).

24  On a 12(b)(6), what's in front of me is, you know, have

25 they not pled the elements? Or in this particular issue, is

1  it -- you know, is it beyond the statute of limitations,

2  which, again, based on the complaint, I don't see it, but, you

3  know, Quinn Emanuel, they're good lawyers.  I'm sure they've

4  got some theory.  I just need it to be more explicit --

5          **MR. SRINIVASAN:**  Understood, Your Honor.

6          **THE COURT:**  -- than it currently -- than is currently

7  there.

8          **MR. SRINIVASAN:**  Understood.  We are on the same

9  page.

10      And I would just -- I've gotten a note.  Just would once

11  again reiterate the confidentiality issue.  It's not just

12  quoting from documents.  It's describing documents that are

13  marked "highly confidential."

14      Mr. Wolfson, I would just ask that -- it's not enough not

15  to quote, but if you're describing them and they're marked

16  "highly confidential" --

17          **THE COURT:**  Okay.  And you're not talking to him

18  directly, are you?  Because if you start talking to him

19  directly and we start forgetting what the rules of argument

20  are in federal court, I'm going to have you up here next time

21  so that that doesn't happen.

22          **MR. SRINIVASAN:**  I apologize, Your Honor.  I

23  understand.  I understand that well.

24          **THE COURT:**  All right.

25      Well, to the extent that it makes it easier, because,

1   again, I'd like to know what's going on -- Mr. Wolfson, you

2   can attach anything that needs to be under seal as a separate

3   document or ask to -- you know, ask for it to be -- portions

4   of it to be under seal.

5       But -- but I need know what's going on in this case.  And

6   right now, I'm -- the light is not -- the light is not shining

7   fully, so I need more clarity.

8           MR. WOLFSON:  Understood, Your Honor.

9           MR. SRINIVASAN:  And I -- I apologize, Your Honor.

10      And, of course, we have no issue with them adding this to

11  their complaint, we would just ask that it be done with the

12  appropriate procedure --

13          THE COURT:  And --

14          MR. SRINIVASAN:  -- confidential.

15          THE COURT:  They're good lawyers.  I'm sure they'll

16  do that.  But I'm just -- you know, I just -- it's -- we're in

17  this environment, right, where no one's in court anymore and

18  people are forgetting some of the basic rules, and so that's

19  why I'm reminding you.  There are rules.  Follow the rules.

20      Okay?

21          MR. SRINIVASAN:  Thank you, Your Honor.

22          THE COURT:  All right.

23          MR. WOLFSON:  Absolutely, Your Honor.

24          THE COURT:  Anything else?

25          MR. SWEDLOW:  Your Honor, Steve -- Stephen Swedlow

1   for the plaintiff.

2       If I understand correctly, we will amend our complaint

3   within two weeks.  Two weeks after that, there would probably

4   be a renewed motion to dismiss, and then we would likely

5   oppose that?

6               **THE COURT:**  Well, I'm assuming that you're not --

7               **MR. SWEDLOW:**  Yes.

8               **THE COURT:**  -- going to concede it, right?  It's

9   typically on 35 days' notice.

10              **MR. SWEDLOW:**  Okay.

11              **THE COURT:**  You know, and -- look, I -- these -- the

12  case law with respect to the continuing violation -- I mean,

13  it's interesting.  You know, you do have -- you do have the

14  *Multidistrict Vehicle Air Pollution* case.  There are cases --

15  obviously, the ones where -- that were cited to me where, you

16  know, a number of my colleagues, you know, have dismissed

17  cases on statute of limitations ground in antitrust cases --

18  in antitrust contexts.  Judge Whyte -- Whyte with a "Y", White

19  with i-t-e.

20      And, you know -- but I'm also cognizant, right, that --

21  that the Ninth Circuit in *Oliver* also said that it was the

22  exception and not the rule.

23      But there has to be -- there has to be some hook.  And in

24  a number of these cases, it looked like to me the Ninth

25  Circuit was looking for the hook, you know, whether it was

 1   another agreement -- but there should be something.  You can't

 2   just sit there and a decade later say, oh, I want to bring my

 3   claim now.  And that's how the complaint reads.

 4       So if there was something new, we've got to be explicit

 5   about it because, you know, on the other hand, if -- if they

 6   are doing new things, they can't hide behind the fact that

 7   they made a seminal decision in 2008 and 2009, and -- and hide

 8   behind it.

 9       But -- but there needs to be more.

10           MR. WOLFSON:  We will add that detail, Your Honor.

11           THE COURT:  Okay?

12       Mr. Srinivasan, don't bring a motion if you don't need to,

13   right?

14           MR. SRINIVASAN:  We will --

15           THE COURT:  I mean, I can write short orders, believe

16   it or not.  And I will if I need to.

17       We are -- we're losing judges.  Judge Koh's gone.

18   Senate's being slow getting us new help.  We've got judges who

19   are going senior, so you should all be just -- just recognize

20   that we -- we have a lot of work and if you don't need to

21   bring it, don't bring it, okay?

22           MR. SRINIVASAN:  We will -- we will evaluate the

23   complaint, Your Honor, and listen to your words.

24           THE COURT:  Okay.  Good enough.

25       Everybody stay safe.  We're adjourned.  Thank you.

1       **MR. SRINIVASAN:**  Thank you.

2       **MR. WOLFSON:**  Thank you, Your Honor.

3          (Proceedings were concluded at 3:13 P.M.)

4                           --o0o--

5

6

7                  **CERTIFICATE OF REPORTER**

8

9          I certify that the foregoing is a correct transcript

10      from the record of proceedings in the above-entitled matter.

11      I further certify that I am neither counsel for, related to,

12      nor employed by any of the parties to the action in which this

13      hearing was taken, and further that I am not financially nor

14      otherwise interested in the outcome of the action.

15

16      _____

17          Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

18              Monday, January 17, 2022

19

20

21

22

23

24

25

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*