1    QUINN EMANUEL URQUHART &
     SULLIVAN, LLP
2    Stephen A. Swedlow (*pro hac vice*)
     stephenswedlow@quinnemanuel.com
3    David A. Nelson (*pro hac vice*)
     davenelson@quinnemanuel.com
4    Marc L. Kaplan (*pro hac vice*)
     marckaplan@quinnemanuel.com
5    191 N. Wacker Dr., Suite 2700
     Chicago, IL 60606
6    Telephone:  (312) 705-7400
     Facsimile:  (312) 705-7401
7
     Adam B. Wolfson (SBN 262125)
8    adamwolfson@quinnemanuel.com
     Joseph Sarles (SBN 254750)
9    josephsarles@quinnemanuel.com
     865 S. Figueroa Street, 10th Floor
10   Los Angeles, CA 90017
     Telephone:  (213) 443-3000
11   Facsimile:  (213) 443-3100

12   *Attorneys for Plaintiff SaurikIT, LLC*

13

14

15                    UNITED STATES DISTRICT COURT

16                   NORTHERN DISTRICT OF CALIFORNIA

17                          OAKLAND DIVISION

18   SAURIKIT, LLC,

19          Plaintiff,                          No. 20-cv-08733-YGR

20          v.
                                                **PLAINTIFF SAURIKIT, LLC'S**
21   APPLE INC.,                                **OPPOSITION TO APPLE INC.'S**
                                                **MOTION TO DISMISS FIRST**
22          Defendant.                          **AMENDED COMPLAINT**

23                                              Date: March 15, 2022
                                                Time: 2:00 pm
24                                              Courtroom: 1, 4th Floor
                                                Judge: Hon. Yvonne Gonzalez Rogers
25

26

27

28

# <u>TABLE OF CONTENTS</u>

STATEMENT OF ISSUES TO BE DECIDED ...................................................................................1

PRELIMINARY STATEMENT ........................................................................................................1

FACTUAL BACKGROUND .............................................................................................................4

      A.    Cydia Brought Suit a Year After Apple Finally Excluded it From the Market ..............................................................................................................4

      B.    This Case is Not About Apple's Refusal to Deal With Cydia—It is About Apple's Repeated, Affirmative Acts to Prevent Consumers and Developers From Using Cydia and Other Alternative App Stores ....................5

      C.    Apple Has Committed Millions of Other Anticompetitive Acts Within the Past Four Years ..............................................................................................6

LEGAL STANDARD ........................................................................................................................8

ARGUMENT .....................................................................................................................................9

I.     CYDIA'S SHERMAN ACT DAMAGES CLAIMS ARE TIMELY ...................................9

      A.    The Unifying Theme of Antitrust Continuing Violation Law is That the *Mechanism* of Competitive Harm Determines What Constitutes an "Overt Act" .............................................................................................................9

      B.    "New and Accumulating Injury" Does Not Mean a New Type of Injury, But Rather a New Instance of Injury Flowing From Acts Harming Competition ..........11

      C.    Apple Committed Multiple Acts Aimed at Specifically Excluding Cydia and Other Alternative App Stores Within the Four Years Preceding This Lawsuit ........................................................................................................12

      D.    Apple's Other Alleged Conduct—All of Which is Alleged as Part of the Same Scheme—Also Constitutes Timely Overt Acts ...........................13

            1.    Imposing anticompetitive agreements on consumers for new versions of iPhones released within the four years preceding this lawsuit ...............................................................................................14

            2.    Imposing anticompetitive agreements on consumers for all new iPhone activations within the four years preceding this lawsuit .................15

            3.    Requiring developers wishing to release apps for the first time on the App Store to agree to the anticompetitive Developer Agreement ..........15

            4.    Enforcing preexisting anticompetitive agreements in order to exclude competition from alternative app stores and in-app payment processing .............................................................................................16

            5.    Steering potential customers (consumers and developers) away from Cydia and other alternative app stores .................................................16

E.    None of Apple's Precedent Addresses Analogous Facts or Liability Theories ........................................................................................................17

1.    *Vehicle Air Pollution* ....................................................................17

2.    *Hawthorne Hangar* .......................................................................19

3.    Apple's other precedent ..................................................................21

II.    CYDIA'S CLAIMS FOR INJUNCTIVE RELIEF ARE ALSO TIMELY .........................24

III.    CYDIA'S STATE LAW CLAIMS ARE TIMELY ............................................................25

1

**TABLE OF AUTHORITIES**

2

**Page**

3

**Cases**

4

*Aerotec International Inc. v. Honeywell International Inc.*,
  836 F.3d 1171 (9th Cir. 2016) ................................................................................. 9, 10, 15

5

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Group LP*,
  592 F.3d 991 (9th Cir. 2010) .................................................................................... 2, 13

6

7

*In re Animation Workers Antitrust Litigation*,
  87 F. Supp. 3d 1195 (N.D. Cal. 2015) ...................................................................... 22, 25

8

*ARCO Environmental Remediation, L.L.C. v. Department of Health & Environmental
  Quality of the State of Montana*, 213 F.3d 1108 (9th Cir. 2000) ....................... 3, 10, 25

9

10

*Aurora Enterprises, Inc. v. National Broadcasting Co., Inc.*,
  688 F.2d 689 (9th Cir. 1982) ..................................................................................... 21, 22

11

*In re Cathode Ray Tube (CRT) Antitrust Litigation*,
  2014 WL 1091589 (N.D. Cal. Mar. 13, 2014) .......................................................... 24

12

13

*Columbia Steel Casting Co., Inc. v. Portland General Electric Co.*,
  111 F.3d 1427 (9th Cir. 1996) .................................................... 1, 10, 12, 15, 16, 23

14

*Construction Aggregate Transport, Inc. v. Florida Rock Industries, Inc.*,
  710 F.2d 752 (11th Cir. 1983) ................................................................................... 10

15

16

*David Orgell v. Geary Stores*,
  640 F.2d 936 (9th Cir. 1981) ..................................................................................... 21

17

*Eastman Kodak Co. v. Image Technical Services, Inc.*,
  504 U.S. 451 (1992) ................................................................................................... 10

18

19

*EEOC v. LogistiCare Solutions LLC*,
  2020 WL 6781270 (D. Ariz. Nov. 18, 2020) ............................................................ 24

20

*Eichman v. Fotomat*,
  880 F.2d 149 (9th Cir. 1989) ............................................................... 1, 10, 16, 22

21

22

*Ellis v. Salt River Project Agricultural Improvement & Power District*,
  --- F.4th ---, 2022 WL 276031 (9th Cir. Jan. 31, 2022) ...................................... 1, 4, 12

23

*In re Facebook, Inc., Consumer Privacy User Profile Litigation*,
  402 F. Supp. 3d 767 (N.D. Cal. 2019) ...................................................................... 9

24

25

*Flynt v. Shimazu*,
  940 F.3d 457  (9th Cir. 2019) .............................................................................. 1, 12

26

*Garnica v. HomeTeam Pest Defense, Inc.*,
  2015 WL 3766514 (N.D. Cal. June 16, 2015) .......................................................... 9, 11

27

*Garrison v. Oracle Corp.*,
  159 F. Supp. 3d 1044 (N.D. Cal. 2016) .................................................................... 22

28

*Glen Holly Entertainment, Inc. v. Tektronix Inc.*,
   343 F.3d 1000 (9th Cir.) ................................................................................................. 13

*Hanover Shoe, Inc. v. United Shoe Machinery Corp.*,
   392 U.S. 481 (1968) ........................................................................................................ 17

*Hawthorne Hangar Operations, L.P. v. Hawthorne Airport, LLC*,
   2021 WL 3264420 (C.D. Cal. Apr. 27, 2021) ...................................................... 19, 20

*Hennegan v. Pacifico Creative Services, Inc.*,
   787 F.2d 1299 (9th Cir. 1986) .................................................................................. *passim*

*Klein v. Facebook, Inc.*,
   2022 WL 141561 (N.D. Cal. Jan. 14, 2022) ................................................ 2, 3, 12, 17

*Manzarek v. St. Paul Fire & Marine Insurance Co.*,
   519 F.3d 1025 (9th Cir. 2008) ........................................................................................ 8

*McCarthy v. Johannesson*,
   2012 WL 12887540 (C.D. Cal. Dec. 11, 2012) ....................................................... 25

*MedioStream, Inc. v. Microsoft Corp.*,
   869 F. Supp. 2d 1095 (N.D. Cal. 2012) .............................................................. 22, 23

*MetroNet Services v. Qwest*,
   383 F.3d 1124 (9th Cir. 2004) ........................................................................................ 9

*In re Multidistrict Vehicle Air Pollution*,
   591 F.2d 68 (9th Cir. 1987) ...................................................................................... 3, 18

*In re National Football League's Sunday Ticket Antitrust Litigation*,
   933 F.3d 1136 (9th Cir. 2019) ........................................................................................ 3

*Newcal Industries, Inc. v. IKON Office Solutions, Inc.*,
   2011 WL 1899404 (N.D. Cal. May 19, 2011) ..................................................... 2, 13

*Oliver v. SD-3C, LLC*,
   751 F.3d 1081 (9th Cir. 2014) ................................................................................. 19, 24

*Pace Industries, Inc. v. Three Phoenix Co.*,
   813 F.2d 234 (9th Cir. 1987) ......................................................... 1, 10, 14, 15, 16

*PBTM LLC v. Football Northwest, LLC*,
   511 F. Supp. 3d 1158 (W.D. Wash. 2021) ............................................................ 14, 15

*Philpot v. Kos Media LLC*,
   2018 WL 10399910 (N.D. Cal. Dec. 6, 2018) ............................................................ 9

*Red Lion Medical Safety, Inc. v. Ohmeda, Inc.*,
   63 F. Supp. 2d 1218 (E.D. Cal. 1999) ................................... 12, 13, 15, 16, 19, 23

*Samsung Electronics Co., Ltd. v. Panasonic Corp.*,
   747 F.3d 1199 (9th Cir. 2014) ................................................................................. *passim*

*Stanislaus Food Products Co. v. USS-POSCO Industries*,
   2010 WL 3521979 (E.D. Cal. Sept. 3, 2010) ........................................................................... 23

*Supermail Cargo, Inc. v. United States*,
   68 F.3d 1204 (9th Cir. 1995) ...................................................................................................... 9

*TCL Communications Technology Holdings, Ltd. v. Telefonaktienbolaget LM Ericsson*,
   2016 WL 7049263 (C.D. Cal. Aug. 9, 2016) ............................................................................ 25

*Twin City Sportservices, Inc. v. Charles O. Finley & Co.*,
   512 F.2d 1264 (9th Cir. 1975) .................................................................................................. 22

**Rules and Regulations**

Fed. R. Civ. P. 12(b)(6) ................................................................................................................... 8

**Additional Authorities**

Areeda & Hovenkamp, *Antitrust Law* ¶ 320a (4th ed. 2013) ......................................................... 9

SAURIKIT, LLC'S OPPOSITION TO MOTION TO DISMISS FIRST AMENDED COMPLAINT
Case No. 20-cv-08733-YGR

1

## STATEMENT OF ISSUES TO BE DECIDED

2      Whether Apple has met its burden to prove that the Complaint establishes beyond doubt that

3   Cydia's claims are barred by the applicable statute of limitations or laches.

4

## PRELIMINARY STATEMENT

5      As the Ninth Circuit reiterated just three days before Apple filed this renewed motion to

6   dismiss, the term "continuing violation" "can be somewhat misleading," because it does not

7   describe "'one on-going violation,' but instead 'a series of repeated violations,' each of which

8   'gives rise to a new cause of action' and thereby 'begins a new statute of limitations period as to

9   that particular event.'" *Ellis v. Salt River Project Agric. Improvement & Power Dist.*, --- F.4th ---,

10   2022 WL 276031, at *8 (9th Cir. Jan. 31, 2022) (quoting *Flynt v. Shimazu*, 940 F.3d 457, 462 n.3

11   (9th Cir. 2019)). Despite this clear restatement, Apple nevertheless urges this Court to engage in

12   exactly the fallacy the Ninth Circuit warned against by concluding that Cydia cannot sue on claims

13   regarding Apple's repeated acts of tying, exclusive dealing, vertically-arranged boycotts,

14   exclusionary design changes, and aftermarket monopoly maintenance—which the FAC explains at

15   length occurred routinely within the past four years—simply because Apple made the policy

16   choice to begin acting anticompetitively in 2008. That is not the law, and subscribing to Apple's

17   arguments would commit this Court to reversible error.

18      Binding precedent makes clear that the following all constitute overt acts giving rise to

19   new antitrust damages claims each time they occur, regardless of when the scheme underlying

20   those acts first began:

21   - imposing an anticompetitive contract with respect to a new device not covered by the original contract, *see, e.g.*, *Samsung Elec. Co., Ltd. v. Panasonic Corp.*, 747

22   F.3d 1199, 1203-1204 (9th Cir. 2014);

23   - imposing an anticompetitive agreement, even if it was "merely a restatement of" an earlier anticompetitive agreement, on a new party for the first time, *e.g.*, *id.* at 1204;

24

25   - enforcing an anticompetitive contract or agreement within the limitations period— even one that was entered earlier than the limitations period, *e.g.*, *id.* at 1203; *Columbia Steel Casting Co., Inc. v. Portland Gen. Elec. Co.*, 111 F.3d 1427 (9th

26   Cir. 1996); *Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 237 (9th Cir. 1987); *see also Eichman v. Fotomat*, 880 F.2d 149, 160 (9th Cir. 1989) ("To restart

27   the statute of limitations in a tying situation, [plaintiff] must show that [defendant] had the ability [to] and actually did enforce the tie during the limitations period.");

28

- each instance of steering customers away from a competitor plaintiff's business, *e.g.*, *Hennegan v. Pacifico Creative Serv., Inc.*, 787 F.2d 1299, 1301 (9th Cir. 1986); and

- taking actions to foreclose aftermarket competition, *e.g.*, *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 998-1000 (9th Cir. 2010) (changing a foremarket product design to exclude aftermarket competition with no procompetitive justification for that change); *Newcal Indus., Inc. v. IKON Off. Sols., Inc.*, 2011 WL 1899404, at *3 (N.D. Cal. May 19, 2011) (engaging in same acts of aftermarket monopolization as pre-limitations period).

Furthermore, as Judge Koh recently noted in response to virtually identical limitations arguments in another major antitrust action in this District (and just before her elevation to the Ninth Circuit), there is "no authority for [the] argument that an act is not 'new and independent' simply because the defendant has previously committed the same type of act as part of a unified anticompetitive strategy." *Klein v. Facebook, Inc.*, 2022 WL 141561, at *33-34 (N.D. Cal. Jan. 14, 2022).

Cydia's amended allegations identify a bevy of such overt acts within the four years preceding this lawsuit. With respect to Cydia specifically, the FAC cites documents from Apple's production showing that it implemented new design choices on both new *and* existing iPhones in 2018 and 2019 to specifically exclude Cydia from iOS app distribution, as well as all other alternative iOS app stores that were then available to consumers and developers. FAC ¶¶ 5-6, 46, 75-76. These acts were the proverbial straw that broke the camel's back, finally excluding Cydia from the market after it had continued to try to compete for more than a decade, even in the face of Apple's consistent attempts to exclude competition and maintain its ill-gotten monopoly power. *Id.* ¶¶ 6, 46, 76. Within a year of that final exclusion, Cydia brought suit. *Id.*

But that is not the only category of timely, Ninth Circuit-recognized overt acts Cydia identified. The FAC details how, in the four years preceding this lawsuit, Apple applied its iPhone warranty (*i.e.*, a tying agreement and/or coercive anticompetitive tool) on consumers for each new model of the iPhone it released, which precluded those customers from choosing alternatives to Apple's app distribution. Apple's warranties are specific to each device a consumer activates (*id.* ¶¶ 28), so even preexisting iPhone owners had to agree again to Apple's anticompetitive conditions regarding iOS app distribution for each new iPhone they bought and activated during the limitations period. *Id.* ¶¶ 28-29, 35. Similarly, Apple forced new developers seeking to

1   distribute their apps on the App Store within the four years preceding this lawsuit to agree to its

2   anticompetitive developer agreements (*i.e.*, tying and/or exclusive dealing agreements), and

3   enforced the same agreements against preexisting developers routinely and in public fashion. *Id.*

4   ¶¶ 5-6, 32-33, 57-59, 70-74. Every one of these instances constituted Apple steering Cydia's and

5   other alternative app stores' potential customers (*i.e.*, consumers and developers) away from those

6   alternatives, thus representing a consistent monopoly maintenance scheme involving millions of

7   anticompetitive acts in the four years preceding this lawsuit. *See In re Nat'l Football League's*

8   *Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1159 (9th Cir. 2019) (monopolization is: "(a) the

9   possession of monopoly power in the relevant market; (b) the willful acquisition ***or maintenance***

10  of that power; and (c) causal antitrust injury.") (emphasis added).

11      In its renewed motion, Apple simply ignores all of the above binding precedent and instead

12  pretends this is a refusal to deal case, because Apple's favorite statute of limitations precedent, *In*

13  *re Multidistrict Vehicle Air Pollution*, 591 F.2d 68 (9th Cir. 1987) (discussed Mot. at 7), involves a

14  refusal to deal claim. That precedent unsurprisingly holds that, when a defendant monopolist

15  refuses to deal with a plaintiff, refusing to deal with them again in the future does not constitute a

16  new overt act; it is simply a reaffirmation of a previous refusal.

17      But this is not a refusal to deal case, and as the Court recognized at the January 5 hearing,

18  Cydia is the "master of [its] complaint" and chooses which claims to bring—not Apple. *ARCO*

19  *Env't Remediation, L.L.C. v. Dep't of Health & Env't Quality of Montana*, 213 F.3d 1108, 1114

20  (9th Cir. 2000). As the amended allegations make clear, Cydia has not asked Apple to deal with it

21  regarding iOS app distribution or iOS app payment processing. Cydia and other alternative app

22  stores are available to consumers via the internet, and iPhone users can download and install those

23  alternative app stores directly on their phones away from Apple's App Store. FAC ¶¶ 4-5, 10, 24,

24  72. Apple has tried to make this as difficult as possible over the years by forcing consumers to

25  (legally, *id.* ¶ 68) jailbreak their phones in ever more convoluted ways, but this is not a case about

26  Apple refusing to list Cydia on the App Store; it is about Apple forcing Cydia's potential

27  customers to not use Cydia (the largest alternative app store) or any other alternative.

28      The very nature of tying claims, exclusive dealing claims, vertically-arranged boycott

claims, and aftermarket monopolization claims is that the defendant monopolist harms competition and its competitors by preventing potential customers from using those competitors' products. That is why the Ninth Circuit is clear that *each* new tying agreement, *each* new exclusive dealing agreement, *each* instance of enforcing such agreements, *each* instance of forcing a customer away from a rival's products or services, and *each* exclusionary act to limit aftermarket competition constitutes a new overt act triggering a new claim to antitrust damages. By arguing that this Court should ignore the essence of such claims and the millions of overt acts committed in support of them within the past four years simply because Apple began committing similar types of acts in 2008, Apple invites clear error. Furthermore, it is notable that, despite Cydia citing the above binding precedent multiple times in its amended allegations (FAC ¶¶ 29, 57, 69, 71, 74, 83), Apple does not attempt to grapple with them in any meaningful way in its renewed motion. That is exactly the opposite of what the Court urged at the January 5, 2022 hearing, when it warned Apple not to file a baseless motion, just because. 1/5/22 Hr'g Tr. at 34:12-21.

Cydia appreciates the Court's concerns about timeliness. Had Cydia gone out of business in 2008, then its claims would be untimely now, because the harm to Cydia would have been complete at that point. Were the nature of Apple's anticompetitive scheme a single anticompetitive act more than four years ago rather than a constant campaign of exclusionary acts that has continued through the present, then the claims also might be untimely. But, those are not the facts, and Apple identifies no law immunizing its recent acts of tying, exclusive dealing, enforced vertical boycotts, exclusionary design changes, and other aftermarket monopolization efforts simply because it has acted anticompetitively for more than a decade. If a defendant commits "a series of repeated violations," *each* "gives rise to a new cause of action" and thereby "begins a new statute of limitations period as to that particular event." *Ellis*, 2022 WL 276031, at *8. Apple cannot escape that black letter law. Respectfully, the Court should deny its motion.

## FACTUAL BACKGROUND

### A.    Cydia Brought Suit a Year After Apple Finally Excluded it From the Market

Cydia was released in 2008, and continued to operate for more than a decade. FAC ¶¶ 6, 10, 46. During that period, it competed directly with Apple's iOS App Store, by offering iPhone and

iPad users an alternative way "to locate, obtain, and . . . pay for other desirable application for their [] devices," and by offering iPhone and iPad application developers an alternative way to distribute their apps to consumers. FAC ¶¶ 22.

Though Apple has long sought to impede Cydia's ability to operate on the iPhone or iPad by (among other things) implementing new technological restrictions, until recently Cydia was able to "continue[] to operate, albeit in hampered form." *Id.* ¶¶ 5, 46. "Beginning in 2018, however— *i.e.*, less than four years before the original complaint in this lawsuit" Apple implemented two significant technological changes to iOS that effectively excluded Cydia from the market. *Id.* ¶¶ 46, 76. The first change, in 2018, "made it essentially impossible for Cydia or any other competing iOS app distribution service to operate on iPhone XS and later models (*i.e.*, models released September 2018 and later)." *Id.* The second change, "in late 2019, … once and for all, prevented Cydia's and other competing iOS app distribution service's ability to operate on *all* iPhone models," including older (pre-iPhone XS) models, thereby finally succeeding in excluding all competitors." *Id.*

When Mr. Freemen confirmed by Tweet in 2019 that Apple succeeded in excluding Cydia Impactor,[1] ████████████████████████████████████████████████████████ ████████████████████████████████████ *Id.*

**B.  This Case is Not About Apple's Refusal to Deal With Cydia—It is About Apple's Repeated, Affirmative Acts to Prevent Consumers and Developers From Using Cydia and Other Alternative App Stores**

"From its inception, Cydia has always been available to users via the internet." *Id.* ¶ 24. "[I]t has never been distributed through the App Store, and does not need to be." *Id.* Users wishing to install Cydia on their iPhone must go through certain processes to avoid the technological restrictions Apple throws in the way of third party app store providers like Cydia—a completely legal process called "jailbreaking"—"but those steps do not rely on nor require any interaction with Apple, and never have." *Id.*[2]

---

[1]  Cydia Impactor is the open source software package that Cydia created and which it and other competitors used to provide their alternative marketplaces to iPhone users. *Id.*

[2]  Contrary to Apple's insinuations (at 12-13), there is nothing "illicit" about jailbreaking an iPhone and installing software (like Cydia) via the internet. The U.S. Copyright Office has squarely rejected that argument, finding that such activities are fully legal. FAC ¶ 68.

Cydia likewise does not rely on Apple to operate. Cydia's software works by utilizing "programming features available to any other developer or programmer." *Id.* "Cydia, as a company, has never requested special access from Apple nor tried to deal with Apple for its busines model." *Id.* In short, Mr. Freeman developed Cydia without any input from or interaction with Apple, and iPhone users download and install Cydia without any interaction with Apple whatsoever.

### C.   Apple Has Committed Millions of Other Anticompetitive Acts Within the Past Four Years

In addition to Apple's successful efforts to technologically exclude Cydia from all iOS devices in 2018 and 2019, Apple has engaged in extensive other timely anticompetitive conduct.

"[W]ithin the four years preceding the original complaint in this lawsuit," Apple "introduced and began selling for the first time … the iPhone XS, the iPhone XS Max, the iPhone XR, the iPhone 11, the iPhone 11 Pro, the iPhone 11 Max, the iPhone SE, the iPhone 12 mini, the iPhone 12, the iPhone 12 Pro, the iPhone 12 Pro Max, the iPhone 13, the iPhone 13 mini, the iPhone 13 Pro, and the iPhone 13 Pro Max)." FAC ¶ 28. For each of those models, Apple preinstalled the App Store, and made it so that users "can neither remove the app nor change their default preference to any other marketplace, such as Cydia," unlawfully tying the App Store to all iPhone purchases. *Id.*

Apple also "provides a warranty agreement with every new iPhone device activation." *Id.* "These warranties are specific to the device the user activates." *Id.* "Thus, if a consumer purchases a new iPhone device [], that device activation is subject to a new warranty and, thus, a new agreement between Apple and that consumer." *Id.* Apple sold millions of iPhones in the four years preceding this lawsuit, each of which was subject to a new warranty agreement. *Id.* Critically, those warranty agreements contained coercive terms designed to discourage users from using alternative app stores like Cydia. Specifically, users that download apps from a source other than the App Store void their warranty. *Id.* ¶29. Apple not only issued millions of these warranty agreements during the limitations period, it "regularly ***enforced*** those terms against users, including in the four years preceding this lawsuit." *Id.* (emphasis in original). "The effect of these restrictions was to coerce and/or steer away iPhone users (*i.e.*, potential customers) from competing offerings, like Cydia." *Id.*

Apple imposed coercive contracts on millions of developers during the limitations period as

well, in order to discourage developers from distributing through competing app stores like Cydia. They include "the Apple Developer Agreement, the Apple Developer Program License Agreement, and Schedule 2 to the License Agreement." *Id.* ¶ 32. "[I]n the four years leading up to this lawsuit," Apple "continuously modified" those agreements to, *inter alia*, "shore up perceived holes in the terms that might permit developers to distribute their apps or process in-app payments through alternatives other than Apple's App Store and/or its IAP API." *Id.* ¶¶ 32, 69. "Apple imposed each of these agreements and their anticompetitive terms . . . on every new app developer that wanted to sell their products in the App Store, including brand new developers (*i.e.*, potential Cydia customers) in the four years preceding this lawsuit." *Id.* ¶ 32. Moreover, existing developers that submit new apps "must receive Apple's approval for its apps and in-app products before Apple will distribute and sell the apps through the App Store," a process that "applies to new apps (of which there have been many over the four years preceding the original complaint in this lawsuit), as well as updates to preexisting apps." *Id.* ¶ 33. Apple routinely "uses the approval process to enforce and coerce compliance with the anticompetitive terms of its developer agreements." *Id.* It also "regularly raises issues with current apps already on the App Store separate and apart from the approval process, and threatens to delist those apps if Apple contends they violate the exclusionary developer contract terms" that prohibit developers from distributing their apps through Cydia. *Id.*

Apple has selectively and arbitrarily enforced those policies during the four years leading up to this lawsuit to exclude competition. The FAC provides several examples of such arbitrary enforcement from 2017-2020. *Id.* ¶¶ 70-71. Notably, in June 2019, a store called AltStore, which would have allowed iPhone uses to download apps without jailbreaking their phone, was made available for download directly from the internet outside of the App Store. *Id.* ¶71. Soon thereafter, "Apple killed this new offering because of the competitive threat it represented, once again by changing its code specifically to prevent that alternative app store from working." *Id.* "AltStore relied on a modified version of Cydia's open source software, and the efforts Apple implemented against AltStore applied with equal force to Cydia's marketplace." *Id.*

Underscoring that these exclusions were Apple's enforcement **choice** (rather than the unabated inertial consequence of the policy of exclusion that it first put in place in 2008) is the

competing example of WeChat, which is a multi-purpose instant messaging, social media and mobile payment app that is incredibly popular in Asia. In early 2017, Apple allowed WeChat to distribute apps as "miniprograms" within the WeChat system. *Id.* ¶ 73. ███████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████ *Id.*

Apple has taken similar steps with respect to iOS payment processing services. For example, "Apple specifically revised its developer program license agreement to prohibit developers from facilitating distribution of apps from any source other than the App Store, and it has become infamous in recent years for pausing or delaying app approval on an ad hoc basis if app developers do not add more revenue-generating features for Apple, such as in-app purchases." *Id.* ¶ 74 News stories of this practice have abounded over the years, including in particular in the four years leading up to this lawsuit. Examples include Apple's conduct regarding Spotify (2017), WordPress (2020), cloud gaming from Microsoft . . . (2020), and, of course Epic Games (2020)." *Id.*

As noted above, every new developer listing their apps for the first time during the four years leading up to this lawsuit was required to sign the developer program license agreement. Moreover, existing developers were required to accept Apple's updated terms each time it issues them (thus constituting a new contract for those existing developers). *Id.* ¶ 83. Each of those contracts "served to prevent customers from using Cydia's and other competitors' products" and either "steered customers away from Cydia or other competitors, or prevented such customers from using those services at all." *Id.*

## LEGAL STANDARD

When deciding a Rule 12(b)(6) motion to dismiss, courts must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the non-moving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). Because Apple does not challenge the plausibility of Cydia's allegations, "the best way to analyze the [statute

8

of] limitation[s] issue is to assume that the antitrust laws have been violated and then consider when the antitrust cause of action has accrued …" Areeda & Hovenkamp, *Antitrust Law* ¶ 320a (4th ed. 2013) ("Areeda & Hovenkamp").

On a motion to dismiss arguing that the claims are untimely, the movant bears an additional burden—one that Apple almost entirely ignores in its motion. "[S]tatutes of limitations provide an affirmative defense, which normally must be raised at summary judgment rather than on a motion to dismiss." *In re Facebook, Inc., Consumer Privacy User Profile Litig.*, 402 F. Supp. 3d 767, 790 n.10 (N.D. Cal. 2019). "[A] plaintiff is not obligated to plead the absence of affirmative defenses." *Philpot v. Kos Media LLC*, 2018 WL 10399910, at *3 (N.D. Cal. Dec. 6, 2018). Accordingly, "at the motion to dismiss stage 'a complaint cannot be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts that would establish the timeliness of the claim.'" *Garnica v. HomeTeam Pest Defense, Inc.*, 2015 WL 3766514, at *2 (N.D. Cal. June 16, 2015) (quoting *Supermail Cargo, Inc. v. United States,* 68 F.3d 1204, 1207 (9th Cir. 1995)).

## ARGUMENT

## I.   CYDIA'S SHERMAN ACT DAMAGES CLAIMS ARE TIMELY

### A.   The Unifying Theme of Antitrust Continuing Violation Law is That the *Mechanism* of Competitive Harm Determines What Constitutes an "Overt Act"

Lost—or, rather, obscured—in Apple's renewed motion is the recognition that what constitutes an "overt act" in support of an anticompetitive scheme depends entirely on the nature of the scheme. Some schemes, like a refusal to deal, focus on the interaction between a monopolist and its would-be competitor, because the harm to competition comes from those interactions.[3] Other schemes, however, are not so narrow in focus. If the alleged scheme involves anticompetitive agreements, one needs to look at the date(s) of those agreements, as well as when the defendant

---

[3]   A refusal to deal plaintiff must establish (1) the "unilateral termination of a voluntary and profitable course of dealing," (2) a refusal to sell "even if compensated at retail price," and (3) a refusal to provide "products that were already sold in a retail market to other customers." *MetroNet Services v. Qwest*, 383 F.3d 1124, 1131 (9th Cir. 2004). That termination will violate Section 2 if "the only conceivable rationale or purpose" of the termination "is to sacrifice short-term benefits in order to obtain higher profits in the long run from the exclusion of competition." *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1184 (9th Cir. 2016).

enforced those agreements. *See*, *e.g.*, *Samsung*, 747 F.3d at 1203-1204; *Columbia Steel*, 111 F.3d 1427; *Eichman*, 880 F.2d at 160; *Pace Indus.*, 813 F.2d at 237. If the scheme depends on depriving the defendant's competitors of the ability to take customers and market share away from the defendant, then one must look to the dates of *each* of those efforts to determine when the defendant last acted in support of the scheme. *See Hennegan*, 787 F.2d at 1301.

Here, Cydia alleges that Apple actively prevented Cydia's potential customers—iPhone consumers and iOS developers—from using alternative app stores up through the time Apple finally excluded Cydia and other alternatives from the market (2019), despite Cydia's clear ability to provide such services and customers' clear desire to use those services. FAC ¶¶ 5-6, 28-29, 32-33, 45-46, 57-58, 68-69, 74-77, 83. This harmed competition in multiple ways, including providing customers less choice, less innovation, and higher prices because Cydia and other alternative app stores were limited and then excluded from the market. *Id.* ¶¶ 84-95. **Apple does not challenge the sufficiency of these allegations on this motion**.

Nevertheless, Apple argues that its efforts to deprive Cydia and other alternative app stores of consumer and developer customers cannot be overt acts because they were directed at "third parties." *See* Mot. at 9-11. This is a gross misstatement of the law. Multiple, well-recognized types of anticompetitive scheme depend *entirely* on restricting third parties' ability to use a monopolist's competitors' products. Such well-recognized liability theories include tying (where a monopolist of one product forces consumers to either buy the monopolist's tied product or agree not to buy its competitors' version of the tied product), exclusive dealing (where a monopolist forces consumers to agree to exclusively use its products or services), vertically-arranged boycotts (where a monopolist forces its competitors' potential customers to boycott those competitors), and aftermarket monopolization (where a monopolist actively prevents consumers of a foremarket product from using or purchasing its competitors' offerings in a related aftermarket).[4] Cydia alleges

---

[4]   *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992) (aftermarket monopolization); *Aerotec*, 836 F.3d at 1178 (tying), 1180-81 (exclusive dealing); *Hennegan*, 787 F.2d at 1300-01 (vertically-arranged boycotts/customer steering); *Constr. Aggregate Transp., Inc. v. Florida Rock Indus., Inc.*, 710 F.2d 752 (11th Cir. 1983) (same).

1    that Apple's conduct falls under all of these liability theories. *See*, *e.g.*, FAC ¶¶ 102-137.

2          Under this clear law, the task on this motion is to assess whether Apple has met its burden

3    to demonstrate there is no set of facts under which Cydia could show that Apple anticompetitively

4    restricted third parties' ability to select Cydia or other alternative app store providers within the

5    limitations period. *Garnica*, 2015 WL 3766514, at \*2. For the reasons discussed below, Apple fails

6    in this burden. But, more fundamentally, to the extent Apple argues (*e.g.*, at 9-11) that well-pled

7    allegations do not identify an overt act simply because they describe instances where Apple harmed

8    competition by imposing anticompetitive restrictions on Cydia's potential customers, that

9    contradicts well-settled, binding law, and invites this Court to error.

10         **B.     "New and Accumulating Injury" Does Not Mean a New Type of Injury, But
                    Rather a New Instance of Injury Flowing From Acts Harming Competition**

11         Another misapplication of the law that Apple urges is with its repeated implications that

12   Cydia can only allege a timely damages claim if it suffers a new *type* of injury it did not previously

13   suffer from other, similar instances of Apple's anticompetitive acts.  For example, Apple argues (at

14   1) that Cydia must allege "Apple did something new and different during the limitation period," and

15   that Cydia must prove Apple specifically targeted Cydia with its anticompetitive acts, rather than

16   target ***competition*** in a way that directly harmed Cydia by unfairly limiting its competitive options.

17   *Id.* at 3, 5, 7, 10, 16 (arguing that "new and accumulating injury" cannot occur if Apple restricted

18   third parties' ability to use Cydia or other alternatives, or if Apple committed the same types of

19   anticompetitive acts as in the pre-limitations period). That, again, is not the law.

20         As an initial matter, to the extent this argument relies on the notion that Cydia cannot

21   describe harm to competition and itself through Apple's acts directed at third parties (*e.g.*, through

22   tying, exclusive dealing, vertically-arranged boycotts, aftermarket monopolization, etc.), that is

23   wrong as a matter of law for the reasons discussed in the previous Section and must be rejected.

24         Just as importantly, however, Apple does not cite a single authority holding that committing

25   the same types of acts both before and during limitations period somehow immunizes it under the

26   continuing violation doctrine. Indeed, the point of the continuing violation doctrine is that a

27   defendant incurs new liability ***every time*** they commit an act violating the law as part of a continuing

28

scheme. *See Ellis*, --- F.4th ---, 2022 WL 276031, at *8 (quoting *Flynt*, 940 F.3d 457, 462 n.3); *see also Samsung*, 747 F.3d at 1202 ("This standard is meant to differentiate those cases where a continuing violation is ongoing—and an antitrust suit can therefore be maintained—from those where all of the harm occurred at the time of the initial violation."). This notion holds particular importance where a monopolist is accused of illegally maintaining its monopoly power through a comprehensive scheme of anticompetitive acts.[5]

Accordingly, to the extent Apple retreats repeatedly to the idea that it put an anticompetitive "policy" in place in 2008, and then simply adhered to that policy through the present (*see*, *e.g.*, Mot. at 11-16), that once again misses the point that timeliness focuses on **overt acts, not policies**. *See*, *e.g.*, *Samsung*, 747 F.3d at 1202 ("[E]ach time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act …"), 1203 (discussing *Hennegan*, "Even though the anticompetitive agreement to divide the market between producers dated back to 1972, the anti-competitive acts of the parties to that agreement, taken pursuant to its terms, were sufficient to support an antitrust action 18 years later."); *Columbia Steel*, 111 F.3d at 1444-1445 (enforcing 18-year-old anticompetitive contract within limitations period constituted a new overt act); *Hennegan*, 787 F.2d at 1301 (finding claim timely for anticompetitive scheme that began years before the lawsuit); *Klein*, 2022 WL 141561, at *34 (finding timely claims based on overt acts within limitations for policy started years before); *Red Lion Med. Safety, Inc. v. Ohmeda, Inc.*, 63 F. Supp. 2d 1218, 1224 (E.D. Cal. 1999) (finding timely claims based on policy first established 15 years earlier). Apple offers no authority contradicting this precedent; nor can it.

**C.    Apple Committed Multiple Acts Aimed at Specifically Excluding Cydia and Other Alternative App Stores Within the Four Years Preceding This Lawsuit**

With this legal backdrop in mind, it bears noting first that Cydia clearly identifies instances within the limitations period where Apple specifically targeted Cydia for exclusion. This Court asked for such instances at the January 5 hearing, and Cydia complied. In the FAC, Cydia describes,

---

[5]    *See*, *e.g.*, *Klein*, 2022 WL 141561, at *34 (rejecting "new and accumulating injury" arguments like Apple's because the complaint alleged how Facebook's recent acts harmed competition and helped it illegally *maintain* monopoly power).

SAURIKIT, LLC'S OPPOSITION TO MOTION TO DISMISS FIRST AMENDED COMPLAINT
Case No. 20-cv-08733-YGR

for example, specific technological updates Apple applied in 2018 and 2019; first to new iPhones that were released for the first time in the four years preceding this lawsuit, and then to all iPhones, regardless of release date. FAC ¶¶ 4-5, 46, 75-76. These 2018 and 2019 efforts were specifically designed to prevent consumers from using alternative app stores, even after legally jailbreaking their phones, and they acted as a complete exclusion for those alternative app stores, Cydia included. *Id.*[6] Furthermore, Apple's internal documents confirm the updates were explicitly anticompetitive in nature, given that ███████████████████████████████████████████████████ ███████████████████████████████████████ *Id.* ¶ 76.

Apple intends to argue these updates were not illegal under the antitrust laws (*see* Mot. at 15-16), and it is free to do so later, although discovery provided to date indicates those efforts will be futile. Now, however, the FAC clearly alleges that these updates were not only targeted specifically at alternative app stores and Cydia itself, but also acted as the final act that "permanently destroy[ed]" competition from such alternatives. *See Hennegan*, 787 F.2d at 1301. Such acts are clearly new overt acts under binding law, clearly tied to the broader scheme Cydia alleges, and therefore demonstrate Cydia's claims are timely. *Id.*; *see also Allied Orthopedic*, 592 F.3d at 998-1000 (changing a foremarket product design to exclude aftermarket competition with no procompetitive justification for that change is an anticompetitive act); *Newcal Indus.*, 2011 WL 1899404, at *3 (each act to restrain competition in an aftermarket constitutes new overt acts).

### D.   Apple's Other Alleged Conduct—All of Which is Alleged as Part of the Same Scheme—Also Constitutes Timely Overt Acts

In addition to acts directed specifically at Cydia itself, the FAC also alleges millions of acts during the limitations period that harmed both competition and, by extension, Cydia. *See Glen Holly Ent., Inc. v. Tektronix Inc.*, 343 F.3d 1000, 1007-08 (9th Cir.) ("Antitrust injury is defined not merely

---

[6]   Apple argues (at 16 n.4) that Cydia really shut down because of security vulnerabilities in its payment processing system. That is incredibly disingenuous and demonstrates the dangers of delving into fact-finding on a motion to dismiss. In the materials Apple cites, Cydia's founder, Mr. Freeman, explained in response to a report of a bug in Cydia's payment processing system, that he had already made the decision to shut down the store because, among other things, he had been deprived of purchasers. Nevertheless, he persisted for another year with Cydia until Apple finally killed it and other alternative app stores with the 2019 update. FAC ¶¶ 5, 76.

as injury caused by an antitrust violation, but more restrictively as injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.") (internal quotations omitted). Apple does not seriously contend that Cydia fails to plausibly allege such acts or injury; it argues that they cannot stand as overt acts supporting a timely claim. *See* Mot. at 9-16. In doing so, Apple argues a position plainly contradictory to binding law.

### 1. Imposing anticompetitive agreements on consumers for new versions of iPhones released within the four years preceding this lawsuit

Contrary to Apple's implications in the renewed motion, "the iPhone" is not some single device that has remained unchanged since 2007. As the FAC (and common experience) makes clear, "iPhone" refers to a brand of smartphones, and Apple has released dozens of different devices under that brand name, including 15 new iPhone models within the four years preceding this lawsuit. FAC ¶ 28. Each time Apple released a new model of the iPhone, it required purchasers who activated that new model to agree to a device-specific warranty that acted as a new tying agreement and/or coercive anticompetitive tool. *Id.* ¶¶ 28-29, 35. This applied to both new and preexisting iPhone users. Anytime a user activated a new iPhone, they had to submit to a new agreement not to use alternative app stores, else void their new phone's warranty. *Id.*

In *Samsung*, the Ninth Circuit expressly held that, where an alleged scheme involves anticompetitive agreements covering only a certain product, applying the same anticompetitive agreement to a new product constitutes a new overt act. *Samsung*, 747 F.3d at 1203-1204 (The adoption of the 2006 license was a 'new and independent act' that caused 'new and accumulating injury' within the meaning of *Pace* because the 2003 license neither covered second-generation SD cards, nor did it cover expansion to future technological developments."). Here, that exact fact pattern holds. Apple's iPhone warranties are device-specific, meaning that a consumer must agree to a warranty's terms for every iPhone they activate and use. FAC ¶ 28. Under *Samsung*'s plain logic, that constitutes a new overt act every single time such an agreement goes into place. 747 F.3d at 1203-1204; *see also PBTM LLC v. Football Nw., LLC*, 511 F. Supp. 3d 1158, 1182 (W.D. Wash. 2021) ("for a claim alleging an unlawful tying arrangement, the cause of action first accrues when the arrangement was executed or became effective"). Accordingly, because the FAC unquestionably

alleges that Apple imposed these agreements within the limitations period and that they harmed competition and, as a result of that harm to competition, Cydia, they identify a timely claim.

### 2. Imposing anticompetitive agreements on consumers for all new iPhone activations within the four years preceding this lawsuit

Even if one assumed that the consumer warranties and other coercive aspects of Apple's acts towards iPhone purchasers in the last four years were just restatements of pre-limitations era contracts, that still does not render Apple's acts anything but a continuing violation. *Samsung* is once again the most on-point, binding authority. There, the Ninth Circuit was clear that requiring a new party to abide by an anticompetitive agreement from the pre-limitations period is a new overt act. *Samsung*, 747 F.3d at 1204 (holding that, "even if the 2006 license was merely a restatement of the 2003 license," applying it to a new SD card manufacturer, Samsung, constituted "an overt act that restarted the limitations period"). Cydia explains at length how Apple's imposition of new anticompetitive agreements on first-time iPhone users during the limitations period continued the same scheme and continued to harm competition (and, consequently, Cydia). FAC ¶¶ 28-29, 35. That clearly articulates new, timely overt acts. *Id.*; *PBTM*, 511 F. Supp. 3d at 1182.

### 3. Requiring developers wishing to release apps for the first time on the App Store to agree to the anticompetitive Developer Agreement

Similarly, on the other side of the platform, Apple's requirements that developers enter the anticompetitive Developer Agreement every time they want to begin listing apps on the App Store (*see* FAC ¶¶ 5-6, 32-33, 57-59, 70-73) is yet another series of instances where Apple applied its anticompetitive agreements to new parties within the limitations period. Such actions unquestionably constitute new overt acts under binding law. *See Samsung*, 747 F.3d at 1203-1204; *Columbia Steel*, 111 F.3d 1427 (antitrust claim originally accrued at time of anticompetitive agreement); *Pace*, 813 F.2d 234, 237 (same); *Red Lion*, 63 F. Supp. 2d at 1224 ("Because Ohmeda's enforcement of its parts policy allegedly has caused new injury to plaintiffs within the four-year limitations period, plaintiffs' claims are not time-barred."); *see also Aerotec*, 836 F.3d at 1181 ("[A] prerequisite to any exclusive dealing claim is an agreement to deal exclusively"). Given that these developer-side agreements foreclose competition and damage Cydia as a result, they all contribute to the timeliness of its claims. *Id.*

1

2

**4.**   **Enforcing preexisting anticompetitive agreements in order to exclude competition from alternative app stores and in-app payment processing**

3

Yet another clear category of overt act is when a monopolist *enforces* an anticompetitive

4   agreement within the limitations period, even a contract entered more than four years earlier. *See*

5   *Samsung*, 747 F.3d at 1203; *Columbia Steel*, 111 F.3d 1427; *Pace Indus.*, 813 F.2d at 237. This is

6   particularly relevant in the tying context—which Cydia alleges here—because enforcing a tie years

7   later is the essence of an overt act harming competition. *See Eichman*, 880 F.2d at 160 ("To restart

8   the statute of limitations in a tying situation, [plaintiff] must show that [defendant] had the ability

9   [to] and actually did enforce the tie during the limitations period."). Apple provides no authority

10   suggesting otherwise. *See* Section I(E), *infra*.

11   Cydia alleges a number of representative examples of Apple enforcing its anticompetitive

12   agreements within the limitations period. FAC ¶¶ 70-74. Thus, once again, Cydia has alleged

13   numerous overt acts that are part of the broader continuing violation, rendering its claims timely.

14   **5.**   **Steering potential customers (consumers and developers) away from Cydia and other alternative app stores**

15   A final point worth noting is that all of the above are examples of Apple steering customers

16   away from Cydia's and other competitive alternatives' respective businesses. Although the

17   mechanisms differed slightly, the result was the same: both consumers and developers were directed

18   away from competing app stores and iOS app payment processors. FAC ¶¶ 29, 83.

19   Although this may have been business as usual for Apple, that does not render it legal. When

20   a scheme depends on steering potential customers away from a competitor, unless that steering

21   permanently puts the competitor out of business, it remains a continuing violation for as long as it

22   occurs. *Hennegan*, 787 F.2d at 1301; *see also Red Lion*, 63 F. Supp. 2d at 1224 ("the Ninth Circuit

23   has found no continuing violation only in situations in which the act outside the limitations period

24   'completely and permanently excluded [the plaintiff] from the market'") (citing *Hennegan* and

25   *Vehicle Air Pollution*). That is exactly the case here. Apple's customer steering conduct first began

26   in 2008, true, but then it continued with every new iPhone release, every new iOS release, and

27   through the thicket of anticompetitive agreements and enforcement activities discussed above, as

28   well as the technological aftermarket restrictions Apple manufactured more recently.

Under *Hennegan*, as well as the sum of all other binding and persuasive precedent cited above, each time Apple, as a monopolist, steered a potential customer away from Cydia and other competitors in an unreasonable and restrictive way (as Cydia alleges was the case here), that harmed competition and thus constituted a new overt act. *See supra*; *see also Klein*, 2022 2022 WL 141561, at *34 (overt acts that harmed competition restarted limitations period and rendered claims timely). Accordingly, because Apple's ordinary course of business was to act anticompetitively, it continued to violate the law and give rise to timely claims up through the present.

**E.      None of Apple's Precedent Addresses Analogous Facts or Liability Theories**

As the above discussion should hopefully make clear, that Apple committed new overt acts within the limitations period is not a close call. Faced with the precedent cited at length above (and in the FAC), however, Apple opts not to grapple with their central holdings on overt acts, and instead points to a number of other cases finding claims untimely for reasons untethered to the FAC's allegations.[7] These other case citations, however, show how weak Apple's renewed motion is, because they address entirely different liability theories and types of core fact, including instances where the alleged anticompetitive acts either occurred entirely outside of the limitations periods or were simply reaffirmations of refusals to deal that occurred before the limitations period and permanently harmed competition at that time. In short, Apple hides from the directly analogous, binding precedent by pointing and citing to inapposite cases in a misleading way. Cydia believes a fulsome discussion of Apple's core citations will help explain why dismissal is inappropriate here.

**1.      *Vehicle Air Pollution***

*Vehicle Air Pollution* is the most glaring example of Apple's inability to address Cydia's allegations head on. In that case, which Apple claims is "on all fours" with this one (Mot. at 7), the plaintiff alleged that the auto manufacturer defendants conspired to refuse to purchase its

---

[7]      Apple suggests (at 8) that the binding and persuasive precedent Cydia cites is limited to Section 1 claims. As an initial matter, that attempted distinction has no bearing on the timeliness of Cydia's claims because it alleges a Section 1 claim. FAC ¶¶ 147-156. But, more importantly, there is no support anywhere in the case law that the continuing violation doctrine only applies to Section 1 claims; quite the opposite. *See, e.g.*, *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 502 (1968) (applying the continuing violation doctrine to Section 2 claims).

afterburners for a new generation of vehicles. 591 F.2d at 70-71. The alleged conspiracy began more than four years before the lawsuit, but the plaintiff alleged that one of the defendants subsequently refused to deal with it within the limitations period. *Id.* In holding—on summary judgment, not a motion to dismiss—that the claim was untimely, the Ninth Circuit observed that the facts showed the original refusal to deal completely excluded the plaintiff from the market at that time because, due to the unique nature of the auto manufacturing industry, a decision not to buy certain products at the start of the design process for a vehicle generation meant the market for any excluded products dried up for years at least. *Id.* In its subsequent *Hennegan* decision, the Ninth Circuit discussed *Vehicle Air Pollution* and clarified that its result was unique to its facts because anticompetitive acts that do not "**permanently destroy**" a plaintiff's business, as well as acts that were of the type a defendant could later change if it chose, do not foreclose a later lawsuit based on new overt acts. *Hennegan*, 787 F.2d at 1301; *see also Samsung*, 747 F.3d at 1202 ("This standard is meant to differentiate those cases where a continuing violation is ongoing—and an antitrust suit can therefore be maintained—from those where all of the harm occurred at the time of the initial violation.").

Cydia alleges exactly the situation *Hennegan* described; *i.e.*, that Apple's overt acts did not permanently destroy its business until within the limitations period, in late 2019, and were of a type that Apple could have easily changed by, *inter alia*, removing the anticompetitive aspects of its consumer and developer agreements, not enforcing those agreements in an anticompetitive way, and by not imposing anticompetitive restrictions on every new model of iPhone it released, including those within the four years preceding this lawsuit. FAC ¶¶ 5-6, 73-75. As these allegations make clear, Apple's anticompetitive acts were always subject to its choice. Indeed, underscoring the voluntary and mutable nature of its anticompetitive conduct, Apple recently announced a change to its in-app payment processing policies as part of the pending developer class action settlement. *Id.* ¶ 58. That, more than anything, shows how easily Apple could have changed its anticompetitive "policy" over the years; it just chose not to, because excluding competition is hugely profitable.

Further underscoring this point is that the FAC alleges how Apple's scheme depended on constantly imposing new anticompetitive agreements on new activations of existing iPhones along with new versions of iPhones, as well as enforcing those agreements within the limitations period.

1   *Id.* ¶¶ 28-29, 35. It is those sorts of **choices** the Ninth Circuit has repeatedly held since *Vehicle Air*

2   *Pollution* clearly constitute new overt acts, and why the untimeliness result stemming from the

3   unique facts presented on summary judgment in that case is the exception, not the rule. *Samsung*,

4   747 F.3d at 1203 ("*AMF* [*i.e.*, *Vehicle Air Pollution*] is the exception, not the rule"; "an action …

5   [is] sufficient to restart the statute of limitations so long as the defendant had the ability not to take

6   the challenged action"); *Oliver v. SD-3C, LLC*, 751 F.3d 1081, 1087 n.5 (noting *Vehicle Air*

7   *Pollution* does not control in a case where the original decision to act anticompetitively did not

8   "permanently and finally control" the defendants' subsequent acts); *Hennegan*, 787 F.2d at 1300-

9   1301 (noting that *Vehicle Air Pollution*'s logic **compelled a timeliness finding** where the

10  anticompetitive scheme was to consistently steer customers away from a competitor's business).[8]

11                              **2.    *Hawthorne Hangar***

12          Apple's next favorite citation is *Hawthorne Hangar Operations, L.P. v. Hawthorne Airport,*

13  *LLC*, 2021 WL 3264420 (C.D. Cal. Apr. 27, 2021) (discussed Mot. at 3, 15), which is a case that is

14  not only inapposite on the point for which Apple cites it, but more broadly supports denying Apple's

15  motion due to holdings Apple fails to bring to the Court's attention. In *Hawthorne Hangar*, the

16  plaintiff alleged the defendants conspired to create a *de facto* monopoly over ground leases and

17  services at the Hawthorne Airport, which prevented the plaintiff from competing for fuel sales there.

18  *Id.* at *1. The plaintiff alleged two anticompetitive acts in this scheme: a 2009 contract limiting the

19  plaintiff's fuel distribution rights, and that, in 2017, the defendant airport re-erected a fence it

20  _____

21          [8]   In its renewed motion, Apple argues (at 12) that *Hennegan* and *Red Lion* stand for the
     proposition that the continuing violation doctrine should not be applied where a pre-limitations
22   period refusal to deal "is subsequently enshrined in the defendant's products or otherwise
     entrenched through its conduct." That is an incredible misreading of those opinions. First, as noted
23   above, this is clearly not a refusal to deal case, so even if Apple was correct in this interpretation
     of the case law, the supposed rule Apple articulates would not apply here. Second, and in any
24   event, the portion of *Hennegan* that Apple cites, 787 F.2d at 1300-01, simply describes the holding
     in *Vehicle Air Pollution* and, more importantly for this particular discussion, explains that *Vehicle*
25   *Air Pollution* established the scope of the continuing violation doctrine **in all antitrust situations**.
     *Id.* Third, in *Red Lion*, the Court found claims based on a 15-year-old refusal to deal policy was
26   **timely**, because, *inter alia* (and like here), the imposition of the original policy did not "completely
     and permanently exclude" plaintiffs from the relevant market, the policy itself could have been
27   changed, and because the defendant enforced the policy within the limitations period. 63 F. Supp.
     2d at 1224. This further shows that Apple's interpretation of this precedent is plainly wrong.

28

1    originally put up in 2009 that prevented the plaintiff from distributing fuel there. *Id.* at *1-*2.

2        Most important for Apple's renewed motion is that the *Hawthorne Hangar* Court found, due

3    to the nature of the alleged scheme, that ***entering the 2009 agreement was itself an anticompetitive***

4    ***act****. Id.* at *3-*4. Here, the alleged scheme involves Apple entering and imposing millions of

5    anticompetitive agreements every year in the four years preceding this lawsuit. *Hawthorne Hangar*

6    thus squarely supports denying Apple's motion, because the court's finding there syncs up with the

7    Ninth Circuit's opinions on agreement-based overt acts, discussed *supra* at 6-8, 14-17.

8        To the extent Apple likens (Mot. at 3-4, 15) the re-erected security fence from *Hawthorne*

9    *Hangar* to its practices of preventing consumers and developers from using alternative app stores,

10   that ignores several key allegations in the FAC. *First*, to the extent a fence analogy even applies

11   here at all, Apple only erected a completely exclusionary technological "fence" around iPhones in

12   2018 and 2019, when it finally succeeded through updates to iOS and newly-released iPhone

13   hardware in completely preventing alternative app stores from even operating on iPhones. FAC ¶¶

14   5-6, 46, 75-76. Before that time, Apple implemented changes to make it harder for consumers to

15   legally jailbreak and operate alternative app stores on their iPhones, but nothing before 2018 and

16   2019 completely excluded those alternatives. *Id.* Thus, Apple did not create a "fence" until within

17   the limitations period, meaning that *Hawthorne Hangar*'s logic supports denying the motion.

18       *Second*, the alleged scheme in *Hawthorne Hangar* centered around who could sell fuel at a

19   single location. Here, each iPhone in the market is a separate "location" where a consumer can

20   decide to install and use an alternative app store. Again, to the extent a fence analogy is even

21   appropriate, Cydia alleges that Apple erected individual "fences" (both contractual and

22   technological) around each iPhone consumers activated in the four years preceding this lawsuit.

23   *Hawthorne Hangar*'s logic thus again supports denying the motion, because it is not until a

24   consumer activates a new iPhone that Cydia and other competitors lost access to that consumer.

25       *Third*, in *Hawthorne Hangar*, the original 2009 fence did not add to the plaintiff's 2009

26   contractual anticompetitive restraint; it was simply a physical manifestation of that agreed restraint.

27   Re-erecting the fence in 2017 thus did not add anything to the plaintiff's antitrust injury, because

28   that injury was complete as of 2009. *Hawthorne Hangar*, 2021 WL 3264420, at *4-*5. In contrast,

1    Apple's scheme here has continued to work for so long only because it continues to force consumers

2    and developers into *new* anticompetitive restraints for each new iPhone activation, each new version

3    of the iPhone, and each new app release on the App Store, and because Apple continuously enforces

4    compliance with those restraints. FAC ¶¶ 5-6, 28-29, 32-33, 35, 57-59, 70-73. Each new act

5    prevented competition and led to Cydia's accumulating antitrust injury. The contrast between such

6    facts and the superfluousness of the fence in *Hawthorne Hangar* show why the result in that case

7    simply does not—and cannot—apply here.

8            **3.    Apple's other precedent**

9            The remainder of Apple's cited precedent similarly does not warrant dismissing this case,

10   because each case involved timeliness deficiencies not present here.

11           *David Orgell v. Geary Stores*, 640 F.2d 936 (9th Cir. 1981), like *Vehicle Air Pollution*, is a

12   refusal to deal case. The defendant originally refused to sell certain products to the plaintiff more

13   than four years before the lawsuit, and continued to refuse to sell to the plaintiff within the

14   limitations period. *Id.* at 937-938. Because the original refusal to deal completed the competitive

15   harm, subsequent refusals were simply reaffirmations of that original refusal and thus did not

16   generate new damages claims. *Id.* As discussed above, that is not the nature of the alleged scheme

17   here and is therefore entirely inapposite. Cydia does not ask anything of Apple; it is Apple that

18   actively prevents Cydia's potential customers from using Cydia or any other competitor. *Orgell*'s

19   logic therefore does not apply to these non-refusal to deal claims.

20           *Aurora Enterprises, Inc. v. Nat'l Broadcasting Co., Inc.*, 688 F.2d 689 (9th Cir. 1982),

21   addressed an alleged tying agreement from 1966, under which NBC was entitled to receive certain

22   syndication profits. The plaintiff did not allege that NBC acted on that agreement or actively tried

23   to enforce it within the limitations period; just that NBC continued to receive the syndication profits.

24   The Ninth Circuit held that passive receipt of benefits from an allegedly anticompetitive agreement

25   does not constitute an overt act in support of an anticompetitive scheme. *Id.* at 693-694. In contrast,

26   Cydia alleges here that Apple continues to *impose* new anticompetitive agreements and, just as

27   importantly, *enforce* those agreements—which include tying agreements. *Aurora* itself clearly states

28   that enforcing an anticompetitive agreement within the limitations period constitutes a new overt

1   act. *Id.* at 694 ("Active enforcement of an illegal contract may, under certain circumstances, cause

2   renewal of an injury and restart the statute of limitations") (citing *Twin City Sportservices, Inc. v.*

3   *Charles O. Finley & Co.*, 512 F.2d 1264 (9th Cir. 1975)); *see also Eichman*, 880 F.2d at 160 ("To

4   restart the statute of limitations in a tying situation, [plaintiff] must show that [defendant] had the

5   ability [to] and actually did enforce the tie during the limitations period.").

6       *Garrison v. Oracle Corp.*, 159 F. Supp. 3d 1044 (N.D. Cal. 2016), involved an alleged

7   conspiracy in which the defendants agreed not to hire each other's workers. As relevant to

8   timeliness, all of the alleged anticompetitive agreements predated the complaint by more than four

9   years and the plaintiffs "failed to allege any acts of enforcement, renewal, or expansion after [the

10  last agreement date]." *Id.* at 1071-1072. In contrast, Cydia alleges multiple exclusionary design

11  changes, millions of anticompetitive agreements within the limitations period, and numerous

12  representative examples of Apple enforcing anticompetitive agreements in the last four years. This

13  all immediately distinguishes *Garrison* from this case.

14      *In re Animation Workers Antitrust Litig.*, 87 F. Supp. 3d 1195 (N.D. Cal. 2015), similar to

15  *Garrison*, addressed an anti-solicitation agreement between major animation studios that

16  supposedly depressed animation workers' salaries. The plaintiffs, however, failed to identify any

17  anti-solicitation agreements within four years of the lawsuit, failed to allege that "any Defendant

18  abided by, attempted to enforce, or otherwise 'reaffirmed' the anti-solicitation scheme or salary

19  range setting on or after September 8, 2010, i.e., four years prior to the first-filed complaint in this

20  consolidated action," and failed to identify any conduct that would have led to depressed wages for

21  animation workers within the limitations period. *Id.* at 1212-1213. Because they failed in these

22  multiple respects, the plaintiffs did not allege a timely claim. *Id.* In contrast, Cydia alleges that,

23  within the limitations period, Apple committed numerous acts of the exact type the *Animation*

24  *Workers* court recognized would have made the plaintiffs' claims timely. *See supra* at 6-8, 14-17.

25      *MedioStream, Inc. v. Microsoft Corp.*, 869 F. Supp. 2d 1095 (N.D. Cal. 2012), involved

26  allegations that Microsoft imposed anticompetitive agreements on PC manufacturers to include the

27  Windows Media platform on all computers they shipped, thereby excluding competing media

28  products. *Id.* at 1105. The plaintiff, however, failed to allege that Microsoft imposed any such

agreements within the limitations period. *Id.* at 1106. In contrast, Cydia alleges at length how Apple imposed millions of anticompetitive agreements on consumers and developers alike in the four years preceding this lawsuit. *See supra* at 6-8, 14-17 (summarizing allegations). *MedioStream* therefore has little application to this case, except to act as a contrast to the sufficient allegations here.

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, 2010 WL 3521979 (E.D. Cal. Sept. 3, 2010), addressed a complaint that two competitors merged in 1986, forming a monopolist, and were thereafter able to charge ever-higher prices due to the allegedly improperly-obtained monopoly. *Id.* at *16. The plaintiff tried to get around this obvious timeliness problem by arguing that its product purchases from the alleged monopolist constituted new overt acts. However, the court noted that the merger in 1986 was the only anticompetitive act the plaintiff identified. "The market was allocated at that time. The competitors were joined at that time. The competition was eliminated at that time. Thus, the injury was complete at that time." *Id.* at *17 (internal citation to *Hennegan*, 787 F.2d at 1301, omitted). There are no similar facts here. As Cydia alleges, Apple's scheme is one of constant maintenance and expansion. Even though Apple was able to wrongfully obtain monopoly power through the same essential scheme, it was only able to ***maintain*** that power through new anticompetitive agreements; enforcement of old ones; introduction of new, exclusionary design changes; and all the other conduct Cydia identifies. *See supra* at 5-8, 14-17 (summarizing same).

It is also notable that *Stanislaus* confirms a point now reiterated multiple times above. "New and independent acts," that court observed, "may include active enforcement of policies first put into place outside the limitations period." *Id.* at *16 (citing *Columbia Steel*, 111 F.3d 1427). Similarly, in *MedioStream*, the court observed "[n]ew and independent acts giving rise to liability might include an agreement *executed* within the limitations period, as well as the 'active enforcement' of mutable policies first put into place outside the limitations period. 869 F. Supp. 2d at 1105 (citing to *Red Lion* and *Columbia Steel*). As with its other cited precedent, Apple picks and chooses which portions of the opinions it likes, while ignoring their full holdings.

*     *     *     *     *

As the above discussion should make clear, none of Apple's preferred precedent involves an anticompetitive scheme in which the defendant monopolist was accused of actively preventing

23

customers from using its competitors' products or services within the limitations period. None addresses a case where the plaintiff explained how the defendant imposed new anticompetitive agreements on relevant parties during the limitations period, nor how they imposed new anticompetitive agreements on products released for the first time in the limitations period. None addressed active enforcement of anticompetitive contracts within the limitations period, nor exclusionary design changes implemented in those four years. In short, Apple's precedent plainly does not address analogous facts or complaints, and Apple fails to face head on the binding and persuasive precedent stating that overt acts of the type Cydia alleges clearly identify timely claims.

## II.  CYDIA'S CLAIMS FOR INJUNCTIVE RELIEF ARE ALSO TIMELY

Laches does not bar Cydia's claims for injunctive relief. "A claim is barred by laches where (1) the plaintiff unreasonably delays in bringing suit and (2) the defendant is prejudiced by the delay." *EEOC v. LogistiCare Sols. LLC*, 2020 WL 6781270, at *1 (D. Ariz. Nov. 18, 2020). Because laches is a fact-based affirmative defense, "claims are not easily disposed of at the motion to dismiss stage based on a defense of laches." *Id.* "A laches defense raised at the motion to dismiss posture requires exclusive reliance on the factual allegations in the complaint. … [T]his postural requirement poses a nearly insurmountable obstacle to a favorable resolution of a defendant's fact-dependent laches claim." *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2014 WL 1091589, at *13 (N.D. Cal. Mar. 13, 2014). Here, Apple's laches defense fails for three independent reasons.

*First*, because, as explained above, Cydia has alleged that it was injured within the four-year antitrust statute of limitations, laches does not apply. *Oliver*, 751 F.3d at 1087 ("Because Plaintiffs allege that they were injured within the four-year limitations period, Plaintiffs have alleged sufficient facts to show that laches does not bar their federal antitrust claim." (footnote omitted)).

*Second*, Apple cannot show an unreasonable delay. "[A] lengthy span of time, alone, is not enough to prove unreasonable delay." *LogistiCare Sols.*, 2020 WL 6781270, at *1. Here, Apple asserts that Cydia's alleged delay was unreasonable because Cydia was aware that Apple began its anticompetitive conduct in 2008. (Mot. at 16-17.) This completely misses the point. As Cydia explains, it was not until 20*19* that Apple was able to fully exclude Cydia from the market. The law is clear that waiting to file suit until one has been fully excluded from the market is fully consistent

1   with the antitrust laws and continuing violation doctrine. *See supra* at 16-18. Cydia filed suit a year

2   after its complete exclusion, well within the limitations period. There is thus no unreasonable delay.

3         *Third*, Apple cannot show prejudice. Apple claims that it has invested significant time and

4   effort to exclude rival app stores from the iPhone, and that adjudicating this suit sooner could have

5   allowed it to know whether such repeated anticompetitive acts were legal or not. (Mot. at 17.) But,

6   this Court personally knows that Apple has been litigating virtually identical issues since 2011, *see*

7   *generally In re Apple iPhone Antitrust Litig.*, 4:11-cv-06714-YGR (N.D. Cal.), and has fought those

8   claims up to the Supreme Court and back, as well as in a full trial against Epic Games. It strains

9   credulity for Apple to claim that it would have done anything differently if Cydia had filed suit

10   sooner, let alone establish it has actually been harmed in any way. Apple therefore cannot

11   demonstrate prejudice. *See McCarthy v. Johannesson*, 2012 WL 12887540, at *4 (C.D. Cal. Dec.

12   11, 2012) (denying motion to dismiss where complaint's allegations did not "provide sufficient

13   information to conclude that defendants have been prejudiced by plaintiffs' delay").

14   **III.   CYDIA'S STATE LAW CLAIMS ARE TIMELY**

15         Finally, Cydia's unfair competition law ("UCL") claims in Count IV are timely for the same

16   reasons as Cydia's' federal claims. UCL claims based on anticompetitive conduct are subject to the

17   same accrual rules as the underlying antitrust claims, so the statute of limitation runs in parallel

18   fashion. *Animation Workers*, 87 F. Supp. 3d at 1211-12. Further, the continuing violation doctrine

19   (or "continuing accrual" theory) also applies to UCL claims. *TCL Commc'ns Tech. Holdings, Ltd.*

20   *v. Telefonaktienbolaget LM Ericsson*, 2016 WL 7049263, at *6 (C.D. Cal. Aug. 9, 2016) ("Under

21   that theory, separate, recurring invasions of the same right triggers each violation's own statute of

22   limitations."); *In re Animation Workers Antitrust Litig.*, 87 F. Supp. 3d at 1211 (UCL claims are not

23   time barred if there are "allegations that Defendants engaged in 'continuing violations'"). Because

24   Cydia's UCL claims are based on the same conduct as Cydia's federal claims and the same accrual

25   rules apply, Cydia's UCL claims are timely for the reasons explained above.

26

27

28

1    DATED:  February 16, 2022          QUINN EMANUEL URQUHART &
                                        SULLIVAN, LLP
2

3

4                                       By   */s/ Adam B. Wolfson*
                                           Stephen A. Swedlow (*pro hac vice*)
5                                          stephenswedlow@quinnemanuel.com
                                           David A. Nelson (*pro hac vice* )
6                                          davenelson@quinnemanuel.com
                                           Marc L. Kaplan (*pro hac vice*)
7                                          marckaplan@quinnemanuel.com
                                           191 N. Wacker Drive, Suite 2700
8                                          Chicago, IL 60606-1881
                                           (312) 705-7400
9

10                                         Adam B. Wolfson (SBN 262125)
                                           adamwolfson@quinnemanuel.com
11                                         Joseph Sarles (SBN 254750)
                                           josephsarles@quinnemanuel.com
12                                         865 South Figueroa Street, 10th Floor
                                           Los Angeles, CA 90017-2543
13                                         (213) 443-3000

14                                         *Attorneys for Plaintiff SaurikIT, LLC*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SAURIKIT, LLC'S OPPOSITION TO MOTION TO DISMISS FIRST AMENDED COMPLAINT
Case No. 20-cv-08733-YGR