QUINN EMANUEL URQUHART &
SULLIVAN, LLP
 Adam B. Wolfson (Bar No. 262125)
adamwolfson@quinnemanuel.com
 Joseph Sarles (Bar No. 254750)
josephsarles@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017-2543
(213) 443-3000

 Stephen A. Swedlow (*pro hac vice*)
stephenswedlow@quinnemanuel.com
 David A. Nelson (*pro hac vice*)
davenelson@quinnemanuel.com
 Marc L. Kaplan (*pro hac vice*)
marckaplan@quinnemanuel.com
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606-1881
(312) 705-7400

*Attorneys for SaurikIT, LLC*

GIBSON, DUNN & CRUTCHER LLP
JAY P. SRINIVASAN, SBN 181471
jsrinivasan@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

BETTY X. YANG (Texas Bar No.
24088690; pro hac vice)
byang@gibsondunn.com
2100 McKinney Avenue, Suite 1100
Dallas, TX 75201-6912
Telephone: 214.698.3100
Facsimile: 214.571.2900

HENRY H. CORNILLIE, SBN 324821
hcornillie@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: 415.393.8200
Facsimile: 415.393.8306

*Counsel for Defendant Apple Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| SAURIKIT, LLC,<br><br>        Plaintiff,<br><br>        v.<br><br>APPLE INC.,<br><br>        Defendant. | No. 20-cv-08733-YGR<br>Related Case<br><br>**JOINT AMENDED CASE MANAGEMENT STATEMENT**<br><br>Date: July 11, 2022<br>Time: 2:00 pm<br>Courtroom: 1, 4th Floor (via Zoom)<br>Judge: Hon. Yvonne Gonzalez Rogers |

Pursuant to the Standing Order for All Judges of the Northern District of California, Civil Local Rule 16-10(d), and the Court's Order setting a case management conference (ECF No. 80), Plaintiff SaurikIT, LLC ("Cydia"), and Defendant Apple Inc. (together, the "Parties"), by and through their undersigned counsel, hereby submit this Joint Amended Case Management Statement in advance of the July 11, 2022 Case Management Conference.

The Parties previously submitted a Joint Case Management Statement on March 22, 2021 (ECF No. 43). This Amended Statement has been updated to reflect the Court's order on Apple's Motion to Dismiss (ECF No. 80) and the Court's order on Cydia's Motion for Clarification and/or for Leave to Seek Reconsideration (ECF No. 84). The Parties have also revised their proposed schedules for discovery and trial.

## 1.   JURISDICTION & SERVICE

The Parties agree that the Court has subject matter jurisdiction over Cydia's federal law claims pursuant to the Clayton Antitrust Act, 15 U.S.C. § 26, and 28 U.S.C. §§ 1331, 1337. The Parties further agree that the Court has supplemental jurisdiction over Cydia's state law claim pursuant to 28 U.S.C. § 1367.

The Parties agree that no issues exist regarding personal jurisdiction or venue and that no Party remains to be served.

## 2.   FACTS

**Cydia's Statement**:

Apple has acted as a monopolist (or attempted monopolist) in the markets for iOS app distribution and iOS app payment processing to the detriment of customers and competitors, including Cydia (which created its own iOS app store before Apple and has offered it ever since, despite Apple's ever-increasing exclusionary practices). Recently, Apple released an update to its iOS operating system alongside a design change in its iPhone hardware that now makes it effectively impossible for third party iOS app distribution and payment processing providers like Cydia to compete with the Apple App Store.

Computing devices utilize an operating system ("OS")—such as Windows, Android, or iOS—that allows users to run programs, known as applications or "apps," for various types of tasks.

Applications written for one OS do not work on a different OS. What this means on a practical level is that apps written for one OS are not reasonably interchangeable with apps written for a different OS (even if the apps perform the same function), because a user with a device running one OS cannot use apps written for a different OS. This further means that app markets are OS-specific.

Historically, apps have been sold through multiple different distribution channels, including both brick & mortar and electronic channels. When Apple released the first iPhone in 2007, which ran on the then-new iOS operating system, Apple had not established its own distribution service for users to download or install additional applications or features on their devices. Jay Freeman, Cydia's founder, therefore saw an opportunity to establish the same sort of app distribution service/channel that competed with Apple (and every other major device manufacturer) in other product markets (*e.g.*, distribution of apps for laptop computers, desktop computers, etc.), so he founded Cydia and created the Cydia app marketplace. Through Cydia, third party developers were able to market their applications to iOS users, and iOS users were, in turn, able to download applications, games, and other features like "extensions" and "packages" (which have now been wrapped into the catch-all "app" category) that enabled users to make their devices easier to use and more customizable. These apps were highly innovative and, through competition with Apple's own apps, showed users the smartphone's full capabilities. For example, one of the most popular early apps distributed through Cydia was Cycorder, the first video recorder app for the iPhone, and Cydia (along with developers distributing their apps through Cydia) pioneered numerous other apps that Apple later incorporated into iOS or Apple's own apps (*e.g.*, predictive keyboards, rich text formatting for email, and accessing a device's camera from the lock screen). Cydia also included payment processing mechanisms, integrating the then-largest payment processors in the world, such as PayPal and Amazon.

Cydia was a massive success in the years following its introduction. Around 2009, it is estimated that roughly 10% of iPhone users utilized the Cydia marketplace, despite Apple's rollout of its own competing App Store in July 2008 after Cydia already introduced its own marketplace. App developers too preferred Cydia after the introduction of the App Store because Cydia had a large customer base and expedited app approval.

Apple, however, recognized the massive opportunity presented by the market for iOS app distribution and thereafter began regularly and consistently working to exclude all competition in that market via a comprehensive, continuing scheme Apple did not challenge on a motion to dismiss, except with respect to whether Apple committed new overt acts in support of that overarching scheme within the last four years—which the Court found it did. Today, through its anticompetitive efforts, Apple is the near sole iOS app distributor, despite Cydia's continuing efforts since its creation to compete with Apple for such distribution (and until Apple finally excluded Cydia in 2019). Apple obtained and maintains this monopoly position through a variety of anticompetitive acts that continue to this day. For example, it has long required (and continues to require) third-party iOS app developers to enter into the Apple Developer Agreement, the Apple Developer Program License Agreement, and the Schedule 2 to the License Agreement (among possibly others), which individually and collectively require developers to agree that, in exchange for Apple's approval to distribute their apps and in-app products through the App Store, they will not distribute their iOS apps through any other distribution channel. Similarly, iPhone users have long had to agree (and must still agree with each new iPhone they purchase or enable) to only obtain iOS apps through the App Store, or else they void their warranty on the iPhone. These agreements, which Apple has imposed and continues to impose on developers and phone users alike since it first introduced the App Store, mean that iOS device purchasers are forced to use the App Store, and iOS app developers are forced to market their apps through the App Store and use Apple's payment processing service, even though there is clear demand for alternate options.

In addition to implementing policies and contractual restrictions, another core part of Apple's continuing scheme has been to implement ever more technical restrictions on iOS devices that prevent iOS users from using App Store alternatives. For example, since the App Store was introduced, Apple has preinstalled the App Store app on iPhones and made it so that users can neither remove the App Store nor change their default preference to any other app marketplace. In recent years, Apple has introduced runtime code modification prevention, pointer authentication, physical map codesigning, memory tagging extensions, and other control mechanisms that prevent iOS users from using any app distribution platform other than the App Store, and that further Apple's

1  comprehensive continuing anticompetitive scheme, as the Court recognized. These latest technical

2  restrictions effectively prevent any iOS user from using Cydia or an alternative app distribution

3  platform and wiped out Cydia's ability to serve iOS users.

4      In conjunction with artificially suppressed competition for the App Store, Apple has

5  simultaneously worked to monopolize the market for iOS app payment processing. Although third

6  party developers create most of the apps on the App Store, iOS users can only pay for apps and in-

7  app purchases through the App Store—with Apple taking a 30% commission on the vast majority

8  of all app-related fees, from download fees to in-app purchases. Indeed, Apple imposes contractual

9  restrictions that require app developers to use Apple for all payment processing services or be

10  excluded from the App Store. In contrast, Cydia does not require developers to use Cydia's payment

11  processing services, and Cydia has always offered to negotiate rates with developers and has offered

12  rates lower than 30%.

13      Although Apple has sought to stamp out competition from other app marketplaces like

14  Cydia, the market has shown continued demand for alternatives to the App Store. Hundreds of

15  thousands of users have continued to use Cydia in each of its iterations since Apple introduced the

16  App Store in 2008, even as Apple continued to impose more and more onerous restrictions on

17  competition.

18      Apple's anticompetitive conduct has thus caused significant harms to iOS users, app

19  developers, and competing app marketplaces and payment processors, including Cydia. Consumers

20  and developers pay higher fees, and competitors are foreclosed from nearly the entire market.

21      Apple was and remains able to inflict these continuing injuries on iOS users, app developers,

22  and competing app marketplaces and payment processors because Apple has monopoly power in

23  the U.S. market (or aftermarket) for iOS app distribution and iOS app payment processing. High

24  switching costs (*e.g.*, the cost of the mobile device and the user's familiarity with the operating

25  system and unwillingness to learn a new system, and low information on the device's total-life costs)

26  prevent iOS users from adopting other devices with different operating systems. Further, because

27  apps written for iOS are not compatible with other operating systems and apps written for other

28

JOINT AMENDED CASE MANAGEMENT STATEMENT
Case No. 20-cv-08733-YGR

1   operating systems are not compatible with iOS, iOS users are restricted to using iOS apps on their

2   iOS devices. Thus, iOS apps exist in an aftermarket for iOS apps.

3         App developers face similar barriers. App developers cannot sell their iOS apps for other

4   OSes, and they may not know how to code in the programming languages required to write apps for

5   another OS. Even those developers that do cannot constrain Apple's misbehavior by developing

6   apps for other OSes. Thus, other app distribution services for other OSes are not substitutes for iOS

7   app distribution services.

8         No procompetitive justification exists for Apple's monopolistic practices. Cydia's policies,

9   as well as the open nature of app distribution on other operating systems, show that Apple's rigid

10  price controls and exclusionary policies are unnecessary. Apple's practices not only raise prices and

11  fees, but they also stifle innovation. Many app developers likely decide that it is not worthwhile to

12  create new iOS apps when 30% of any profits must go to Apple, in addition to a $99 annual fee.

13  Further, because there is no competitive pressure on the App Store, there are no incentives for Apple

14  to innovate and increase benefits for consumers. But for Apple's restrictions, competing app

15  distributors like Cydia would provide customers and developers choices beyond the App Store and

16  would inject healthy competition into the currently stagnant market.

17        Cydia anticipates that the following factual issues, among others, will be disputed: (1)

18  whether iOS app distribution and iOS payment processing are relevant antitrust markets; (2) whether

19  Apple has market power in those markets; (3) whether Apple's conduct had (and has)

20  anticompetitive effects on competition, app developers, consumers, and competing app distributors

21  and payment processing providers like Cydia; (4) whether Apple's justifications for its conduct are

22  pretextual and/or can be achieved through less restrictive alternatives; and (5) to what extent Cydia

23  was damaged by Apple's anticompetitive conduct.

24        Apple's portions of this joint statement also indicate that it intends to tell a false story about

25  what Cydia was and why it ultimately shut its marketplace and payment processing doors. Contrary

26  to Apple's story, Cydia was a place for innovative apps; ones that Apple either rejected (because

27  they often competed with Apple's own apps) or which the app developers wanted to distribute

28  outside of the App Store due to Apple's unreasonable demands. Cydia also was secure and private,

1   run as it was by one of the world's foremost iOS developers. At the very end of 2018, as the result

2   of an exhaustive third-party analysis, a vulnerability was reported to Cydia that affected its payment

3   processing service. However, largely due to the technological restraints that Apple continued to

4   impose in ever-increasing, ever-more-restrictive ways in that time frame (which finally effectively

5   eliminated Cydia and competition with those updates in that time period), there was little incentive

6   to fix the issue (despite that the reporter who revealed the flaw provided a suggested fix), and instead

7   Cydia shut down that portion of its business.[1] Cydia then stumbled along for another year before

8   Apple's final killing blow occurred. Apple's contrary and misleading narrative about the nature of

9   the Cydia store and security issues is not based in fact.

10          Finally, it bears noting that Apple's statements throughout its Answer (ECF No. 82) and

11  below indicate that, as Cydia recently observed it would do (ECF No. 81)—and contrary to Apple's

12  claims that it had not yet developed its opinions on the subject (ECF No. 82)—Apple intends to (and

13  does, repeatedly) argue that the Court's ruling on the motion to dismiss means Cydia cannot prove

14  up the full extent of the continuing violation it alleges, including the but-for world extending back

15  to the time when Apple first began that comprehensive, continuing scheme. Instead, Apple contends

16  that Cydia is limited to proving only the 2018 and 2019 technological restraints the Court found

17  constitute new overt acts for the broader continuing violation Cydia alleges (ECF No. 80). Cydia

18  will address these arguments in the upcoming joint discovery letter on this issue, but it notes for

19  now that it believes Apple's positions would contradict decades of binding precedent in which a full

20  record of a continuing violation was presented to the court, notwithstanding a damages claims for

21  just four years preceding the complaint.

22          **Apple's Statement:**

23          Plaintiff, a self-described "computer hacker," is the proprietor of a defunct operation that

24  tried to distribute bootleg apps—often pirated versions of legitimate apps—on Apple's iOS platform

25  _____

26          [1] Contrary to Apple's statement below that a Reddit post regarding Cydia "laid no blame" on
    Apple's conduct, earlier in that same post, it states that "effectively no one is buying anything

27  anymore [on Cydia] (*for multiple, even numerous!, reasons*, with the result that no one is logged
    on)." *Infra* n. 2. The "numerous" reasons that Cydia no longer had customers clearly refers to

28  Apple's exclusionary conduct.

without Apple's permission and in a manner that jeopardized the consumers who did business with Plaintiff.  After operating this bootleg platform for over a decade, Plaintiff itself recognized in or around 2018 that its platform was exposing its own consumers' financial information to third parties, causing Plaintiff to shut down its commercial operations.  That should have been the end of the story.  But in December 2020, emboldened by lawsuits brought by other entities, Plaintiff opportunistically filed this lawsuit asserting all manner of claims primarily based on alleged harms to third parties based on theories tied to those third parties.  Virtually nothing in Plaintiff's allegations indicated that Apple's conduct with respect to Plaintiff itself ever varied from Apple's longstanding and unwavering decision to limit native app distribution on Apple's iOS platform to Apple's App Store.

For its part, the Court now has thrice rejected as time-barred the majority of Plaintiff's claims, including those based on Apple's agreements with consumers and developers.  *See* ECF No. 80.  In so holding, the Court noted both that: (1) Plaintiff, after two attempts, failed to plead any "new contractual requirements" that constituted a "new and independent act" within the limitations period, as required to state a timely claim; and, that (2) Apple's contracts with its developers and consumers was insufficient "to restart the statutory clock on the claims of [Plaintiff] a non-party to the contract."  *Id.* at 5.  The Court's Order permitted Plaintiff to proceed under only one theory pled in the First Amended Complaint—that the "new technological designs [implemented by Apple] between 2018 and 2021 . . . made it such that no iOS app distributor, including Cydia, could provide an app that was usable on iOS devices."  *Id.* at 4.  Yet Plaintiff's statement of the case ignores the Court's order and continues to assert numerous theories that the Court has dismissed as time-barred. In any event, Plaintiff's only surviving theory fails on the merits.

Apple is the creator of iPhone and iPad, devices that revolutionized the mobile computing industry.  In 2008, Apple launched the App Store, a curated platform where iPhone and iPad users can discover and download curated, safe, high-quality native apps.  Apple designs its devices— including the iPhone and iPad—and the Apple App Store—to safeguard the user experience. Consumers demand Apple's products because they are secure, reliable, and harness the very latest technologies, and because Apple is constantly developing and regularly releasing updates to the

software that runs on its devices to address, among other things, security vulnerabilities that bad actors try to create and exploit.  Apple's unwavering commitment to the safety, security, and reliability of its devices has yielded incredible success despite fierce competition from myriad competitors in many markets.  Since its creation, and as a direct result of Apple's efforts and investments, the App Store has grown into a diverse marketplace with a community of tens of millions of app developers worldwide, with roughly a billion consumers across 175 countries.

Plaintiff, on the other hand, is the proprietor of an unauthorized app store on the Internet that distributes the equivalent of bootleg native apps to Apple iOS devices by circumventing (and requiring iOS device users to circumvent) the security protections of iOS devices, thereby exposing these users to fraud, piracy, and malicious software.  In 2018, Plaintiff, by its own account, was forced to discontinue its service when a security researcher discovered and publicized a security vulnerability in Plaintiff's payment processing system.  At the time, Plaintiff acknowledged its own responsibility and laid no blame on Apple, explaining: "the bug was serious, and affected people actively logged in to Cydia: it is stupid of specifically me that I have made such a massive error in the Cydia Store backend . . . I have thereby gone ahead and shut down the ability to buy things in Cydia, effective immediately."[2]

But Plaintiff changed its story after it filed this lawsuit.  Plaintiff's original Complaint was primarily focused on App Store practices dating back to 2008—Apple's preinstallation of the App Store on iOS devices, requirement that native apps be downloaded on the App Store, and its contracts with developers and consumers.  *See, e.g.*, ECF No. 1 at ¶ 66.  When the Court dismissed these allegations as untimely, however, Plaintiff contrived an antitrust theory by misattributing the failure of its store to software updates that Apple made in 2018 and 2019—rather than the 2018 blunder for which Plaintiff itself had already publicly taken responsibility.

But the alleged conduct remaining in the case—Apple's unwavering efforts to update its iOS platform to protect against ongoing security and privacy threats—cannot support antitrust liability.

---

[2] https://www.reddit.com/r/jailbreak/comments/a5wfq9/news_andrew_wiik_recommend_that_everyone_removes/

The App Store is a key feature of an integrated iOS infrastructure that provides consumers the most secure, private, and trusted mobile computing device ever created. To achieve this, Apple implemented and maintains rigorous standards, including requiring that apps undergo an extensive vetting process before being approved for distribution; Apple preinstalls the App Store on iOS devices so it knows that iOS applications for Apple devices have gone through this detailed scrutiny; Apple has never allowed third parties to distribute native iOS applications for the iPhone through alternative app stores; and, critically, Apple makes continual technological updates to its iOS platforms to combat the efforts of bad actors who seek to exploit the platform to the detriment of consumer privacy and security.

Plaintiff has never been authorized by Apple to distribute native third-party applications on iOS devices, and therefore can only work on iOS devices that have been "jailbroken"—a process that modifies Apple's iOS operating system to enable the installation of unauthorized software, including applications from other interfaces.  Jailbreaking and other forms of hacking poses a significant threat to the promise of security, privacy, and trust that consumers associate with the Apple brand.  Indeed, a jailbroken device eliminates many, if not most, of the security protections that are a hallmark of Apple's devices and exposes users to hostile exploits of all kinds.  As Plaintiff knows, Apple's policies exist to protect the integrity of Apple devices for both consumers and developers.

At bottom, what remains of Plaintiff's lawsuit seeks to strip Apple of the discretion to protect the safety, security and privacy of its iOS platform, and instead supplant it with Plaintiff's (or any other third party's) judgment of what Apple should be allowed to do to keep its products safe and preferred by consumers.  But the technological updates that Apple implemented in 2018 and 2019 are indisputably pro-competitive, protect consumer safety, privacy, and security, and cannot form the basis of any antitrust claim.  And the demise of Plaintiff's business was caused, not by Apple's security updates, but by Plaintiff's own failure to provide a safe, private, and secure platform for its users.  Plaintiff is not entitled to either damages or injunctive relief.

**3.      LEGAL ISSUES**

This case raises the following legal issues, among others:

**Common Statement of Legal Issues:**

Whether Apple's conduct violates California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*

Whether any defenses raised by Apple preclude liability or recovery by Cydia on any or all of its claims.

**Cydia's Statement of Additional Legal Issues:**

Whether Apple's conduct with respect to the iOS app distribution market violates Section 1 and/or 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.

Whether Apple's conduct with respect to the iOS app payment processing market violates Sections 1 and/or 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.

**Apple's Statement of Additional Legal Issues:**

Whether Apple's technological updates in 2018 and 2019 with respect to its iOS platform violate Section 2 of the Sherman Act, 15 U.S.C. § 2.

**4.      MOTIONS**

On February 4, 2021, Apple moved to dismiss Cydia's Complaint. (ECF No. 35.) On January 5, 2022, the Court granted Apple's motion without prejudice and with leave to amend. (ECF No. 68.)

Cydia filed its First Amended Complaint on January 19, 2022. (ECF No. 72.) On February 2, 2022, Apple moved to dismiss Cydia's First Amended Complaint. (ECF No. 74.) On May 26, 2022, the Court issued an order granting in part and denying in part Apple's motion to dismiss. (ECF No. 80.)

On June 9, 2022, Cydia filed a Motion for Clarification and/or for Leave to Seek Reconsideration. (ECF No. 81.) The Court denied that motion on June 24, 2022 (ECF No. 84).

Apple intends to file a Motion for Summary Judgment on Plaintiff's remaining claims.

**5.      AMENDMENT OF PLEADINGS**

**Cydia's Statement:**

Discovery is just beginning and evidence uncovered during discovery may require amendments to the pleadings.  For example, Apple has served no discovery requests on Cydia, and

1   neither party has taken or noticed any depositions.

2   **Apple's Statement:**

3   Apple does not presently expect to add or dismiss any parties, claims, or defenses.  Apple

4   disagrees that discovery is just beginning.  Plaintiff has already amended its pleading based on

5   discovery it sought and received from Apple nearly 10 months ago, including millions of pages of

6   produced documents, written discovery responses, expert reports, and deposition transcripts.

7   **6.   EVIDENCE PRESERVATION**

8   The Parties confirm that they have reviewed the Guidelines Relating to the Discovery of

9   Electronically Stored Information and that they have met and conferred pursuant to Federal Rule of

10   Civil Procedure 26(f) regarding reasonable and proportionate steps taken to preserve evidence

11   relevant to the issues reasonably evident in this Action.

12   **7.   DISCLOSURES**

13   The Parties served their respective initial disclosures on April 12, 2021.

14   **8.   DISCOVERY**

15   **A.   Discovery to Date**

16   On May 5, 2021, the Parties entered into a stipulation regarding discovery (ECF No. 52),

17   which the Court approved on June 24, 2021 (ECF No. 54). Pursuant to that stipulation, Apple

18   produced to Cydia the documents that it previously produced in *Epic Games, Inc. v. Apple Inc.*, No.

19   4:20- CV-05640-YGR-TSH (N.D. Cal.); *In re Apple iPhone Antitrust Litig.*, No. 4:11-CV-06714-

20   YGR-TSH (N.D. Cal.); and *Cameron v. Apple Inc.*, No. 4:19-CV-03074-YGR-TSH (N.D. Cal.) (the

21   "Related Actions"). Apple also produced to Cydia its discovery responses and expert reports from

22   the Related Actions, as well as deposition transcripts of Apple's witnesses from the Related Actions.

23   The Parties agreed to hold all further discovery in abeyance pending a decision on Apple's motion

24   to dismiss.  No other discovery has yet taken place.

25   On June 27, 2022, Cydia served its First Set of Requests for Production and First Set of

26   Interrogatories to Apple.  Apple also expects to issue discovery requests shortly.

27

28

1

2

### B. Scope of Anticipated Discovery

**<u>Cydia's Statement:</u>**

3    Cydia anticipates additional discovery will be necessary regarding (1) Apple's technical and

4  contractual restrictions regarding iOS app distribution and iOS payment processing; (2) historical

5  and projected revenues, costs, and profitability for the App Store and iOS payment processing; (3)

6  the markets for iOS app distribution and iOS payment processing; (4) Apple's historical and current

7  policies, practices, and pricing for the App Store and iOS payment processing; (5) security measures,

8  threats, or past breaches concerning iOS devices, the App Store, iOS payment processing, and third

9  party payment processing; (6) Apple's practices regarding developers' use or request to use payment

10  processing methods other than Apple's; (7) Apple's practices and policies regarding termination of

11  developer accounts and/or developers' ability to distribute their apps (or updates to their apps)

12  through the App Store; (8) the effects of Apple's policies and practices on competition, innovation,

13  app developers, consumers, app distributors, and payment processing providers; and (9) any

14  purported procompetitive benefits and/or legitimate business justifications for Apple's conduct.

15    Cydia also anticipates seeking discovery from non-parties, including developers who have

16  dealt with Apple to distribute apps through the App Store, software distributors, app developers

17  affected by Apple's policies, and other alternative app distribution platforms.

18    Given Apple's response to Cydia's recent motion, as well as its Answer (ECF No. 82) and

19  statements throughout this joint statement, in which it contends that it need not respond to multiple

20  aspects of Cydia's complaint because they are supposedly time-barred, Cydia expects that a dispute

21  on multiple of the above areas of discovery will soon arise. In accordance with the Court's recent

22  Order (ECF No. 84), Cydia intends to address any such disputes via the procedures set forth under

23  the Court's and Magistrate Judge Hixson's individual procedures.

24    **<u>Apple's Statement:</u>**

25    Apple expects to take discovery from Plaintiff regarding, *inter alia*, (1) Plaintiff's policies,

26  practices, and pricing for its operations; (2) actual or perceived threats to privacy, security, and

27  safety implicated by Plaintiff's operations; (3) the measures Plaintiff took or considered taking to

28  counteract such threats to privacy, security, and safety implicated by its operations; (4) the risks and

1  impact to Plaintiff's customers and developers of such threats; (5) the impact, if any, on Plaintiff's

2  operations by Apple's technological updates to its iOS platform; (6) the history of Plaintiff's

3  operations, including when it stopped operating and the reasons why it stopped operating; (7)

4  Plaintiff's historical and projected revenues, costs, and profitability.

5        Apple expects to take discovery from non-parties with respect to the security threats exposed

6  by Plaintiff's operations and the impact of Apple's efforts to maintain the security, privacy and

7  safety of its iOS devices.

8        Apple believes that the Court's May 26, 2022 Order on Apple's Motion to Dismiss the First

9  Amended Complaint, which dismissed as untimely Plaintiff's "tying and/or exclusive dealing

10  agreements category of allegations"—in particular those based on Apple's contractual agreements

11  with developers and consumers (ECF No. 80 at 5-6)—should inform the scope of discovery.  Apple

12  will assess Plaintiff's discovery on its merits when it is served and, if a dispute arises, Apple will

13  meet and confer with Plaintiff to resolve it as required by the Court's standing order and reaffirmed

14  by the Court in its June 24, 2022 Order denying Plaintiff's Motion for Clarification. Apple disagrees

15  with Plaintiff's statement regarding its anticipated scope of discovery, which wholly ignores the

16  ramifications of the Court's Motion to Dismiss Order (ECF No. 80) and suggests that Order has no

17  effect on discovery whatsoever.

18        **C.      Proposed Limitations or Modifications to the Discovery Rules**

19        *Related Cases.* The Parties have agreed to engage in reasonable efforts to coordinate

20  discovery, including stipulating to the Court's Order Regarding Coordination of Discovery in *In re*

21  *Apple iPhone Litigation*, No. 4:19-cv-03074-YGR, ECF No. 79 (N.D. Cal. Jan. 2, 2020). The Parties

22  agree that they should seek to achieve the maximum coordination of document and other discovery

23  among the related cases where reasonably practical.

24        *Depositions*. Cydia believes that relief from the limitation on the number of depositions set

25  forth in Federal Rule of Civil Procedure 30(a)(2) is necessary and appropriate, but believes it is

26  premature to set a precise limit on the number of depositions at this time. Apple believes that it is

27  too early to tell if any relief from Rule 30(a)(2) is necessary.

28

*Document Subpoenas to Non-Parties.* With respect to non-party subpoenas issued pursuant to Federal Rule of Civil Procedure 45, the Parties agree that the issuing Party shall request that non-parties simultaneously produce materials to both Parties. If, notwithstanding such request, the non-party does not produce the materials to both sides, the issuing Party shall provide a copy of all materials to the other Party within three calendar days after receipt of the materials from the non-party.

*Authenticity Presumptions.* The Parties agree that all documents produced by either Party or by non-parties from the non-parties' files shall be presumed to be authentic within the meaning of Federal Rule of Evidence 901. If a Party serves a specific good faith written objection to the authenticity of a particular document, the presumption of authenticity will no longer apply to that document. Any objection to a document's authenticity must be provided with (or prior to) the exchange of objections to trial exhibits. The Parties will promptly meet and confer to attempt to resolve any such objection.

*Service.* Service of any documents not filed via ECF, including pleadings, discovery requests, subpoenas for testimony or documents, and expert disclosure shall be by email to all attorneys for the receiving Party then appearing on the ECF docket, at the email addresses listed thereon. In the event the volume of served materials is too large for email and requires electronic data transfer by file transfer protocol or a similar technology, or overnight delivery, the serving Party will telephone or email the other side when the materials are sent to provide notice that the materials are being served. For purposes of calculating discovery response times under the Federal Rules of Civil Procedure, electronic delivery shall be treated the same as hand delivery.

**D.      Stipulated E-Discovery Order**

The Parties filed a Stipulated Electronically Stored Information (ESI) [Proposed] Order on March 29, 2021 (ECF No. 46), and the Court entered the order on April 12, 2021 (ECF No. 48).

**E.      Current Discovery Disputes**

**<u>Cydia's Statement</u>:**

Cydia expects, based on Apple's positions in its Answer and this Case Management Statement, that the discovery requests it served on June 27, 2022 will result in a discovery dispute

regarding the scope of permissible discovery (*i.e.*, discovery into Apple's historical and continuing practices that are part of Cydia's alleged continuing anticompetitive scheme, which resulted in Cydia's full exclusion only within four years of the initial complaint in this lawsuit).

**Apple's Statement:**

There are no current discovery disputes.

**9.    RELATED CASES**

Per the Court's January 8, 2021 Order (ECF No. 31), this litigation has one related case: *In re Apple iPhone Antitrust Litigation*, No. 4:11-CV-06714-YGR-TSH (N.D. Cal.).  And, although they have not been formally related to this case, Apple has also produced to Cydia documents, discovery responses, expert reports, and deposition transcripts from the Related Actions.

The Parties reserve their rights with respect to any potential motion to relate additional actions to the above-captioned action.

**10.    RELIEF**

**Cydia's Statement:**

Cydia seeks damages (including treble damages) for harm caused by Apple's conduct as well as injunctive and equitable relief, including that the Court: (1) issue an injunction prohibiting Apple's anticompetitive conduct described in the Complaint and mandating that Apple take all necessary steps to cease its unlawful conduct and restore competition; (2) issue a declaration that the restraints described in the Complaint are unlawful and unenforceable; (3) award any other equitable relief necessary to prevent and remedy Apple's anticompetitive conduct; and (4) grant any other relief the Court deems just and proper.

**Apple's Statement:**

Apple denies that Plaintiff is entitled to the relief sought in the Complaint or to any relief whatsoever. Because Plaintiff has not sought public injunctive relief on behalf of the general public and has not pursued any claims on behalf of a putative class, it is barred from obtaining representative relief on behalf of others pursuant to California law. See Cal. Bus. & Prof. Code § 17535; Cal. Civ. Code § 382.

**11.    SETTLEMENT & ADR**

At this time, the Parties do not believe that settlement is likely. The Parties have met and conferred regarding ADR and determined that ADR would not assist in resolving the case at this time, although they remain open to conducting ADR if circumstances warrant doing so in the future. On February 23, 2021, the Parties filed their respective ADR Certifications.

**12.    CONSENT TO MAGISTRATE JUDGE FOR ALL PURPOSES**

On April 12, 2021, the Court referred this matter to Magistrate Judge Thomas Hixson for all discovery matters.  (ECF No. 47.)

**13.    OTHER REFERENCES**

The Parties agree that this case is not suitable for reference to binding arbitration, a special master, or the Judicial Panel on Multidistrict Litigation.

**14.    NARROWING OF ISSUES**

The Parties do not see areas in which the issues can be narrowed at this time, but if the case proceeds, the issues may be narrowed as the case progresses and as additional facts emerge through discovery.

**15.    EXPEDITED TRIAL PROCEDURE**

The Parties agree that this case is not suitable for handling under the Expedited Trial Procedure of General Order No. 64.

**16.    SCHEDULING**

**Cydia's Statement:**

Cydia proposes the following schedule. Contrary to Apple's positions stated below, the scope of discovery remains broad in this case—an issue that, as directed (ECF No. 84), Cydia expects it will need to address shortly via the Court's discovery disputes procedures. Although Apple produced materials from the Related Actions, the parties also agreed that they would be able to engage in additional discovery following the Court's decision on the motion to dismiss. Cydia's proposed schedule permits the parties adequate time to conduct that discovery.

Another benefit of the below schedule is practical in nature, in that it permits more time for the Ninth Circuit to hand down its decision in the *Epic Games v. Apple* appeal, which will likely

1    provide useful insights for discovery, as well more general guidance for both the parties and the

2    Court, given its overlapping nature with this case. This is not a request to "suspend" the schedule

3    until that decision, as Apple contends below, but a practical suggestion to provide enough time in

4    the schedule to maximize the chance that the decision comes down at a point when both parties may

5    still address it in their respective discovery efforts. Furthermore, although Apple contends that the

6    issues in *Epic Games* are "largely independent" of the issues here, Apple does not argue that it will

7    not rely upon that decision, which is revealing.[3]

8         Finally, Apple knows that Cydia's counsel is currently scheduled for trial in February 2024

9    against a different Gibson Dunn team defending Apple in a different antitrust case before Judge

10   White of this Court, *see AliveCor, Inc. v. Apple Inc.*, No. 21-cv-03958-JSW, ECF No. 58 (N.D.

11   Cal.). Its proposal for a trial that same month in this case therefore seems designed to unfairly

12   disadvantage Cydia.

| **Event** | **Proposed Deadline** |
|---|---|
| Non-Expert Discovery Cutoff | June 30, 2023 |
| Opening Expert Reports Due | August 17, 2023 |
| Rebuttal Expert Reports Due | September 29, 2023 |
| Expert Discovery Cutoff | October 31, 2023 |
| Dispositive Motions and *Daubert* Motions Due | December 15, 2023 |
| Dispositive Motions and *Daubert* Oppositions Due | January 16, 2023 |
| Dispositive Motions and *Daubert* Replies Due | February 16, 2023 |
| Hearing on Dispositive Motions and *Daubert* Motions | At the Court's convenience |
| Pretrial Conference | June 11, 2024 |
| Trial | June 24, 2024 |

---

[3]    Also absent from Apple's statement below is that it has told the Ninth Circuit it cannot argue the appeal in any of October, November, *or* December of this year, a position that Epic has noted unnecessarily delays resolution of that case. *See Epic Games, Inc. v. Apple Inc.*, No. 21-16506, ECF Nos. 180-182.

**Apple's Statement**:

Given the Court's narrowing of Plaintiff's asserted theories, and that Apple produced to Plaintiff millions of pages of documents, written discovery responses, expert reports, and deposition transcripts from the Related Cases nearly 10 months ago, Apple believes that the remaining discovery in this case should be focused and efficient.  Apple therefore submits that a discovery cutoff date in February 2023 is appropriate and would provide the Parties ample opportunity to take additional discovery over the next eight months.

Apple disagrees that the schedule in this case should be suspended pending the appeal in *Epic Games v. Apple*.  Neither the Parties nor the Court can divine when an appellate decision will issue, and despite Plaintiff's attempts to parrot in this case the claims asserted against Apple by Epic, the theories that remain in this case are largely independent of that appeal.

Contrary to Plaintiff's accusations, Apple prepared its proposed schedule based on what it believes is an appropriate timeline for litigating this case, and not based on the current schedules set in other litigations involving the same two large law firms.  Plaintiff's suggestion that Apple's proposed schedule is "designed to unfairly disadvantage Cydia" rings hollow when Plaintiff is represented by a firm whose tagline is:  "the largest law firm in the world devoted solely to business litigation and arbitration."  Moreover, the proposed schedule would equally impact counsel for Apple and for Plaintiff, given that both are involved in the two trials.  There is no prejudice created here.

| **Event** | **Proposed Deadline** |
|---|---|
| Non-Expert Discovery Cutoff | February 17, 2023 |
| Opening Expert Reports Due | March 31, 2023 |
| Rebuttal Expert Reports Due | May 12, 2023 |
| Expert Discovery Cutoff | June 9, 2023 |
| Dispositive Motions and *Daubert* Motions Due | July 21, 2023 |
| Dispositive Motions and *Daubert* Oppositions Due | August 21, 2023 |
| Dispositive Motions and *Daubert* Replies Due | September 11, 2023 |

| **Event** | **Proposed Deadline** |
|---|---|
| Hearing on Dispositive Motions and *Daubert* Motions | At the Court's convenience |
| Pretrial Conference | January 22, 2024 |
| Trial | February 5, 2024 |

**17.    TRIAL**

The case will be tried before a jury for all issues triable by a jury. At this time, the Parties are unable to estimate the length of trial.

**18.    DISCLOSURE OF NON-PARTY INTERESTED ENTITIES OR PERSONS**

Pursuant to Civil Local Rule 3-15, Cydia filed its Certification of Interested Entities or Persons (ECF No. 4), which discloses that as of the date of filing, Cydia has no parent corporation and no corporation owns more than 10% of Cydia, and that, other than the named parties and Jay Freeman, there is no other person, firm, partnership, corporation, or other entity known by Cydia to have either: (i) a financial interest in the subject matter in controversy or in a party to the proceeding; or (ii) any other kind of interest that could be substantially affected by the outcome of the proceeding.

Apple filed its Certification of Interested Entities or Persons pursuant to Rule 3-15. (ECF No. 19.) Apple is aware of no other interested parties other than those named.

**19.    PROFESSIONAL CONDUCT**

The Parties confirm that all attorneys of record for the Parties have reviewed the Guidelines for Professional Conduct for the Northern District of California.

1     Dated: July 5, 2022              Respectfully submitted,

2                               */s/ Adam B. Wolfson*

                              QUINN, EMANUEL, URQUHART & SULLIVAN, LLP

3                               Adam B. Wolfson (Bar No. 262125)

                              Joseph Sarles (Bar No. 254750)

4                               865 South Figueroa Street, 10th Floor

                              Los Angeles, CA 90017-2543

5                               (213) 443-3000

6                               Stephen A. Swedlow (*pro hac vice*)

                              David A. Nelson (*pro hac vice*)

7                               Marc L. Kaplan (*pro hac vice*)

                              191 N. Wacker Drive, Suite 2700

8                               Chicago, IL 60606-1881

                              (312) 705-7400

9

10                               *Attorneys for SaurikIT, LLC*

11                               GIBSON, DUNN & CRUTCHER LLP

                              JAY P. SRINIVASAN, SBN 181471

12                               jsrinivasan@gibsondunn.com

                              333 South Grand Avenue

13                               Los Angeles, CA 90071-3197

                              Telephone: 213.229.7000

14                               Facsimile: 213.229.7520

15                               BETTY X. YANG (Texas Bar No. 24088690; pro hac

                              vice)

16                               byang@gibsondunn.com

                              2100 McKinney Avenue, Suite 1100

17                               Dallas, TX 75201-6912

                              Telephone: 214.698.3100

18                               Facsimile: 214.571.2900

19                               HENRY H. CORNILLIE, SBN 324821

                              hcornillie@gibsondunn.com

20                               555 Mission Street, Suite 3000

                              San Francisco, CA 94105-0921

21                               Telephone: 415.393.8200

                              Facsimile: 415.393.8306

22

23                               *Counsel for Defendant Apple Inc.*

24

25

26

27

28

## <u>DECLARATION REGARDING CONCURRENCE</u>

I, Adam B. Wolfson, am the ECF user whose identification and password are being used to file this JOINT AMENDED CASE MANAGEMENT STATEMENT.  In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that all of the signatories listed above have concurred in this filing.


Dated:  July 5, 2022                                                  [FIRM THAT FILES]

                                                                     By:  */s/ Adam B. Wolfson*
                                                                          Adam B. Wolfson